Ekern, Appellant, vs. McGovern and others, Respondents.

*May 14—May 31, 1913.*

*Officers: Commissioner of insurance: Removal by governor: Forcible
    dispossession: Injunction: Equity: Jurisdiction: Co-ordinate de-
    partments of government: What acts reviewable by courts: De
    facto and de jure officers: Trying title: Determining entire con-
    troversy in injunction suit: Nature of right to office: Property
    rights: "Due process of law:" Notice and hearing: Ground of
    decision: Sufficiency: Quasi-judicial power: Duties of insurance
    commissioner: Prohibited activities: Statutes construed: "Polit-
    ical committee:" "Manager of political campaign."*

Plaintiff, while commissioner of insurance for a four-year term
    having three years to run, and prohibited by statute from
    "serving on or under any political committee or as manager of
    any political campaign for any party or candidate," was
    charged before the governor with violation of such duty in re-
    moval proceedings under sec. 970 of the Statutes. Upon notice
    of less than one hour a hearing was had. Under protest of un-
    fairness as to notice, time of, and conduct of the hearing, that
    there was no proof of any breach of duty, and that witnesses
    were present to testify in the commissioner's favor on the
    subject, the governor—suggesting undisclosed personal infor-
    mation and that haste was required in order to close the matter
    in the few moments to elapse before commencement of the
    legislative session which would suspend the removal power—
    summarily closed the hearing, entered an order of removal, and
    appointed a successor. Possession by the appointee having been
    refused, the governor, through his agents, sought to place him
    in possession of the office quarters and accessories by force.
    This action was commenced to prevent it, a temporary injunc-
    tion being granted, presently terminating the existing violent
    efforts. Later the trial court refused to continue the restraint
    except to enable plaintiff to remove the cause to this court.
    Upon its so reaching, an armistice was agreed upon pending
    the decision.

*Held:* The following principles of law are applicable and rule the
    case:

1. As to mere error of judgment on the part of the governor in the
    exercise of his lawful authority, his acts are not reviewable by
    the court. Within his jurisdiction both he and those who act
    by his direction are immune from judicial remedies.

2. The governor, jurisdictionally, has competency to remove the
    commissioner of insurance from office.

3. The power of removal does not include, or have incidental thereto,
    power to forcibly install a successor.

4. In an action by one in possession of an office to prevent an adverse claimant or those acting in his support from gaining possession by violence, it is competent to determine whether such person is, *de facto*, the officer he claims to be.

5. An action in equity will not lie for the primary purpose of trying the title to an office, that being, as primary matter, a subject for legal relief.

6. The judicial power of circuit courts in the field of equity as regards injunctive authority, temporary or otherwise, is not solely referable to sec. 2744 of the Statutes. Such courts have all such authority possessed in chancery at common law and such in addition as the statute confers. *Trustees, etc. v. Hoessli*, 13 Wis. 348, 354; *Lutheran E. Church v. Gristgau*, 34 Wis. 328; and *DePauw v. Oxley*, 122 Wis. 656, affirmed. *Ward v. Sweeney*, 106 Wis. 44, criticised.

7. An officer *de facto*, in good faith claiming the right to possession of an office until the right *de jure* shall have been determined—if in imminent peril of forcible disturbance by an adverse claimant or those acting in his support—may maintain an action in equity to prevent such disturbance, and may and should have temporary injunctive protection pending determination of the right to permanent immunity from forcible dispossession.

8. An action in equity to try the title to an office is distinct from one under the foregoing rule. The former is equitable and permissible, the latter is legal and not permissible.

9. Sovereign authority, under our form of government, is in the people and exercisable through three major co-ordinate agency departments, viz.: executive, legislative, and judicial,—each being, within its particular jurisdiction, answerable only to the people, but subordinate outside thereof to the jurisdiction conferred by the people through constitutional mandate on its co-ordinate department.

10. When a judicial question arises it is within the competency of the judicial department to deal therewith, not stopping, necessarily, to consider who are the parties. It is not bound to desist because of the alleged wrongdoer being the governor or a person acting by his direction.

11. The doctrine that the court will not reach the governor in the performance of his duties, or any one acting under his direction and by his authority in respect to any matter, applies only to acts within the scope of executive authority; outside thereof the principle of equality before the law renders him and his agents liable to judicial remedies the same as any other person, except in so far as the dignity of the place should, and does,

protect him and them to some extent from coercive interference by judicial mandate.

12. On grounds of public policy the court will not act coercively as to the governor except in case of extreme urgency.

13. The public policy which protects the governor as a co-ordinate department of the government from being interfered with by judicial mandate except in dire emergency, does not apply with full force to subordinates acting by his authority.

14. The basic idea of the state constitution is that this "is a popular representative government, the officers being mere agents, not rulers of the people,—one where no man is so high as to be above the constitution and no one so low as to be beneath its protection."

15. Consistent with the stated basic principle, no one is necessarily immune from judicial remedies in case of having violated or being in an attitude of threatening to violate the rights of another.

16. A person who is in possession of an office by color of authority,— that is, having that appearance, in that he is performing the duties of the office and is being commonly recognized as entitled to do so,—is an officer *de facto* whether he has any valid title to the office or not.

17. "One who has the reputation of being the officer he assumes to be although he is not such in point of law," if he is in possession of an office, in good faith claiming to be entitled to perform its duties, is, subject to the exception noted in the next rule, an officer *de facto*.

18. A person in the good-faith possession of an office as stated in the foregoing rule, holding over after expiration of the term for which he was elected or appointed, is not a *de facto* officer so as to be entitled to equitable protection in his possession as against a person who shall have been, in due course, certified to have been elected or appointed his successor in the particular office and holds the evidence thereof showing *prima facie* title.

19. The principle of the foregoing exception to the general rule is that, in the particular circumstances stated, the evidence of the title *de jure* to the particular office for the particular term, afforded by the certificate, on grounds of public policy has provisionally the force of a judicial determination, leaving no room for a good-faith resistance thereto, other than by judicial remedies which a court of equity should take cognizance of. *State ex rel. Jones v. Oates*, 86 Wis. 634, limited.

20. The rule that an action in equity will not lie to determine the title to an office does not preclude the making of such determi-

nation in equity in case of that being incidental to some matter of primary right which is a proper subject for equitable interference and for which the court has taken jurisdiction and acquired jurisdiction of the parties.

21. In case of an action for equitable relief in the nature of protecting the right of a person in possession of an office from forcible interference until the title *de jure* shall have been judicially determined, and it appearing that such title must be determined before the entire controversy between the parties can be set at rest, and as matter of fact the title may as well or better be settled in the pending action as in another commenced for legal relief, the court may and should proceed to settle the entire controversy.

22. The foregoing is within the equitable rule that where a court shall have obtained jurisdiction of the parties and of the subject matter for a proper purpose, it may proceed and determine the entire controversy connected with the primary ground for relief which the plaintiff has, or in planting his action in equity in good faith supposed he had.

23. An officer entitled to hold an office for a fixed term subject to removal only for cause is by common-law rules, unless the same shall have been abrogated by statute, entitled to protection against danger of unjust removal—being so entitled by due process of law, which excludes interference with personal or property rights except according to established principles of justice.

24. The established principles of justice, except as otherwise constitutionally provided by statute, secure to every person the right, before being condemned as to his person or his property, as to anything materially affecting his constitutional right to life, liberty, and the pursuit of happiness, to reasonable notice of a hearing in respect to the matter, reasonable notice of the charges against him, reasonable opportunity to be heard by himself, his witnesses, and his counsel, to know the opposing evidence and oppose it with evidence according to the principles of fair judicial investigation, and to have the final determination grounded on evidence in some reasonable view supporting it.

25. The right to an office, though not a vested property right, is property in that broad sense which includes everything of pecuniary value to its possessor; but, whether property in the broad sense or merely a privilege, it is within the protection of the foregoing rule and within the constitutional guaranty of the state constitution and the guaranties of due process of law and equal protection of the laws of the federal constitution.

*State ex rel. Starkweather v. Superior,* 90 Wis. 612, and *State ex rel. Wagner v. Dahl,* 140 Wis. 301, explained.

26. "Due process of law" means according to the law of the land— process according to the principles of natural justice, by the rules of the common law, except as constitutionally changed by statute.

27. If no proceeding is provided by statute for exercising a power of removal of an officer for cause, then the common-law method which accords hearing before condemnation is the guaranteed "due process of law." If such proceeding is provided, or the right of removal is by clear legislative intent exercisable at pleasure or in any particular prescribed method, then a proceeding in that manner is the "due process of law" so guaranteed.

28. In case of an express or inferred statutory right of removal for cause, of an officer holding for a fixed term, it is to be presumed to have been conferred to be exercised under the restrictions of "due process of law" in the common-law sense, unless the contrary expressly or by necessary implication appears to have been the legislative intent.

29. Under the foregoing rule the power of removal for cause established by "satisfactory proof" under sec. 970 of the Statutes is subject to the guaranty of "due process of law," requiring a hearing and determination according to the principles of natural justice.

30. For exercise of the power of removal under sec. 970 of the Statutes, in connection with sec. 1966y prescribing the duties of the commissioner of insurance, these things are essential:

    (1) Jurisdiction of the subject in general by assignment of a ground for removal within the specifications of the statute.

    (2) Jurisdiction of the particular subject matter by reasonable notice to the officer of the time and place of hearing and of the charges preferred against him.

    (3) Reasonable opportunity of the accused to defend against the case adverse to him in a manner "analogous in its most essential feature to a judicial hearing and investigation." *Larkin v. Noonan,* 19 Wis. 82, 88.

    (4) Fair judicial consideration of the evidence and determination thereon of the ultimate facts within the boundaries of reason.

31. While the power of removal of an officer for cause established by satisfactory proof is administrative in character, as distinguished from that judicial power lodged by the constitution only in courts, it includes that species of judicial power denominated *quasi*-judicial, and as to that element the result of

exercise of the power is reviewable by the court as to all matters of jurisdiction. *State ex rel. Starkweather v. Superior*, 90 Wis. 612, and *State ex rel. Wagner v. Dahl*, 140 Wis. 301, explained.

32. The terms "political committee" and "manager of a political campaign" in sec. 1966*y* of the Statutes, as regards the duties of the commissioner of insurance, have the same import as similar terms in the Corrupt Practices Act (sec. 94—1 to sec. 94—39, inclusive, of the Statutes).

33. The terms "political committee" and "manager of a political campaign," as used in the statutes, do not refer to mere efforts to assist, after election of members of the legislature shall have occurred, an aspirant for the position of speaker thereof to gain the position.

34. The terms "political committee" and "manager of a political campaign," as used in the statutes, refer to a committee for a political party or for a person, or manager of a political party or personal party campaign, such as would be required under the Corrupt Practices Act to file reports of expenses with the secretary of state.

35. Notice given one hour or so before the time set for a hearing in removal proceedings under sec. 970 of the Statutes, of the fact that such hearing will occur, is not reasonable. Neither is closing of such a hearing without affording opportunity for the person accused to present the evidence of his witnesses, and without according to him reasonable opportunity to testify fully and to be heard by counsel, and without affording him knowledge of all the evidence to be considered against him and fair opportunity to oppose the same with evidence,—reasonable.

[Syllabus by MARSHALL, J.]

APPEAL from an order of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Reversed.*

Action for equitable relief respecting forcible disturbance of the plaintiff in the possession of the office of insurance commissioner.

The case, as primary matter, involved the right of peaceable possession by the plaintiff of the office of insurance commissioner pending determination of the validity of removal proceedings whereby he had been, in form, removed from the office.

. The facts being regarded in some particulars as peculiar and without precedent, and also to some degree the propositions of law urged upon the court in support of the judgment, the history of the entire matter as closed by the judgment complained of is given below in its logical order.

*Circumstances leading up to the removal proceedings.*

In January, 1913, appellant was in possession of the office of commissioner of insurance under sec. 1966y, Stats., his term having some three years to run. The office, aside from some constitutional positions, is one of the most important in the administration of the government. The legislature so created it as to secure good expert ability for the place by attaching thereto a salary incident of $5,000 per year, requiring of the appointee special knowledge of all subjects within the broad scope of the proposed administration, creating disability of the incumbent during his term of office for holding any other official position of any kind, requiring him to devote his entire time to his official duties, and prohibiting him from holding any position of trust or profit, public or private, or engaging in any occupation or business interfering with or inconsistent with his duties, or serving on or under any political committee or as manager of any political campaign for any candidate or party. It was made a place of much honor and power,—subordinate in a sense to that of the governor,—but power greater by far than was ever before given in this state to an appointive officer. It took the place of a somewhat similar but much inferior elective office which for years had been classed, in practical effect, with constitutional state officers. It was made greater than any of them with the exception of the office of governor and that of members of this court, as regards the interests of the people to be conserved. It was made appointive by the governor by and with the advice and consent of the senate—as an assurance

that the legislative conception of fitness for the place would
be most certainly satisfied,—with power to the executive to
fill any vacancy occurring, for the unexpired term, subject to
confirmation by the senate—the appointment, in any case, to
be in force until acted upon by the senate.   No specific pro-
vision was made for removal for any cause.

To fill the place the governor appointed appellant, as sat-
isfying the calls of the statute.   His fitness was so well
known that, doubtless, the legislature expected such an event
would occur when the system was adopted.   Whatever pro-
vision exists for exercising executive power to remove an in-
cumbent of the office, is found in sec. 970, Stats., providing
that any officer of the class to which the particular one be-
longed "who are or shall be appointed by the governor by and
with the advice of the senate or by the legislature with the
concurrence of the governor may, for official misconduct,
habitual or wilful neglect of duty, be removed by the gov-
ernor *upon satisfactory proof,* at any time during the recess
of the legislature."

Leading up to the legislative session in 1913, there was
much factional strife among those who, generally speaking,
were opposed to the Democratic party; culminating in mem-
bers of one faction, made up of persons antagonistic to their
former associates in the Republican party, canvassing to ef-
fect selection of a speaker of the house who would be, as near
as practicable, in harmony with their views.   There were
several candidates for the place, the contest being substan-
tially factional.   The governor was regarded as in harmony
with the movement which aroused the particular strife.
Members of the opposition as to such faction canvassed to
secure a speaker in harmony with their choice.   Appellant
made publicly known his preference.   It was antagonistic to
the faction supposed to represent the governor.   In that situ-
ation the latter, on the day before the legislature was to con-

vene, caused charges to be preferred by one of his office force against appellant, looking to his removal from office.    These are the charges:

"Deponent . . . charges, upon information and belief, that *Herman L. Ekern* is guilty of official misconduct and wilful neglect of duty as commissioner of insurance in this, that, on and between the first day of January, A. D. 1913, and the seventh day of January, A. D. 1913, both inclusive, at the city of Madison, Dane county, Wisconsin, the said *Herman L. Ekern* did serve as and under the political committee and as manager of the political campaign for one L. L. Johnson who was then and there a candidate for the office of speaker of the assembly of the state of Wisconsin, contrary to the provisions of section 1966*y* of the Statutes."

*Mr. Ekern* was served with notice of the charges having been filed about 9 o'clock in the forenoon on the following day, and that at such time, at the executive office, a hearing would be had in respect thereto, and that he should appear at that time.

<i>Proceedings on the hearing.</i>

*Mr. Ekern,* at the time stated in the notice for the hearing, appeared at the governor's office with Aylward and Olbrich, his attorneys.    We will not attempt to give anything like a verbatim statement of what was said and of all acts done during the hearing.    It will be sufficient to give the same in substance so as to show, clearly, the circumstances affecting the rights of the parties.

*Mr. Aylward:* I object to these proceedings because sec. 970 of the Statutes confers authority in such matters only when the legislature is not in session.    That includes the whole of today, though the legislature does not convene until 12 o'clock noon.

*Governor:* The objection is overruled.

*Mr. Aylward:* I call attention that the notice and charges were served but a few moments before the time for appear-

ance; that up to now *Mr. Ekern* has not been allowed any time to obtain counsel and prepare for the hearing; that inasmuch as the charges were procured to be filed by the one who is to sit in judgment, and the subject to be dealt with is in reality a co-ordinate branch of the government and that the matter is very serious, in view of the near approach of the legislative session, requiring special attention of the commissioner to important matters to come before it, forcing upon him such a speedy hearing is unjust; and that some reasonable time is necessary to advise with counsel and prepare to present the defense. I request such time to be granted in the interests of the accused, the people of the state, and the executive himself.

*Governor:* The application is denied. I do not agree with counsel as to the law. The proceeding will go on to a conclusion before 12 o'clock noon, the time for the legislature to convene.

*Mr. Aylward:* I am here to protect my client's interests. We are in court, are we not? I presume, whether the hearing is concluded by the time stated will depend upon whether the testimony is closed by that time or not.

*Governor:* I will hear no more argument on this now. If you think you are going to protract this hearing—

*Mr. Aylward:* For the purpose of preserving a record I wish it to appear that the governor's stenographer is taking down what occurs. May we not present our testimony?

*Governor:* I have ruled and you will desist from argument on the subject.

*Mr. Aylward:* I will take such course as I may think ought to be taken before an impartial judge and to protect my rights as a lawyer.

*Governor:* I am governor, acting as a judge, and will not allow these proceedings to be unduly protracted.

*Mr. Aylward:* May we have the usual privilege of filing an answer?

*Governor:* You may dictate your answer into the record, but there must be no attempt to fritter away the forenoon.

*Mr. Aylward:* May I have a few moments to confer with our client?

*Governor:* Yes, sir.

After a brief conference, a verified answer on the part of *Mr. Ekern* was filed, putting in issue all of the allegations of the charges made against him.

*Mr. Aylward:* I request a reading of the record of the proceedings up to this time.

*Governor:* The request is denied.

Mr. Gifford having been called by the governor, Mr. Aylward interposed by insisting that *Mr. Ekern* had not yet been afforded any suitable time to prepare for the hearing, and protested against his being compelled to proceed without proper time to consult with his counsel, obtain his witnesses, and prepare to make his defense. The protest was overruled and the witness testified, in response to interrogatories propounded by the governor, substantially as follows: I am proprietor of the Avenue Hotel. On New Year's day about noon *Mr. Ekern* inquired, by telephone, about two rooms on the first floor of the hotel, as he wanted them for January 6th and 7th. He did not say anything about the purpose. On the following Monday he called and informed me that the rooms were for Mr. Johnson. Johnson was a candidate for speaker. They were held for him for the two days. The furniture was not changed, except a few additional chairs were supplied at *Mr. Ekern's* suggestion. Johnson was not present during my conversation with *Ekern.* The rooms were in use Monday and Tuesday as Mr. Johnson's headquarters. I do not know of any one being in the rooms during that time except Mr. Johnson. After the conversation with *Ekern* I did not see him until this morning. The rooms are closed but have not been paid for. They were closed last night by Mr. Johnson's orders.

In response to interrogatories propounded by Mr. Aylward, Mr. Gifford said: I did not know I would be needed as a witness until called to testify. The governor requested me to call last Monday in respect to the matter. *Mr. Ekern* only asked if the rooms were engaged, and, upon being informed they were not, he said to hold them. He had used them before as headquarters. He made no suggestion about them thereafter except what I have stated. Johnson took the rooms. He made the necessary arrangements. No one used the rooms but him to my knowledge. *Ekern* made no suggestion as to being chairman of any political committee or manager of any political campaign or party. I supposed he engaged the rooms for some other person. He did not mention Johnson's candidacy. Johnson did not have any committee, so far as I know, nor any manager. I made no charge for the rooms against *Mr. Ekern.* I think he stepped into the hotel for just a minute Monday night. When he asked for the rooms he did not say they were for a headquarters. They have been so used many times.

Mr. Wilbur, in response to the governor's questions, testified substantially as follows: I am clerk in this office. This was said in my presence between you and *Mr. Ekern.* He said Mr. Hull was hostile to him because he was supporting Johnson. That he had the caucus nomination to a certainty. You said, Is his hostility because of belief that you are supporting Johnson? *Ekern* replied in the affirmative. You inquired as to what the fact was. He answered that he favored Johnson and Dr. Goff. You inquired as to what there was in the rumor of his having engaged rooms for the political headquarters of Johnson. He replied that he had engaged the rooms. You inquired whether it was true that he had discussed the speakership matter with members of the legislature, stating that there was a contest between yourself and Senator La Follette, and that in the speakership contest

members must stand for or against the senator and for or against you, and that he represented those who were against you. He replied in the affirmative. You inquired as to whether he had stated to different members that you were not to have anything to do with the organization of the assembly. He replied in the affirmative. You then stated there was no fight or contest between yourself and the senator, save a fictitious contest used for political purposes by certain men for personal reasons. He replied that he was glad to hear that. You informed him that the statute prohibited the insurance commissioner from being politically active and insisted that he conform thereto; that he close the headquarters which he had opened and refrain from further participating in the speakership contest both on the surface and in fact. He replied that Johnson now had the headquarters and he did not know what Johnson would do about the matter. You replied that you were not asking what Johnson would do. You were simply insisting that that night he close the headquarters which he had opened; that there was but one governor in the state and his offices were in the east wing of the state capitol and not the north wing. Then *Mr. Ekern* got up and said he would endeavor to comply with your wishes, and the interview closed.

The witness testified in response to interrogatories by Mr. Aylward: I talked the matter over with the governor before making the charges. I made the charges on information and belief. I have other information than what has been testified to. In the charges I conformed to the wording of the statute. I do not know as to Johnson having a formally organized committee. He had one in the sense that he had men working together to promote his candidacy for speaker,— a political committee as generally understood. *Ekern* was the most active person. Assemblyman Holmes was also active. I do not know definitely as to any one else. They

were acting as a committee for Mr. Johnson as I understood it. I do not know that any statement was filed under the Corrupt Practices Act regarding Mr. Johnson's candidacy, and did not seek any information on that point before filing the charges. The activity I referred to in the charges referred to the actual handling of Johnson's campaign. His neglect of duty mentioned in the charges consisted of his supporting Johnson's candidacy and of campaigning in his interest. *Mr. Ekern* came to the governor's office in response to a telephone communication from the governor, transmitted by me at the governor's request. There was some conversation as regards Senator La Follette's attitude in the speakership contest, but the general talk was as to whether the senator was interfering presently. The question came up as to *Ekern* closing the headquarters which he had opened. He did not say that he had not opened the headquarters. When the closing of the headquarters was demanded, he said Johnson was now in charge and he was not able to say what Johnson would do. The governor demanded that he close the headquarters which he had admitted that he opened. When he referred to Johnson being now in charge the governor said he would have no splitting of hairs and that *Ekern* must close the headquarters and refrain from further participation in the speakership contest or there would be a new commissioner of insurance. *Ekern* said that if there had been any activity in the speakership contest on his part it was unintentional and he would refrain from anything further, and it was then that the governor assured him that there was but one governor in the state of Wisconsin and he was located in the east wing of the capitol.

*Mr. Ekern* testified in his own behalf, in effect as follows: I had no substantial opportunity to prepare for this hearing. Just time to call my attorneys by telephone and make my appearance. I have called some witnesses since we appeared

and made answer. I have had no opportunity to consult
with my counsel prior to appearing at the hearing nor with
any witnesses. It is necessary for a proper presentation of
my defense that I should have opportunity to consult with
counsel and to procure and consult with witnesses, and I pro-
test against the hearing in advance of such opportunity.
Mr. Johnson, in official work, has been much in my office.
I think he was there on New Year's day. I then talked with
Mr. Gifford over the telephone at Johnson's request in re-
spect to the rooms. I supposed I was doing an act of ordi-
nary courtesy. The next day Gifford asked me what was
wanted in the rooms and I replied, nothing special except,
possibly, some more chairs. I thought then that Johnson
would see him right away and paid no more attention to it.
Johnson and I went to the hotel for lunch on Monday, the
6th of January. Gifford was told that the rooms were for
Johnson. I never went near them nor had anything to do
with them, nor did I ever visit them while Johnson had them,
nor send any one there, nor assume any responsibility in re-
spect to them. Johnson did not have any political committee
to my knowledge or any campaign manager. I did not act
in regard to the matter, directly or indirectly. I spoke
favorably of Johnson for speaker and that I personally fa-
vored him and I spoke favorably of Dr. Goff. I asked
Mr. Richards to call on me, which he did, and we discussed
the speakership matter—I making known my position in re-
spect to it. I expressed the idea that Johnson was a strong
candidate and was likely to win. In talking with members
I referred to the general differences between the governor and
Senator La Follette, but that was not intended to influence
the speakership. It referred to a purely political contest
which had been on for some time. When I referred to the
subject of taking sides it had reference to the general con-
test, the general political situation. What I said to the mem-

bers of the legislature was not to influence them in favor of the man I wanted elected speaker. I had a broader purpose in mind. I may have mentioned the speakership matter in letters. I have not spoken to many people about Johnson's candidacy. I don't think I ever said that you [the governor] should have nothing to say in respect to who should be speaker. I claim I have a right to have my opinion, the same as any one else. I never thought expressing of an opinion was managing a political campaign. I helped draw the Corrupt Practices Act and we didn't understand it would work that way. I have not served on any political committee or as manager of the political campaign for Johnson or any other person. At the conversation I had with the governor, he asked me if I thought Johnson was going to be elected. I replied in the affirmative. He then asked about my running his quarters for him, which I denied. I told him about my connection with engaging rooms at the Avenue Hotel. I confessed freely that I favored Johnson and that I had said there was a fight on between him and La Follette. I also expressed the opinion that I did not think the governor ought to dictate in the speakership matter. He charged me with having violated the law and demanded that I close the Johnson headquarters, threatening that if I did not he would remove me from office.

*Governor:* Did you do anything about closing the headquarters?

*Ekern:* Have I done anything about closing the headquarters? As I said that night I had nothing to do with it.

*Governor:* You understood the question, don't repeat it.

*Ekern:* There was nothing for me to do about closing them.

*Governor:* The evidence is closed.

*Mr. Aylward:* I am not satisfied to have the evidence closed here at all.

*Mr. Ekern:* I appeal for fairness and justice. The gov-

ernor has just brought out the first part of the conversation. As the governor delivered his ultimatum, as it has been called, which ended our interview, I said you don't mean that. I have been scrupulous in observing the law and it is my intention to do so. I have complied with the strictest construction that any one has put upon it, and I propose to do that in the future, and from you, as governor, I am willing to accept the strictest construction that you can put upon it. I am willing to do everything that can be properly done.

*Governor:* I don't care to hear any more. I know what happened. It isn't as though you were talking to a man not present at the time.

*Mr. Ekern:* I said I would call Gifford on the telephone and tell him I had nothing to do with the rooms if that was what you wished and you said, No, that was not satisfactory, that I must go to the hotel and close the headquarters that night. I denied I opened the rooms but you insisted, in spite of that, upon my closing the Johnson headquarters.

*Governor:* I said, if Johnson is there you put him there. You opened those headquarters and you must close them. If someone else opened them I would ask him to close them. If it inconveniences Mr. Johnson I am sorry; but you must close the headquarters that you opened. I don't care to hear any more testimony or take any more time in this matter.

*Mr. Aylward:* I haven't finished *Mr. Ekern's* testimony and have present to testify, Assemblyman Johnson, Mr. Beedle, former insurance commissioner, and I want to also present the testimony of Lieut. Gov. Morris. I believe justice affords *Mr. Ekern* a right to have the testimony of his witnesses taken.

*Governor:* We would go into the matter more fully if there was time. We have heard all the testimony which time permits. It must be borne in mind I have personal knowledge which no testimony can modify concerning *Mr.*

*Ekern's* own admissions on the evening he was here as to his participation in the management of Mr. Johnson's campaign, and what he did in reference to it, so I shall find—

*Mr. Aylward:* Mr. Wilbur has testified to that conversation.

*Governor:* I was here myself and heard the conversation.

*Ekern:* You refuse to permit my recollection of that—

*Governor:* You have gone over the whole transaction. You were notified at the outset that the hearing would terminate before 12 o'clock. You were called at 11 o'clock. You have had more than three quarters of an hour to testify. I now terminate this hearing.

*Mr. Aylward:* One thing more, Governor, it won't take but a minute. The question is about *Mr. Ekern* being political manager for Mr. Johnson in the speakership contest. Mr. Johnson is present,—the one man above all others who would know.

*Judge Rosa:* My name has been brought into this and I think I ought to testify to what happened, from beginning to end.

*Governor:* You may testify if it will not take over five minutes.

*Judge Rosa:* It will take more than five minutes.

*Governor:* A more extended hearing is not allowed now. I would be glad to hear the rest of the testimony, but of course you don't know any more about it. I have ended the hearing.

*Mr. Aylward: Mr. Ekern* has only had three quarters of an hour in which to present evidence respecting the question of whether he shall be dismissed from office. I move that the complaint be dismissed because there is no evidence to sustain the charges.

*Governor:* The motion is denied.

*Mr. Aylward:* A person accused, after testimony has been offered, is entitled to be heard by counsel.

*Governor:* Desist from further argument. It is perfectly ·
apparent you are trying to protract the hearing till after
12 o'clock and I shall not permit it. I don't intend anything
to interfere. My decision is to sustain the charges—to find
*Mr. Ekern* guilty as charged and order his removal from of-
fice for the reason stated in the complaint and evidenced by
the proof submitted to me. I shall sign a written order to
this effect as soon as it can be prepared.

An order of removal was duly prepared and signed.

### *Subsequent proceedings resulting in the appeal.*

Defendant *Anderson* was appointed successor to appellant
and, having in form qualified for the place, demanded pos-
session of the office quarters, books, and papers, and the de-
mand was refused. Forcible compliance therewith, under or-
ders from the governor, being threatened and seeming to be
imminent, appellant caused his complaint to be prepared,
setting forth the facts aforesaid, his claim in good faith to
be the commissioner of insurance notwithstanding the re-
moval order, and that such order was made without authority
of law, and thereon applied for injunctive protection from
being forcibly interfered with in his possession. Under the
governor's orders, defendant *Essmann* attempted to forcibly
install *Anderson* in appellant's place. While *Mr. Essmann*
was in the act of beating down the office door for the purpose
of gaining entrance to the official rooms and expelling appel-
lant, and a serious breach of the peace to accomplish such re-
sult was impending, the temporary restraining order applied
for was granted and served. The efforts to obtain forcible
possession of the office thereupon ceased. Thereafter the
complaint was amended and supplementary affidavits were
filed which, in the whole, set forth the facts fully, from ap-
pellant's standpoint, and that continuance of the temporary
injunction was essential to prevent unlawful interference
with his possession, and on the whole record asked therefor,

continuing the injunction pending the final result of the litigation. Upon such record and numerous affidavits filed in defendant's behalf, not changing the appearance, materially, as to whether appellant was entitled to remain in the undisturbed possession of the office, and that forcible disturbance thereof could only be prevented by judicial authority, the case was submitted to the court, resulting in a decision thus:

The court will not assume jurisdiction to review the acts of a co-ordinate department of the government unless power to do so be clearly given by law.

If the governor was without power or duty to forcibly dispossess *Mr. Ekern* in the manner attempted, the court has power to enjoin such interference, regardless of the official status of the offender, but whether such power or duty exists need not be decided because of the conclusion on another point fatal to plaintiff's application for protection.

The court will not interfere to protect a person in possession of an office from being forcibly dispossessed by another having the *prima facie* right, unless such person is at least an officer *de facto*.

Whether *Mr. Ekern* has a *de facto* right to the office depends upon whether *Anderson* has the *de jure* right. The court cannot determine the former without determining the latter by passing upon the validity of the removal, so the rule that precludes trial of the title *de jure* in the equity action also precludes trial of the title *de facto*, as ruled in *Barendt v. McCarthy,* 160 Cal. 680, 118 Pac. 228.

It follows that this case is ruled by *Ward v. Sweeney,* 106 Wis. 44, 82 N. W. 169.

From the order thus entered the appeal was taken.

The cause was argued March 17, 1913.

*John A. Aylward* and *M. B. Olbrich,* for the appellant, argued, among other things:

I. It appearing from the undisputed facts and circumstances that no valid order of removal had been made, it was a clear abuse of discretion by the trial court to refuse to grant the injunction prayed for. *Ward v. Sweeney,* 106 Wis. 44, 55, 82 N. W. 169; *St. Hyacinth Cong. v. Borucki,* 141 Wis. 205, 124 N. W. 284; *State ex rel. Hayden v. Arnold,* 151 Wis. 19, 23, 138 N. W. 78. The appellant has a clear legal title to the office of commissioner of insurance because there has been no removal. (a) The order of removal was wholly void· upon its face for want of the great seal being affixed thereto in compliance with law. Sec. 4, art. XIII, Const.; ·sec. 98, Stats.; *State-ex rel. Miller v. Barber,* 4 Wyo. 409, 34 Pac. 1028, 27 L. R. A. 45; *State ex rel. Fleming v. Crawford,* 28 Fla. 441, 10 South. 118, 14 L. R. A. 253, 259; *Hamilton v. State,* 61 Md. 14, 27; *Marbury v. Madison,* 1 Cranch, 137; *Att'y Gen. ex rel. Rich v. Jochim,* 99 Mich. 358, 58 N. W. 611, 41 Am. St. Rep. 606, 23 L. R. A. 699; *Dolan v. Trelevan,* 31 Wis. 147; *Brown v. Cohn,* 85 Wis. 1, 54 N. W. 1101; *Oelbermann v. Ide,* 93 Wis. 669, 68 N. W. 393; *Marsh v. Nichols, S. & Co.* 128 U. S. 605, 9 Sup. Ct. 168; *Baxter v. State,* 15 Wis. ·488; *Smeltzer v. White,* 92 U. S. 390. (b) The cause of removal assigned was ·no offense under the statute, and the order was without jurisdiction. *State ex rel. Gill v. Watertown,* 9 Wis. 254; *State ex rel. Danforth v. Kuehn,* 34 Wis. 229; *State ex rel. Kennedy v. McGarry,* 21 Wis. 496; *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 64 N. W. 304; *State ex rel. Velie v. Morgan,* 130 Wis. 293, 295, 296, 110 N. W. 245; *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 122 N. W. 748; sub. 1, 2, sec. 1966*y,* Stats.; sec. 970, Stats. A member of the assembly desiring or seeking to be chosen as speaker of the assembly, although he may have friends or members interested or working in his behalf, is not, under the election laws and Corrupt Practices Act of this state, "a candidate." He is

not carrying on a "political campaign" and those interested in his behalf are not serving on or under a "political committee" or as "manager of a political campaign" for any candidate or party. The choosing or selecting of the officers of the assembly is not an election, but an appointment. Const. art. IV, sec. 9; art. XIII, secs. 6, 9; *Tenney v. State,* 27 Wis. 387, 392; Const. art. III, secs. 1, 3; *State ex rel. Wood v. Baker,* 38 Wis. 71, 86; *Conger v. Gilmer,* 32 Cal. 75; *State Board v. Ballinger,* 138 App. Div. 12, 122 N. Y. Supp. 651; 3 Words & Phrases, 2330, 2332, 2333. The primary and election laws and the Corrupt Practices Act, except as otherwise specified, relate only to elective offices. The terms "political campaign," "political committees," and "candidates" relate only to work incident to the filling of elective offices and other matters submitted to popular vote. (c) The statutes having provided that the removal may be made "by the governor upon satisfactory proof," this court will examine the record to ascertain if the removal was arbitrarily made or if there was a clear case of abuse in making the removal. *State ex rel. Danforth v. Kuehn,* 34 Wis. 229; *State ex rel. Willis v. Prince,* 45 Wis. 610; *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 622, 64 N. W. 304; *State ex rel. Coffey v. Chittenden,* 112 Wis. 569, 88 N. W. 587; *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 122 N. W. 748. The record of removal as made by the governor shows that he acted in a wholly arbitrary manner and in total want of good faith.

II. If the court will not terminate the controversy it should preserve the *status quo.* Equity will preserve the *status quo* by enjoining interference with the possession of the office by the *de facto* officer actually in discharge of the duties of the office. 2 High, Injunctions (3d ed.) § 1315; *Stenglein v. Beach,* 128 Mich. 440, 87 N. W. 449; *School Dist. v. Weise,* 77 Minn. 167, 79 N. W. 668; *Palmer v. Foley,* 45 How. Pr. 110; *State v. Superior Court,* 17 Wash.

12, 48 Pac. 741; 22 Cyc. 887; *Neeland v. State,* 39 Kan. 154, 18 Pac. 165; *Huntington v. Cast,* 149 Ind. 255, 48 N. E. 1025; *Parsons v. Durand,* 150 Ind. 203, 49 N. E. 1047; *Landes v. Walls,* 160 Ind. 216, 66 N. E. 679; *Guillotte v. Poincy,* 41 La. Ann. 333, 6 South. 507, 5 L. R. A. 403; *State v. Alexander,* 107 Iowa, 177, 77 N. W. 841; *Reemilin v. Mosby,* 47 Ohio St. 570, 26 N. E. 717; *Appeal of Town Council* (Pa.) 15 Atl. 730; *Kerr v. Trego,* 47 Pa. St. 292; *Jackson v. Powell,* 119 La. 882, 44 South. 689; *Lucas v. Futrall,* 84 Ark. 540, 106 S. W. 667; *Seneca Nation v. Jimeson,* 62 Misc. 91, 114 N. Y. Supp. 401; *Davies v. State,* 30 Ohio Cir. Ct. Rep. 527; *Hardy v. Reamer,* 84 S. C. 487, 66 S. E. 678; *Casey v. Bryce,* 173 Ala. 129, 55 South. 810; *Hollar v. Cornett,* 144 Ky. 420, 138 S. W. 298; *Barendt v. McCarthy,* 160 Cal. 68, 118 Pac. 228; *Hotchkiss v. Keck,* 86 Neb. 322, 125 N. W. 509. · In the instant case the plaintiff is in possession. His term of office has not expired by lapse of time. Under the law and the certificate of appointment which he holds he has yet two years to serve, and it is presumed that he is still entitled to the office. *Rochester & G. V. R. Co. v. Clarke Nat. Bank,* 60 Barb. 234, 249; ·9 Ency. of Ev. 914; *Kinyon v. Duchene,* 21 Mich. 498; *Norris v. State,* 22 Ark. 524; *Kaufman v. Stone,* 25 Ark. 336; *Sawyer v. Knowles,* 33 Me. 208; *Urmston v. State,* 73 Ind. 175; *State ex rel. Coffey v. Chittenden,* 112 Wis. 569, 88 N. W. 587; *Dubuc v. Voss,* 19 La. Ann. 210, 92 Am. Dec. 526; *State ex rel. Buller v. Callahan,* 4 N. Dak. 481, 61 N. W. 1025, 1029; *State ex rel. Moore v. Archibald,* 5 N. Dak. 359, 66 N. W. 234.

*A. C. Umbreit* and *Harry L. Butler,* for the respondents: . I. Courts are without jurisdiction to control by injunction the chief executive of the state or those acting under his direction. (1) The defendant *Francis E. McGovern* is in fact and law proceeded against in his capacity as governor of the

state. *Minnesota v. Hitchcock,* 185 U. S. 373, 387, 22 Sup.
Ct. 650; *Mississippi v. Johnson,* 4 Wall. (71 U. S.) 475, 502.
(2) The governor, as the head of an equal and co-ordinate de-
partment of government, is not subject to control by the ju-
diciary, even as to ministerial duties imposed on him by law.
*State ex rel. Byrne v. Harvey,* 11 Wis. 33; *Att'y Gen. ex rel.
Taylor v. Brown,* 1 Wis. 513; *State ex rel. Gill v. Watertown,*
9 Wis. 254; *State ex rel. Peck v. Rusk,* 55 Wis. 465, 13 N.
W. 452; *People ex rel. Sutherland v. Governor,* 29 Mich.
320; *Hawkins v. Governor,* 1 Ark. 570; *Bates v. Taylor,* 87
Tenn. 319, 11 S. W. 266; *Jonesboro, F. B. & G. B. T. Co.
v. Brown,* 8 Baxt. (Tenn.) 490; *State ex rel. Latture v.
Board of Inspectors,* 114 Tenn. 516, 86 S. W. 319; *Hovey v.
State,* 127 Ind. 588, 27 N. E. 175; *State v. Governor,* 25 N.
J. Law, 331; *People ex rel. Broderick v. Morton,* 156 N. Y.
136, 50 N. E. 791; *Mauran v. Smith,* 8 R. I. 192; *Western
R. Co. v. De Graff,* 27 Minn. 1, 6 N. W. 341; *Rice v. Aus-
tin,* 19 Minn. 103; *People ex rel. Bacon v. Cullom,* 100 Ill.
472; *People ex rel. Harless v. Yates,* 40 Ill. 126; *People ex
rel. Billings v. Bissell,* 19 Ill. 229; *Vicksburg & M. R. Co. v.
Lowry,* 61 Miss. 102; *Tcat v. McGaughey,* 85 Tex. 478, 22
S. W. 302; *Bledsoe v. International R. Co.* 40 Tex. 537;
*State ex rel. Low v. Towns,* 8 Ga. 360; *State ex rel. Bisbee
v. Drew,* 17 Fla. 67; *State ex rel. Lockwood v. Kirkwood,* 14
Iowa, 162; *In re Dennett,* 32 Me. 508; *State ex rel. Robb v.
Stone,* 120 Mo. 428, 25 S. W. 376; *Woods v. Sheldon,* 9 S.
Dak. 392, 69 N. W. 602.    (3) Courts will not review by *cer-
tiorari* the alleged unlawful acts of the chief executive.
*State ex rel. Peck v. Rusk,* 55 Wis. 465, 13 N. W. 452; *People
ex rel. Leo v. Hill,* 13 N. Y. Supp. 186; 2 Spelling, Extr.
Rem. § 1954.    (4) Courts will not restrain by injunction or
prohibition the alleged unlawful acts of the chief executive.
*Mississippi v. Johnson,* 4 Wall. 475; *Western R. Co. v. De
Graff,* 27 Minn. 1, 6 N. W. 341; *Bates v. Taylor,* 87 Tenn.
319, 11 S. W. 266; *State ex rel. Att'y Gen. v. Huston,* 27

Okla. 606, 113 Pac. 190; *Frost v. Thomas,* 26 Colo. 222, 56 Pac. 899; *People ex rel. Alexander v. District Court,* 29 Colo. 182, 68 Pac. 242; *State ex rel. Taylor v. Lord,* 28 Oreg. 498, 43 Pac. 471; *Stein v. Morrison,* 9 Idaho, 470, 75 Pac. 246; *Greir v. Taylor,* 4 McCord (S. C.) 206; *Slack v. Jacob,* 8 W. Va. 612, 657. (5) Officers and subordinates acting under direction of the governor (as his codefendants are here alleged to be) are immune from injunctive restraint to the same extent as the executive. *Hartranft's Appeal,* 85 Pa. St. 433; *Marbury v. Madison,* 1 Cranch, 137; *Hawkins v. Governor,* 1 Ark. 570; *People ex rel. Sutherland v. Governor,* 29 Mich. 320; *Western R. Co. v. De Graff,* 27 Minn. 1, 6 N. W. 341; *State ex rel. Taylor v. Lord,* 28 Oreg. 498, 43 Pac. 471. (6) If jurisdiction judicially to control the governor in the attempted exercise of executive power is to be assumed at all, it should not be permitted in a suit by a private party in a circuit court. *Income Tax Cases,* 148 Wis. 456, 134 N. W. 673, 135 N. W. 164; *State ex rel. Hartung v. Milwaukee,* 102 Wis. 509, 78 N. W. 756; *Ward v. Sweeney,* 106 Wis. 44, 82 N. W. 169. (7) The acts sought to be restrained were within executive power. *In re Neagle,* 135 U. S. 1, 10 Sup. Ct. 658; *Stephenson v. Little,* 10 Mich. 433; *Wells v. Nickles,* 104 U. S. 444; *In re Debs,* 158 U. S. 564, 15 Sup. Ct. 900; *Logan v. U. S.* 144 U. S. 263, 12 Sup. Ct. 617; *Buster v. Wright,* 135 Fed. 947; *In re Matthews,* 122 Fed. 248; *U. S. v. Mullin,* 71 Fed. 682. (8) An officer entitled to possession may use necessary force to obtain possession. *Sterling v. Warden,* 51 N. H. 217; *State ex rel. Dithmar v. Bunnell,* 131 Wis. 198, 110 N. W. 177.

II. Assuming that the court has jurisdiction, yet title to the office could not be tried in this action, and no case was made warranting an injunction pending trial of title at law. (1) The title to public office is not triable in an equitable action for injunctional relief, nor even in *mandamus.* *Ward v. Sweeney,* 106 Wis. 44, 82 N. W. 169; *State ex rel. Loch-*

*schmidt v. Raisler,* 133 Wis. 672, 114 N. W. 118; *State ex rel. Jones v. Oates,* 86 Wis. 634, 57 N. W. 296; *State ex rel. McCoale v. Kersten,* 118 Wis. 287, 95 N. W. 120.    (2) The order below is fully supported by *Ward v. Sweeney,* 106 Wis. 44, 82 N. W. 169.    (3) The holder of a certificate of election is entitled to the possession of an office as against an incumbent who claims that he was in fact elected and entitled to possession, and throws the burden on the latter to establish his title at law.    This right of possession of the certificate holder may be enforced by *mandamus,* though title to the office will not be determined therein.    *La Pointe v. O'Malley,* 46 Wis. 35, 50 N. W. 521; *State ex rel. Jones v. Oates,* 86 Wis. 634, 57 N. W. 296; *State ex rel. McCoale v. Kersten,* 118 Wis. 287, 95 N. W. 120; *State ex rel. Rinder v. Goff,* 129 Wis. 668, 109 N. W. 628; *State ex rel. Hayden v. Arnold,* 151 Wis. 19, 138 N. W. 78; *People ex rel. Cummings v. Head,* 25 Ill. 325; *State v. County Court,* 41 Mo. 247; *Crowell v. Lambert,* 10 Minn. 369; *Nelson v. Sneed,* 112 Tenn. 36, 83 S. W. 786.    (4) A person holding over under a claim of re-election is a mere usurper as against his successor having a certificate of election.    Cases last above cited; also *Olson v. Trego Co.* 8 Kan. App. 414, 54 Pac. 805; *Comm. v. Bush,* 131 Ky. 384, 115 S. W. 249; *Chandler v. Starling,* 19 N. Dak. 144, 121 N. W. 198.    (5) While *mandamus* will issue to enforce the right of possession of the certificate holder, injunction to protect the possession of his adversary will be denied.    *Ward v. Sweeney,* 106 Wis. 44, 82 N. W. 169; *Casey v. Bryce,* 173 Ala. 129, 55 South. 810; *Harrison v. Stroud,* 129 Ky. 193, 110 S. W. 828.    (6) A commission of appointment, like a certificate of election, confers *prima facie* right to an office.    *Elledge v. Wharton,* 89 S. C. 113, 71 S. E. 657; *Barendt v. McCarthy,* 160 Cal. 680, 118 Pac. 228; *In re Sells,* 15 App. Div. 571, 44 N. Y. Supp. 570.    (7) Such commission confers a right of possession, en-

forceable by *mandamus,* and not restrainable by injunction on behalf of an incumbent claiming illegality of the new appointment.   Cases above cited, and particularly *Conklin v. Cunningham,* 7 N. M. 445, 38 Pac. 170; *Hubbell v. Armijo,* 13 N. M. 482, 85 Pac. 1046; *Beebe v. Robinson,* 52 Ala. 66; *Casey v. Bryce,* 173 Ala. 129, 55 South. 810; *State ex rel. Adams v. Herreid,* 10 S. Dak. 16, 71 N. W. 319; *Cameron v. Parker,* 2 Okla. 277, 38 Pac. 14.   (8) It is the plain import of the statutes that a commission of appointment to fill a vacancy caused by removal stands on the same basis as a certificate of election to an office, and that the commission, like·the certificate, confers the *prima facie* right to the office and entitles the holder thereof to possession.   Secs. 977–980, Stats.; *Curran v. Norris,* 58 Mich. 512, 25 N. W. 500; *In re Sells,* 15 App. Div. 571, 44 N. Y. Supp. 570.

III. The order below should be affirmed because the record shows that the *de jure* title is not in the plaintiff.   (1) Where power of removal is vested in an officer and no right of judicial review or appeal is given by statute, the action of the removing officer is final and conclusive, and the sole judicial question is whether the removal was within the power, namely, Was the assigned cause a legal cause?   *State ex rel. Kennedy v. McGarry,* 21 Wis. 496; *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 122 N. W. 478; *State ex rel. Cook v. Houser,* 122 Wis. 534, 100 N. W. 964; *State ex rel. Davern v. Rose,* 140 Wis. 360, 122 N. W. 751; *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 64 N. W. 304; *State ex rel. Willis v. Prince,* 45 Wis. 610; *State ex rel. Gill v. Watertown,* 9 Wis. 254; *Att'y Gen. ex rel. Taylor v. Brown,* 1 Wis. 513. (2) Plaintiff was removed for a legal cause.   *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 64 N. W. 304. (3) The plaintiff was removed during a recess of the legislature.   Sec. 99, Stats.; *State ex rel. Emberson v. Byrne,* 98 Wis. 16, 73 N. W. 320.   (4) The validity of the order of

removal is not affected by the fact that the same is not sealed or countersigned by the secretary of state. *State ex rel. Neill v. Page,* 20 Mont. 238, 50 Pac. 719; *State ex rel. Miller v. Barber,* 4 Wyo. 409, 34 Pac. 1028; *State ex rel. Bienvenu v. Wrotnowski,* 17 La. Ann. 156; *Att'y Gen. ex rel. Rich v. Jochim,* 99 Mich. 358, 58 N. W. 611; *La Pointe v. O'Malley,* 46 Wis. 35, 54, 55, 50 N. W. 521; *Curran v. Norris,* 58 Mich. 512, 25 N. W. 500. (5) The motives of the governor or his discretion as to length of notice or scope of hearing afforded will not be judicially inquired into, and hence averments of arbitrariness are immaterial even in *quo warranto. Att'y Gen. ex rel. Taylor v. Brown,* 1 Wis. 513; *State ex rel. Gill v. Watertown,* 9 Wis. 254; *State ex rel. Att'y Gen. v. Doherty,* 25 La. Ann. 119. (6) No notice or hearing was required. *State ex rel. Kennedy v. McGarry,* 21 Wis. 496; *Nehrling v. State ex rel. Thal,* 112 Wis. 637, 88 N. W. 160; *People ex rel. Shipley v. Mays,* 117 Ill. 257, 7 N. E. 660; *Conklin v. Cunningham,* 7 N. M. 445, 38 Pac. 170; *Patton v. Vaughan,* 39 Ark. 211; *State ex rel. Rawlinson v. Ansel,* 76 S. C. 395, 57 S. E. 185; *State v. Doherty,* 25 La. Ann. 119; *O'Dowd v. Boston,* 149 Mass. 443, 21 N. E. 949; *Trimble v. People,* 19 Colo. 187, 34 Pac. 981; *People ex rel. Fonda v. Morton,* 148 N. Y. 156, 42 N. E. 538; *People ex rel. Gere v. Whitlock,* 92 N. Y. 191; *State ex rel. Hamilton v. Grant,* 14 Wyo. 41, 81 Pac. 795. (7) The exercise of the removing power is not judicial, but administrative or executive. *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 64 N. W. 304; *State ex rel. Cook v. Houser,* 122 Wis. 534, 100 N. W. 964; *State ex rel. Rawlinson v. Ansel,* 76 S. C. 395, 57 S. E. 185; *In re Guden,* 171 N. Y. 529, 64 N. E. 451.

After the cause was submitted for decision a resubmission was ordered on these propositions:

Question 1. Does sec. 970 of the Statutes require that due process of law, as guaranteed by the constitution, be pursued in removing an officer?

Question 2. Does due process of law in such a case entitle the officer attempted to be removed to a reasonable notice of the hearing and of the particulars of the charge, a reasonable opportunity to be heard in person and by counsel, to know the adverse evidence to be considered, the right to cross-examine the opposing witnesses and present all material evidence in his own behalf?

Question 3. If an order for the removal of an officer charged in such a proceeding be made without according to him these privileges, is it valid?

Question 4. Is it a jurisdictional requirement of an order under the removal statute that it be based on evidence, taken according to the essentials of due process of law, which in some reasonable view sustains the charges against the person accused, which will warrant his removal, and if so, was such a case made as to *Mr. Ekern?*

The cause was again argued, upon the foregoing questions, on May 14, 1913.

Upon the reargument counsel for appellant urged, among other things:

I. Sec. 970, Stats., requires that due process of law, as guaranteed by the constitution, must be pursued in removing an officer. Due process of law has been the subject of innumerable definitions. McGehee, Due Process of Law; 3 Words & Phrases, 2227–2256. Our own court has repeatedly given consideration to the meaning of this phrase. *Dietz v. Neenah,* 91 Wis. 422, 64 N. W. 299, 65 N. W. 500; *Rowan v. State,* 30 Wis. 129, 147, 148; *Baldwin v. Ely,* 66 Wis. 171, 188, 28 N. W. 392; *Stone v. Little Yellow D. Dist.* 118 Wis. 388, 95 N. W. 405; *State ex rel. Milwaukee Med.*

*College v. Chittenden,* 127 Wis. 468, 504, 107 N. W. 500; *Schiltz v. Roenitz,* 86 Wis. 31, 56 N. W. 194. Sec. 970 is unconstitutional if it does not provide due process. *State ex rel. Milwaukee Med. College v. Chittenden,* 127 Wis. 468, 504, 107 N. W. 500; *Ex parte Garland,* 4 Wall. 333, 378; *Ex parte Heyfron,* 7 How. (Miss.) 127; *People ex rel. Mulford v. Turner,* 1 Cal. 143; *Fletcher v. Daingerfield,* 20 Cal. 427. Unless clearly modified by statute or constitution, the common-law rule that due process of law be pursued still prevails. *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112; 23 Am. & Eng. Ency. of Law (2d ed.) 434; Berryman, Removal of Public Officers, 25 Am. Law Rep. 199, 204, 208; Throop, Public Officers, § 362; Const. art. XIV, sec. 13; *Coburn v. Harvey,* 18 Wis. 147; *Todd v. Dunlap,* 99 Ky. 449, 464, 36 S. W. 541; *Andrews v. King,* 77 Me. 224, 225; *Stoddard v. Gibbs,* 1 Sumn. 263, Fed. Cas. No. 13,468; *Edwards v. U. S.* 103 U. S. 471; *State v. Clayton,* 27 Kan. 442, 41 Am. Rep. 418; 8 Cyc. 379; *Kreitz v. Behrensmeyer,* 149 Ill. 496, 36 N. E. 983, 24 L. R. A. 59. The constitution does not contemplate removal without due process, and the legislature did not dispense with due process. An examination of the statutory provisions of every state in the Union discloses that the phrase "upon satisfactory proofs" occurs in the Wisconsin statutes only, and that the Wisconsin statute, therefore, is most emphatic in its requirement of due process. As to the meaning of this phrase, see *Inglis v. Schreiner,* 58 N. J. Law, 120, 32 Atl. 131; *Githens v. Mount,* 64 N. J. Law, 166, 44 Atl. 851; 6 Words & Phrases, 5686; *Callan v. Hanson,* 86 Iowa, 420, 53 N. W. 282; *Baltimore & O. S. W. R. Co. v. Walker,* 41 Ind. App. 588, 84 N. E. 730; *Knights of Pythias v. Steele,* 107 Tenn. 1, 8, 63 S. W. 1126; 1 Greenl. Ev. 2; *Finks v. Cox* (Tex. Civ. App.) 30 S. W. 512; *Brewer v. Doose* (Tex. Civ. App.) 146 S. W. 325; *Moore v. Stone* (Tex. Civ. App.) 36 S. W. 909; 7 Words & Phrases, 6335; *Comm.*

*v. Colandro,* 231 Pa. St. 343, 80 Atl. 571; *State v. Trosper,* 41 Mont. 442, 109 Pac. 858; *San Antonio & A. P. R. Co. v. Graves* (Tex. Civ. App.) 131 S. W. 613; *Traiser v. Commercial Travelers' E. A. Asso.* 202 Mass. 292, 88 N. E. 901; *Minneapolis, St. P. & S. S. M. R. Co. v. Railroad Comm.* 136 Wis. 146, 116 N. W. 905; *Bannon v. Ins. Co. of N. A.* 115 Wis. 250, 91 N. W. 666; *Shaw v. Gilbert,* 111 Wis. 165, 86 N. W. 188; *Lepley v. Andersen,* 142 Wis. 668, 125 N. W. 433. The following text-writers and courts, while ofttimes passing on statutes with different language and sometimes reaching conclusions adverse to the officer removed, are in our judgment authority for answering in the affirmative the first question propounded for reargument: 29 Cyc. 1409; Throop, Public Officers, § 364; 1 Dillon, Mun. Corp. 250; Mechem, Public Officers, § 454; 19 Am. & Eng. Ency. of Law (2d ed.) 562; *Shurtleff v. U. S.* 189 U. S. 311, 314, 23 Sup. Ct. 535; *Reagan v. U. S.* 182 U. S. 419, 425, 21 Sup. Ct. 842; *Ex parte Garland,* 4 Wall. 333, 378; *Lucas v. Futrall,* 84 Ark. 540, 106 S. W. 667; *Patton v. Board of Health,* 127 Cal. 388, 59 Pac. 702; *Kennedy v. Board of Ed.* 82 Cal. 483, 22 Pac. 1042; *People ex rel. Simpson v. Denman,* 16 Colo. App. 337, 65 Pac. 455; *Benson v. People,* 10 Colo. App. 175, 50 Pac. 212; *Coleman v. Glenn,* 103 Ga. 458, 30 S. E. 297; *Jacques v. Little,* 51 Kan. 300, 33 Pac. 106, 20 L. R. A. 304; *Page v. Hardin,* 8 B. Mon. 648; *Renshaw v. Cook,* 129 Ky. 347, 372, 111 S. W. 377; *Todd v. Dunlap,* 99 Ky. 449, 460, 36 S. W. 541; *Andrews v. King,* 77 Me. 224; *State v. Donovan,* 89 Me. 448, 36 Atl. 982; *Ham v. Board of Police,* 142 Mass. 90, 7 N. E. 540; *Cull v. Wheltle,* 114 Md. 58, 78 Atl. 820; *Miles v. Stevenson,* 80 Md. 358, 30 Atl. 646; *Harman v. Harwood,* 58 Md. 1; *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112; *People ex rel. Metevier v. Therrien,* 80 Mich. 187, 45 N. W. 78; *Hallgren v. Campbell,* 82 Mich. 255, 46 N. W. 381; *Townsend v. Sauk Centre,* 71 Minn. 379, 74 N. W.

150; *State v. Walbridge,* 82 Mo. App. 162, 24 S. W. 457; *State ex rel. Denison v. St. Louis,* 90 Mo. 19, 1 S. W. 757; *State v. Smith,* 35 Neb. 13, 52 N. W. 700; *Hagerty v. Shedd,* 75 N. H. 393, 74 Atl. 1055; *Markley v. Cape May Point,* 55 N. J. Law, 104, 25 Atl. 259; *State ex rel. Haight v. Love,* 39 N. J. Law, 14; *Bradshaw v. Camden,* 39 N. J. Law, 416; *People ex rel. Maloney v. Douglass,* 195 N. Y. 145, 87 N. E. 1070; *State ex rel. Caldwell v. Wilson,* 121 N. C. 425, 28 S. E. 554; *State ex rel. Att'y Gen. v. Hawkins,* 44 Ohio St. 98, 5 N. E. 228; *State ex rel. Att'y Gen. v. Hoglan,* 64 Ohio St. 532, 60 N. E. 627; *Biggs v. McBride,* 17 Oreg. 640, 21 Pac. 878, 5 L. R. A. 791; *Comm. ex rel. Bowman v. Slifer,* 25 Pa. St. 23; *Willard's Appeal,* 4 R. I. 595; *McDowell v. Burnett* (S. C.) 75 S. E. 873; *State ex rel. Hitchcock v. Hewitt,* 3 S. Dak. 187, 52 N. W. 875, 16 L. R. A. 413; *McCully v. State,* 102 Tenn. 509, 53 S. W. 134, 46 L. R. A. 567; *Honey v. Graham,* 39 Tex. 1; *People ex rel. Murphy v. McAllister,* 10 Utah, 357, 37 Pac. 578; *Gilbert v. Board of P. & F. Comm'rs,* 11 Utah, 378, 40 Pac. 264; *State ex rel. McReavy v. Burke,* 8 Wash. 412, 36 Pac. 281; *Phares v. State,* 3 W. Va. 567; *State v. Grant,* 14 Wyo. 41, 81 Pac. 795, 799; *State ex rel. Milwaukee Med. College v. Chittenden,* 127 Wis. 468, 107 N. W. 500.

II. Due process of law, in such a case, entitled the officer attempted to be removed to a reasonable notice of the hearing and of the particulars of the charge, a reasonable opportunity to be heard in person or by counsel, to know the adverse evidence to be considered, the right to cross-examine the opposing witnesses and present all material evidence in his own behalf. *Dietz v. Neenah,* 91 Wis. 422, 64 N. W. 299, 65 N. W. 500; *Schiltz v. Roenitz,* 86 Wis. 31, 56 N. W. 194; *McVeigh v. U. S.* 11 Wall. 259, 267; *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112; *Hagerty v. Shedd,* 75 N. H. 393, 74 Atl. 1055; *McCully v. State,* 102 Tenn. 509, 53 S. W.

134; *McDowell v. Burnett* (S. C.) 75 S. E. 873; *Shurtleff v. U. S.* 189 U. S. 311, 314, 23 Sup. Ct. 535, 536; *Biggs v. Mc-Bride,* 17 Oreg. 640, 21 Pac. 878, 5 L. R. A. 791; *State ex rel. Att'y Gen. v. Hoglan,* 64 Ohio St. 532, 60 N. E. 627; *State v. St. Louis,* 90 Mo. 19, 1 S. W. 757, 758; *Benson v. People,* 10 Colo. App. 175, 50 Pac. 212; *Andrews v. King,* 77 Me. 224; *State v. Smith,* 35 Neb. 13, 52 N. W. 700; *Lucas v. Futrall,* 84 Ark. 540, 106 S. W. 667; *Comm. ex rel. Bowman v. Slifer,* 25 Pa. St. 23, 28; *Jacques v. Little,* 51 Kan. 300, 33 Pac. 106, 23 L. R. A. 304; *Patton v. Board of Health,* 127 Cal. 388, 59 Pac. 702; *Hayden v. Memphis,* 100 Tenn. 582, 47 S. W. 182; *State ex rel. McReavy v. Burke,* 8 Wash. 412, 417, 36 Pac. 281; *Coleman v. Glenn,* 103 Ga. 458, 30 S. E. 297; *State v. Grant,* 14 Wyo. 41, 81 Pac. 795; *State ex rel. Milwaukee Med. College v. Chittenden,* 127 Wis. 468, 506, 107 N. W. 500.

III. It would seem to follow from the foregoing decisions, without detailed or further argument, that if these things are requisites, any failure to observe them would render void an order of removal.

IV. The commissioner had no reasonable notice and the order of removal was therefore void. The many cases already cited confirm and strengthen what seems an obvious conclusion, that the order must be based upon the evidence taken and the evidence must sustain the charges. The governor in such proceedings is acting in a *quasi*-judicial capacity. *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 622, 64 N. W. 304; *State ex rel. Milwaukee Med. College v. Chittenden,* 127 Wis. 468, 506, 107 N. W. 500; *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112, 116; Throop, Public Officers, § 379; Mechem, Public Officers. Assuming for the argument that the proceedings otherwise were regularly conducted, it is jurisdictional that the order of removal be based on evidence so taken which in some reasonable view sustains

the charges against the person accused. The governor's *ipse dixit* is not conclusive. *State ex rel. Milwaukee Med. College v. Chittenden,* 127 Wis. 468, 503, 524, 532, 107 N. W. 500; *State ex rel. Durner v. Huegin,* 110 Wis. 189, 237, 85 N. W. 1046; *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 622, 64 N. W. 304; *State ex rel. Heller v. Lawler,* 103 Wis. 460, 79 N. W. 777; *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 122 N. W. 748; *State ex rel. Augusta v. Losby,* 115 Wis. 57, 90 N. W. 188; *State ex rel. Moreland v. Whitford,* 54 Wis. 150, 154, 11 N. W. 424; *State ex rel. N. C. Foster L. Co. v. Williams,* 123 Wis. 61, 65, 100 N. W. 1048; *State ex rel. Vilas v. Wharton,* 117 Wis. 558, 94 N. W. 359; *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112, 116; *Riggins v. Waco,* 100 Tex. 32, 93 S. W. 426; *State ex rel. Att'y Gen. v. Hoglan,* 64 Ohio St. 532, 60 N. E. 627; *People ex rel. Campbell v. Campbell,* 82 N. Y. 247, 255; *People ex rel. Simpson v. Denman,* 16 Colo. App. 337, 65 Pac. 455; *State v. Newark* (N. Y.) 6 Atl. 659; *State ex rel. Kinsella v. Eberhart,* 116 Minn. 313, 133 N. W. 857.

Counsel for respondents contended, on the reargument:

I. There is no property right in an office. *State ex rel. Buell v. Frear,* 146 Wis. 291, 298–301, 131 N. W. 832; *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 303, 122 N. W. 478; *State ex rel. Cook v. Houser,* 122 Wis. 534, 603, 100 N. W. 964; *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 619, 64 N. W. 304; *State ex rel. Att'y Gen. v. Hawkins,* 44 Ohio St. 98, 5 N. E. 228, 233–235; *Donahue v. Will Co.* 100 Ill. 94; *Taylor v. Beckham,* 178 U. S. 548, 576–578, 20 Sup. Ct. 890; *Nichols v. MacLean,* 101 N. Y. 526, 533; *Bonner v. Belsterling* (Tex. Civ. App.) 137 S. W. 1154, 1157; *Trimble v. People,* 19 Colo. 187, 34 Pac. 981, 985; *Beebe v. Robinson,* 52 Ala. 66; Throop, Public Officers, §§ 18, 19, 345. The exercise of removal power is not a judicial function, but is administrative or executive. *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 619, 64 N. W.

304; *State ex rel. Cook v. Houser,* 122 Wis. 534, 603, 100 N. W. 964; *State ex rel. Att'y Gen. v. Hawkins,* 44 Ohio St. 98, 5 N. E. 228, 232 *et seq.; In re Carter,* 141 Cal. 316, 74 Pac. 997; *In re Guden,* 171 N. Y. 529, 64 N. E. 451; *State ex rel. Rawlinson v. Ansel,* 76 S. C. 395, 57 S. E. 185, 11 Am. & Eng. Ann. Cas. 613, 619, 620; *Territory v. Cox,* 6 Dak. 501; *Riggins v. Richard,* 97 Tex. 229, 237, 77 S. W. 946; *State ex rel. Hamilton v. Grant,* 14 Wyo. 41, 81 Pac. 795. Hence, neither the due process clause of the Fourteenth amendment, nor any provision of the state constitution of similar effect, is impaired by any provision the state legislature may see fit to make as regards removals from office. *State ex rel. Buell v. Frear,* 146 Wis. 291, 298–301, 131 N. W. 832; *State ex rel. Att'y Gen. v. Hawkins,* 44 Ohio St. 98, 5 N. E. 228, 232 *et seq.; Wilson v. North Carolina,* 169 U. S. 586, 18 Sup. Ct. 485; *Taylor v. Beckham,* 178 U. S. 548, 576–578, 20 Sup. Ct. 890. This is but an application of the self-evident proposition that an officer gets only what the law gives him, and if by either constitutional or statutory provisions his tenure is subject to termination by removal, he is as conclusively presumed to accept it subject to this as to any other condition. *Gillan v. Board of Regents,* 88 Wis. 7, 14, 58 N. W. 1042; *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 619, 64 N. W. 304; *State ex rel. Cook v. Houser,* 122 Wis. 534, 603, 100 N. W. 964; *State ex rel. Bannen v. Arnold,* 151 Wis. 38, 40, 138 N. W. 85; *People ex rel. Clay v. Stuart,* 74 Mich. 411, 41 N. W. 1091; *Wilson v. North Carolina,* 169 U. S. 586, 18 Sup. Ct. 485; *Bonner v. Belsterling* (Tex. Civ. App.) 137 S. W. 1154, 1157; *Trimble v. People,* 19 Colo. 187, 34 Pac. 981, 985; Mechem, Public Officers, p. 288. It is of course not to be expected that cases will be found where the courts have had occasion to construe similar language to that contained in sec. 970 and cognate statutes. Reference is, however, made to the following, wherein notice and hearing were held unnecessary under statutes no

more clearly evidencing the intent to dispense therewith than those in question here: *State ex rel. Kennedy v. McGarry,* 21 Wis. 496; *People ex rel. Shipley v. Mays,* 117 Ill. 257, 7 N. E. 660; *People ex rel. Stevenson v. Higgins,* 15 Ill. 110; *Wilcox v. People,* 90 Ill. 186; *State ex rel. Rawlinson v. Ansel,* 76 S. C. 395, 57 S. E. 185, 11 Am. & Eng. Ann. Cas. 613; *Trimble v. People,* 19 Colo. 187, 34 Pac. 981; *State ex rel. McReavy v. Burke,* 8 Wash. 412, 36 Pac. 281; *State ex rel. Howlett v. Cheetham,* 19 Wash. 330, 53 Pac. 349; *Mayor, etc. v. Gear,* 27 N. J. Law, 265; *In re Carter,* 141 Cal. 316, 74 Pac. 997; *People ex rel. Fonda v. Morton,* 148 N. Y. 156, 42 N. E. 538; *People ex rel. Gere v. Whitlock,* 92 N. Y. 191; *State ex rel. Hamilton v. Grant,* 14 Wyo. 41, 81 Pac. 795, 1 L. R. A. N. s. 588, 595; *O'Dowd v. Boston,* 149 Mass. 443, 21 N. E. 949; *Conklin v. Cunningham,* 7 N. M. 445, 38 Pac. 170, 174. In many of the cases cited by appellant notice and hearing were expressly or by necessary implication provided for. In others the court assumed that office was a property right, protected as such by the Fourteenth amendment, or followed the old English cases, which were in turn based upon the conception that under the English system public office was a hereditament,—a conception which has no application to our governmental system. In other cases the power of removal is erroneously treated as an exercise of judicial power as distinguished from administrative or executive power. But with practical unanimity the cases cited by counsel hold that, where the legislature evidences the intent that no notice or hearing be required, such intent will control. *Coleman v. Glenn,* 103 Ga. 458, 30 S. E. 297; *Cull v. Wheltle,* 114 Md. 58, 78 Atl. 820, 824; *Hallgren v. Campbell,* 82 Mich. 255, 46 N. W. 381, 383; *Field v. Comm.* 32 Pa. St. 478, 481; *State v. Smith,* 35 Neb. 13, 52 N. W. 700; *People ex rel. Maloney v. Douglass,* 195 N. Y. 145, 87 N. E. 1070, 1072; *State v. Wilson,* 121 N. C.

425, 480, 28 S. E. 554, 561; *S. C.* on appeal (*Wilson v. North Carolina*) 169 U. S. 586, 592, 593, 18 Sup. Ct. 485; *Andrews v. King,* 77 Me. 224; *State ex rel. Att'y Gen. v. Hawkins,* 44 Ohio St. 98, 5 N. E. 228, 233, 235, 236; *McDowell v. Burnett* (S. C.) 75 S. E. 873, 879; *People ex rel. Murphy v. McAllister,* 10 Utah, 357, 37 Pac. 578, 580; *State ex rel. McReavy v. Burke,* 8 Wash. 412, 36 Pac. 281; *State ex rel. Hamilton v. Grant,* 14 Wyo. 41, 81 Pac. 795, 799; *Reagan v. U. S.* 182 U. S. 419, 21 Sup. Ct. 842; *Shurtleff v. U. S.* 189 U. S. 311, 23 Sup. Ct. 535. And this latter view is taken by many of the courts which have regarded office as a property right or removal therefrom as an exercise of judicial power. *Coleman v. Glenn,* 103 Ga. 458, 30 S. E. 297; *Cull v. Wheltle,* 114 Md. 58, 78 Atl. 820; *Hallgren v. Campbell,* 82 Mich. 255, 46 N. W. 381; *Field v. Comm.* 32 Pa. St. 478; *State v. Wilson,* 121 N. C. 425, 480, 28 S. E. 554; *Andrews v. King,* 77 Me. 224.

II. Assuming that due process was required, see, as to what notice and charges are necessary in such cases: *Board, etc. v. Darrow,* 13 Colo. 460, 22 Pac. 784, 787; 18 Ency. Pl. & Pr. 215; *State ex rel. Kennedy v. McGarry,* 21 Wis. 496, 498; *In re Guden,* 171 N. Y. 529, 538, 64 N. E. 451; *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112, 119; *People ex rel. Donovan v. Board of Fire Comm'rs,* 77 N. Y. 153, 154. Objections to the service and sufficiency of the notice are waived by appearance and answer to the charges. *State ex rel. McMahon v. New Orleans,* 107 La. 632, 32 South. 22, 25; *Christy v. Kingfisher,* 13 Okla. 585, 76 Pac. 135, 139; 2 Dillon, Mun. Corp. (5th ed.) § 481. As to the hearing in such case: *Field v. Comm.* 32 Pa. St. 478, 484; *Att'y Gen. ex rel. Rich v. Jochim,* 99 Mich. 358, 58 N. W. 611, 23 L. R. A. 699, 705; *People ex rel. Weston v. McClave,* 123 N. Y. 512, 515, 25 N. E. 1047; *In re Guden,* 171 N. Y. 525, 64 N. E. 451; *Hogan v. Collins,* 183 Mass. 43, 46, 66 N. E. 429;

*Nehrling v. State ex rel. Thal,* 112 Wis. 637, 643, 88 N. W. 610; *Moline, M. & S. Co. v. Curtis,* 38 Neb. 520, 57 N. W. 161, 162; *Hopkins v. Scott,* 38 Neb. 661, 57 N. W. 391, 392; *Keens v. Buffalo Co.* 53 Neb. 1, 73 N. W. 214; *Central Pac. R. Co. v. Placer Co.* 32 Cal. 583.

III. If we are to assume, for the purposes of the argument, that questions 1 and 2 be answered in the affirmative, it would appear to follow that question 3 be answered in the negative,—but with the qualification that the validity of the order is not subject to determination or impeachment in this injunction suit: (1) Because there is no jurisdiction to restrain the chief executive of the state from the attempted exercise of his official power, any more than there is jurisdiction to restrain the legislature from adopting an unconstitutional law, especially in a suit by a private party brought in the circuit court. (2) Because the determination of the validity of the order involves trial of title to the office, which may not be done in an injunction suit, especially against the protest of the parties. (3) Because the certificate of appointment of *Mr. Anderson* conferred on him, not only by judicial precedent, but by clear statutory implication, the *prima facie* title to the office, and the right of possession pending trial of title thereto at law.

IV. Assuming that notice and hearing were intended, it still remained for the legislature to say whether, though this privilege be accorded the officer, the governor should nevertheless be the final arbiter as to whether the assigned causes existed. The plaintiff took his office subject to such conditions as the legislature saw fit to impose concerning the matter. *Att'y Gen. ex rel. Taylor v. Brown,* 1 Wis. 513; *State ex rel. Kennedy v. McGarry,* 21 Wis. 496; and other cases above cited. The language of sec. 970 cannot mean "proofs" satisfactory to the officer removed, nor satisfactory to the courts, but must of necessity mean to the governor alone. *Att'y*

*Gen. ex rel. Taylor v. Brown,* 1 Wis. 513; *State ex rel. Kennedy v. McGarry,* 21 Wis. 496; *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 122 N. W. 478. In the present case, where the statute, especially when the legislative scheme is considered as a whole, must be construed as meaning that the governor may remove for the prescribed causes upon any evidence or information which shall satisfy *his* mind of the existence thereof, the court cannot inquire whether, according to its view, there is any reasonable ground for his conclusion. *People ex rel. Kennedy v. Brady,* 166 N. Y. 44, 59 N. E. 701; *In re Guden,* 171 N. Y. 529, 64 N. E. 451; *Keenan v. Perry,* 24 Tex. 253; *People ex rel. Belch v. Bearfield,* 35 Barb. 254; *State ex rel. Howlett v. Cheetham,* 19 Wash. 330, 53 Pac. 349; *People ex rel. Engley v. Martin,* 19 Colo. 565, 36 Pac. 543, 24 L. R. A. 201; *State ex rel. Att'y Gen. v. Doherty,* 25 La. Ann. 119, 13 Am. Rep. 131; *Wright v. Defrees,* 8 Ind. 298; *Att'y Gen. ex rel. Taylor v. Brown,* 1 Wis. 513, 522; *State ex rel. Peck v. Rusk,* 55 Wis. 465, 479, 13 N. W. 452. From the nature of the office of governor as well as from the statute itself, it is clearly to be implied that he had the right to make his own investigation and act upon knowledge thus acquired. *People v. Mays,* 17 Ill. App. 361; *Nehrling v. State ex rel. Thal,* 112 Wis. 637, 88 N. W. 610.

MARSHALL, J. We will endeavor, so far as practicable, to discuss this case, separating it into logical order of subjects involved, and first give attention to the dominant reason assigned by the trial court for the order complained of.

## I.

There is no controversy before us but that the decision below, to the effect that the courts should not and cannot properly interfere with the action of the executive of a state within the scope of his authority, is sound doctrine, as the language used was probably intended to be understood. For

mere error of judgment on the part of the governor in do-
ing what he has a right to do, he cannot be judicially inter-
fered with.

The claim of appellant below that the scope of the gov-
ernor's authority did not extend to forcibly putting his ap-
pointee in possession of the office in dispute and, therefore,
no immunity of respondents from being dealt with by ju-
dicial remedies can be successfully claimed for the illegal
act, seems to have been sustained in the course of the trial
court's decision.    Such an act was, seemingly, thought not to
be within the rule above stated, but it was left somewhat
involved at the end, and the decision placed wholly on the
doctrine of *Ward v. Sweeney,* 106 Wis. 44, 82 N. W. 169,
upon the supposition that whether appellant was a *de facto*
officer depended upon whether *Anderson* had the *prima facie
de jure* right, and therefore neither question was triable in
this action for equitable relief, such relief being dependable
upon whether appellant occupied a status of at least the dig-
nity of a *de facto* officer.

The idea that it is not competent in an action of this sort
to determine whether the plaintiff is a *de facto* officer is quite
novel.    We venture to say neither principle nor authority
supports that feature of the trial court's decision.    The ques-
tion of *de facto* right was decided in *Ward v. Sweeney,* suf-
ficiently for the case, and was one of the grounds for the re-
sult, and regarded sufficient.    The trial court grievously
erred in supposing that *Barendt v. McCarthy,* 160 Cal. 680,
118 Pac. 228, supports the conclusion.    There the person out
of was endeavoring to regain possession by a suit in equity
against his adversary.    The court proceeded far enough to
determine that the defendant was at least an officer *de facto*
and was in possession.    So, it will be seen, the case is author-
ity against rather than in support of the position that in this
suit it was not competent to solve the question of whether ap-

pellant had at least a *de facto* right to possession of the office. To determine that did not necessarily involve trying the title *de jure* at all.

Having committed the error aforesaid, the court easily misapplied *Ward v. Sweeney* and misconceived its purport.

The facts in *Ward v. Sweeney* were these: There was an officer in possession claiming a *de facto* status. He entered equity against one claiming the title *de jure* and threatening to take possession by force, to determine the question of who had the better title and, incidentally, to prevent being forcibly dispossessed in the meantime. The case turned on the following points: (a) Can an equity action be maintained to try the title to an office? (b) Is a temporary restraining order proper except under sec. 2774, Stats., to preserve the *status quo* and in a proper action to try the title to the office? (c) Is temporary protection by injunction in such an action proper at all, except in case of imminent danger of a forcible disturbance of the officer's possession, detrimental to the public interests? (d) Should such protection be afforded at all in favor of the one in possession and not appearing clearly to be at least a *de facto* officer?

The writer, with the late Justice BARDEEN, dissented from the decision of the court so far as it might be regarded as holding that equity will not freely protect a *de facto* officer from imminent danger of being forcibly dispossessed by an adverse claimant in an effort to settle his right by wager of battle, and so far as it was held that the power to grant injunctive protection, under all circumstances, is referable to the statute and so not proper except as ancillary to an action to try title. Without questioning the decision itself, it is conceded by the court now that some of the reasoning upon which it was based is unsound.

An action in equity, whether instituted by one in or one out of possession of an office, to try the title, is one thing; an

action by a person in possession of an office, having at least a *de facto* status, to compel an adversary to vindicate his claim by lawful methods and restrain him from disturbing the existing state of things in the meantime, is quite another affair. The one involves the adjudication of the title *de jure.* The other merely involves the right *de facto* and to have the claimant proceed lawfully to settle his claim of title *de jure.* All the relief necessary in the latter is within the competency of a court of equity to grant, leaving the real right of the matter respecting the title to the office, if thought necessary or advisable, wholly unsettled.

That an equitable action for the protective measure of relief mentioned is proper, was vigorously maintained, independently, in the *Sweeney Case,* and not questioned in the opinion of the court except as applicable to the particular circumstances there dealt with, and, further, upon the theory that the power to grant temporary equitable relief is restricted to the scope of the Code provision, sec. 2774 of the Statutes. It may be safely affirmed that, in general, an officer *de facto* in possession is entitled to equitable interference to prevent forcible disturbance thereof other than in judicial proceedings. The authorities cited in *Ward v. Sweeney* would seem ample in support of that doctrine. 2 Beach, Injunctions, § 1380; 2 High, Injunctions (4th ed.) § 1315; *Sullivan v. Haacke,* 5 Ohio N. P. 26; *Parsons v. Durand,* 150 Ind. 203, 49 N. E. 1047; *Harding v. Eichinger,* 57 Ohio St. 371, 49 N. E. 306; *Goldsworthy v. Boyle,* 175 Pa. St. 246, 34 Atl. 630.

Nothing of moment to the contrary of the foregoing is cited by counsel for respondents, while in support thereof appellant's counsel cited many authorities, the following being a few of the most significant: *Stenglein v. Beach,* 128 Mich. 440, 87 N. W. 449; *School Dist. v. Weise,* 77 Minn. 167, 79 N. W. 668; *Palmer v. Foley,* 45 How. Pr. 110;

*State v. Superior Court,* 17 Wash. 12, 48 Pac. 741; *Neeland v. State,* 39 Kan. 154, 18 Pac. 165; *Parsons v. Durand,* 150 Ind. 203, 49 N. E. 1047; *Landes v. Walls,* 160 Ind. 216, 66 N. E. 679; *State v. Alexander,* 107 Iowa, 177, 77 N. W. 841; *Reemilin v. Mosby,* 47 Ohio St. 570, 26 N. E. 717; *Jackson v. Powell,* 119 La. 882, 44 South. 689; *Lucas v. Futrall,* 84 Ark. 540, 106 S. W. 667; *Hollar v. Cornett,* 144 Ky. 420, 138 S. W. 298.

A *de facto* officer has no need of instituting an action of *quo warranto* or any other action to try a controversy over the title to the office, in order to protect his possession. It is the business of the claimant who is trying to break in to resort to such remedy. The one in possession may use physical means, reasonably, to prevent being dispossessed, or he may resort to the more peaceful remedy of an action in equity for that purpose, as appellant did. The latter is to be preferred, and the court should not do anything to encourage a resort to the former. As remarked in *Palmer v. Foley,* 4 Jones & S. 14, referred to in *Ward v. Sweeney,* and often quoted with approval, "The earliest jurisdiction, if not at" one "time the chief business of the court of chancery, was in assault, trespasses, and a variety of outrages. . . . In respect to the use of preventive process, the jurisdiction ought to be, and therefore is, the same; and if it is proper in one case to exercise the jurisdiction to prevent a wrong threatened to be done to mere property, how much more proper is it to use the same power to arrest premeditated wrong to the person or personal rights?"

The following from *Sullivan v. Haacke, supra,* is quite apropos to the case in hand:

"The action shows itself to be that, familiar to equity practice, wherein an individual in possession of an office seeks to restrain another who claims the office from by force and violence ejecting him, instead of resorting to the dignified,

peaceful, and orderly methods provided by law for gaining possession." . . . "A claimant to public office, even though he have title, cannot, through the exercise of physical force and violence, divest possession from his predecessor." . . . "The spectacle of claimants to high and important public office, charging themselves at fisticuffs over who shall have possession, and this at the very portals of the public courts, is not in harmony with the policy of the law, and is not one whereon a peace-loving, law-abiding public delights to gaze; and . . . the courts in the name of the public, for the preservation of the public peace, and in vindication of public dignity, will command peace and obedience to the orderly forms of law."

This further from *Palmer v. Foley, supra,* is quite appropriate to the case:

"The defendant is not in possession of the office. . . . He stands in no better attitude than a mere stranger, except that he may invoke the aid of the attorney general to proceed against the present incumbent to try the title to the office. But at present he cannot have the possession of the office, nor can he enforce a recognition of himself as the legally constituted officer. He must wait until the disputed question is determined in his favor by a judgment in a proper action. The plaintiff desires that he . . . may be undisturbed in the office" he claims to legally fill, "and instead of asserting his right by bringing to his aid the maxim of the law, *Domus sua cuique est tutissimum refugium,* he adopted a measure more conformable to peace and order."

The unfortunate occurrence giving rise to this litigation, of the attempted taking of law into one's own hands—making an assault upon the commissioner's quarters and threatening to use physical violence in a more personal way, to enforce submission, while he was performing his duty as he saw it, and his duty in fact so long as he honestly believed he had not been legally removed from office,—a duty not only to himself but to the public—to defend his possession against an unlawful intrusion—and what might be the result in the fu-

ture of the court ·adopting, as a principle, the idea that it cannot or will not exercise its power to compel the settlement of such controversies by lawful methods,—must drive conviction home to the judicial mind that what was said, independently, in *Ward v. Sweeney,* and so emphatically supported in the authorities above referred to, and practically by universal authority, both elementary and judicial, is sound beyond any room for reasonable controversy. The court not only can interfere with its strong injunctive arm in such cases, but it would be recreant to its duty not to do so promptly and firmly. There should be no hesitation in that regard, giving encouragement to such conflicts as occurred in the particular instance, tending to bring the law into disrepute and inflict harm upon the state. The doctrine of *Sullivan v. Haacke,* 5 Ohio N. P. 26, is a very salutary one, that an office is a franchise and is separate and distinct from the mere office quarters, and that the attempt of a claimant thereof to possess himself of it by forcibly dispossessing his adversary should be regarded so odious in a court of equity that, in case of the physical possession of such quarters being so obtained, the act should be regarded, practically, as not placing the offender any nearer the real thing sought after—the office itself—than as though he had not committed the unlawful act.

In the foregoing we have assumed, without discussion or reference to ·authority, that the governor's official duty did not extend·to forcibly putting *Mr. Anderson* into possession of the office of commissioner of insurance. Neither principle nor authority can be found to support any such exercise of authority. We will not dignify the matter by even discussing it. It is really too plain for reasonable controversy that the governor does not possess any such authority. The learned circuit judge was evidently convinced of that, notwithstanding he left the matter of whether the executive could be interfered with, in case of his usurping such author-

ity, undecided, choosing to rest the decision of the case upon a supposed, but not real, fatal infirmity in appellant's competency to obtain in equity the relief sought.

The suggestion made in the *Sweeney Case* of want of jurisdiction to grant temporary injunctional protection except as given by statute, is so obviously wrong that the court will not let this opportunity for correcting it go by without doing so. It was doubtless permitted to go into the decision before by mere oversight. We are constrained to say that, since it is contrary to the law as well understood ever since our judicial system was established. Power in equity, as it existed at common law, was lodged by the constitution in the court. The legislature is powerless to restrict it and has never attempted to do so. The practice has been in harmony with this from the first. The court as early as *Trustees, etc. v. Hoessli,* 13 Wis. 348, held that "when the complaint lays a foundation for an injunction it will be granted whether asked for as a final judgment or as a provisional remedy, in all cases where it would have been allowed under the old chancery practice. The statute on the subject enlarges rather than restricts the power of the court over the remedy by injunction." See, also, *Lutheran E. Church v. Gristgau,* 34 Wis. 328. In *DePauw v. Oxley,* 122 Wis. 656, 100 N. W. 1028, the court remarked on the same subject: The statute "confessedly was intended to enlarge the duty of the court as it existed under the former chancery practice."

In the case last cited it was held that not only all the power existing at common law regarding injunctive relief was vested in the court by the constitution, but an added power was afforded by statute, and, it was remarked, following previous cases on the subject, where the papers on an application for an order preserving the *status quo* pending the final result of the case show a reasonable probability of plaintiff's ultimate success, it is well nigh an imperative duty of the

court to grant such relief. "Not only does the discretionary power exist to protect a party" in such circumstances, "but the duty exists to exercise it." To the same effect are *Valley I. W. M. Co. v. Goodrick,* 103 Wis. 436, 78 N. W. 1096; *Milwaukee E. R. & L. Co. v. Bradley,* 108 Wis. 467, 84 N. W. 870; *Bartlett v. L. Bartlett & Son Co.* 116 Wis. 450, 93 N. W. 473.

There is nothing to the contrary of the foregoing, we venture to say, to be found in our books, except as suggested in the *Sweeney Case.* Had it not been for the inadvertence there made and now criticised, possibly this unfortunate litigation would not have arisen. Denial of power, or hesitation to use it until some calamity shall have occurred, are both unfortunate. Power should be used discreetly and efficiently; neither denied where it exists, nor used with such timidity as to bring the administration of the law into contempt and encourage infractions of it.

We may now safely restrict *Ward v. Sweeney* to this: (a) The court will not recognize a controversy as to title to an office as a primary right constituting a proper major subject for adjudication in equity; (b) The right in such a case being strictly legal, as a primary matter, it must be dealt with by legal remedies; (c) The right of a *de facto* officer to remain in undisputed possession of an office as opposed to forcible efforts of an adverse claimant to gain possession, until the *de jure* right of the latter shall have been judicially established, is a proper primary subject for equitable vindication with all the judicial instrumentalities essential to that end; (d) Whether the circumstances in any given case are such as to render use of the injunctive power of the court advisable or demandable, is matter of administration and not of power.

The foregoing is as far as it is necessary to go to demonstrate that *Ward v. Sweeney* does not, as the trial court sup-

posed, rule this case, if the appellant, at the time of the forcible disturbance of his possession, was a *de facto* officer. The court did not there decide, nor has any court decided, and it would be contrary to elementary principles if any court should decide, that in such circumstances as here it is not competent to judicially protect the party in possession, if a *de facto* officer. Even if the court would indorse now the degree of hesitancy suggested in *Ward v. Sweeney* to protect an officer in his possession against being unlawfully ejected, all the elements of imminent peril to personal security and public interests which were supposed to be absent there, or not clearly shown to exist, were present here in a high degree.

So if appellant was a *de facto* officer, and of that anon,—the circuit judge, as said, did not pass upon the matter—and the fact that the author of the disturbance was the governor did not change the ordinary rule—and of that we are about to speak,—the court not only had power and duty to act as it was invoked to act, but *Ward v. Sweeney* rules the case in appellant's favor instead of in respondents' favor and entitles appellant to a reversal as regards any question decided by the circuit court adversely to him.

## II.

Thus it will be seen demonstrated that the supposed safe basis for the judgment appealed from has no sustaining quality and, unless the result be right because of some question of law erroneously decided by the trial court against respondents, a reversal must follow. Counsel who stand for the judgment appreciate that, seemingly, and confidently press upon our attention a proposition of radical character which does not seem to have received any favor below further than is indicated by the suggestion in the learned judge's decision that "this court has refused to issue temporary restraining orders which would in any way interfere with the exercise of the broad powers vested in the chief executive of a state. The

governor is responsible to the people, and not to the courts, for the manner in which he exercises these broad powers." Citing *Att'y Gen. ex rel. Taylor v. Brown,* 1 Wis. 513, 522.

The broad language thus used might be very misleading to the casual professional reader, and particularly so to the nonprofessional, without having definitely in mind some important legal principles which will be mentioned. Confined to the literal sense of the words, "exercise of the broad powers vested in the chief executive of a state," illustrated by *Att'y Gen. ex rel. Taylor v. Brown,* which involved the exercise of a power so vested, the language is accurate; extended to the exercise of power not so vested—to the usurpation of power,— the language rather points favorably to the contention of counsel for respondents which we are about to discuss.

We hesitate to think the learned court intended to go further than to hold that the executive of a state is only answerable directly to the people in respect to the exercise of the power which he possesses; his conduct in that respect being a subject for political consideration at the bar of public opinion and the people at the polls—leaving him answerable at the bar of the court, as the representative of the people, in respect to violations of law by assumption of power which he does not possess. It is quite certain that the learned circuit judge did not mean, "this court will refuse to issue a temporary restraining order which in any way interferes with the exercise" of power assumed "by the executive of a state" to be vested in him, but which he does not in fact possess, and the exercise of which could not occur except by a violation of law—a usurpation,—because the judge proceeded to consider the subject and held that the "broad powers vested in the executive of a state" do not include power, personally or by his agent, to violently eject a person from an office when he shall have declared it vacant and to install his appointee therein as the successor, and to further hold that in a proper

case an injunction will lie to prevent such an interference, though that was left somewhat involved later.

It were better if the learned judge had carefully, expressly, differentiated between "interfere with the exercise of the broad powers vested in the chief executive of a state," which plaintiff's counsel were not urging, and interfere with the exercise of assumed power not possessed in fact, which was the subject of complaint. The failure to thus differentiate left the initial decision liable to be considered obscure or contradictory, which has called for this *expose* in order to do justice thereto.

The full scope of the proposition dealt with below, as above indicated, and now urged with great confidence is this: The governor of a state, acting in the name of his office, regardless of whether what he does or the manner of doing it is within or without the scope of his authority, cannot be interfered with by the courts. He is answerable only to the legislature under the impeachment feature of the constitution, or to the people. He is entirely independent of the courts, in acting as governor, regardless of whether his acts be legal or illegal. If he violates private rights, acting as governor, there is no jurisdiction in the court to afford redress for the wrong by interfering with him or his agents.

That is a striking proposition, as it is put up to us for consideration, though not a novel one, even here. The boldness with which it is pressed upon our attention, in view of the fact that it was most emphatically condemned here more than fifty years ago, is strange, passing strange. Some authorities are cited to our attention supposed to give some support thereto, without appreciating, seemingly, that in general they deal with matters decided by the governor within his jurisdiction, and that, in case of anything said suggesting authority outside of it regardless of judicial restraint, it is mere *obiter* and not supported by any principle grounded in

our system of government; and further not appreciating, apparently, that the matter is really not open to discussion here, unless the law as most solemnly declared in 1855 on one of the most, if not the most, significant occasions in the history of the court, is to be overruled.

A brief discussion of our system of government will not be amiss at this point. When it was established the people had in their keeping the whole power of sovereignty, which was of old deemed to be centered in a personal head as the agency of God on earth. Their effort to form a government to exercise that power contemplated a new system—one essentially different from any existing in the old world. The courts were no longer to be the agencies of a personal sovereign deriving authority from on high instead of from the people, but they were to be agencies of the latter. Sovereign authority was to be regarded as in the people, exercisable by the people through their chosen agencies, and for the people. It was divided into three grand divisions, viz., executive, legislative, and judicial; each to be the supreme agency within its particular sphere and to be subordinate outside of it. So the structure was builded. So it exists and must continue to exist until the people who wrought it see fit to change it.

No right is more sacred under such system than that of an individual to appeal to the judicial forum of his country for redress of any wrong perpetrated upon him. Without that right neither life, liberty, nor the pursuit of happiness would be secure, and the very purpose for which, in contemplation of our constitution, "governments are instituted among men" would fail utterly. To conserve that purpose, not to destroy it, executive power was conferred on the governor, coupled with the restraint and balance afforded by judicial authority to confine it within its jurisdiction, not to regulate it, by dealing with all judicial questions,—a guaranty which distinguishes our constitutional liberties from the

system of old. The executive is absolutely free from judicial interference within the scope of his duties. To that extent the court will not attempt to invade his realm to enjoin him, to mandate him, or prohibit him. There are a multitude of authorities on this. But when he steps aside from the sphere of his duty and violates the law, he is amenable to the law the same as any other person. The scope of his duty does not extend to breaking the law. Within its scope, acting as governor, he is powerful, but outside thereof, though pretending to act as governor, he is but an individual and must bow to the underlying principles of our system that all men are equal before the law,—the humblest with the most exalted, the lowliest in legitimate industry with the highest surrounded by all the power which wealth can give, or the highest in agency authority referable to the people; there is no difference in contemplation of our system, and if courts do their duty there can be no difference in fact. The courts must settle rights in any controversy respecting violation thereof, whether the violator be the governor or a private individual.

Anything contrary to the foregoing is a relic of an ancient system where there were no private rights, strictly speaking— only privileges. In the separation from old-world systems and the erection of a new one in this country, the former, contemplating merely graces, was succeeded by the latter, contemplating inherent rights, and among those rights those of life, liberty, and the pursuit of happiness—a system of real rights in place of a system of mere privileges enjoyable only through grace.

We must go on at some length, not attempting however any full exposition of the constitution, from an original standpoint, as to questions which were long ago supposed to be set at rest and must now be so regarded no matter what other courts have said or may say on the subject. To go over

it anew and in detail at this late date would be a work of supererogation and reflect upon generations of our judicial history and those eminent men who embellished it—Carpenter, Randall, Howe, Orton, Arnold, Ryan, Knowlton, and others at the bar, two of whom subsequently became chief justices of this court—and Cole, Whiton, and Smith from the bench, who so logically placed the matter on record beyond room for reasonable doubt.

The subject in hand is so important in every way, and it is of such moment to refresh the memory of the older members of bench and bar and to inculcate upon the minds of those of lesser experience the great truths spoken in this court before the days of those now in service, that we feel justified in restating such truths in a general way, and quoting at some length the inimitable, forensic, and eloquent logic with which they were in those early days spread upon our pages.

Under our system, when a judicial question arises it is within the competency of the court to deal with it, not stopping to consider, necessarily, who are the parties. Whenever there is a violation of law, perpetrated or threatened, it is competent for the courts to apply a remedy. It is not bound to desist—indeed it has no right to desist—because, perchance, of the violator being the governor of the state or his agent, for then the offender is outside the scope of his duty and, as before indicated, he is a mere individual, regardless of his name or title.

In the foregoing, as we have already sufficiently indicated, it is not doubted that the governor within the scope of his authority is beyond the reach of the courts; but a violation of private rights, we reiterate, is not within such scope, and when that occurs by him or his agents the wronged party may appeal to the courts of his country for redress.

As said by this court in *Att'y Gen. ex rel. Bashford v. Barstow*, 4 Wis. 567, so long as the court merely proceeds

"in the discharge of its appropriate duty of determining and settling rights of parties, and not creating these rights, then it must go forward to judgment, however unpleasant and delicate a duty that may be, and regardless of any and all consequences that may result from its constitutional action. . . . Here we must firmly stand to our posts of public trust, until the constitution fall about us in ruins." Those words, evincing a lofty conception of judicial duty and courage to do it, after the lapse of over half a century in the history of this court might well be repeated with emphasis. The idea so eloquently phrased by Justice COLE in those early days and on that memorable occasion in the court's administration, is no less pervading here now than then. Notwithstanding assaults upon it then or since or now, upon the theory of a sort of kingly authority vested in the executive department, enabling the one chancing to be there to infract the law and be so above the agency of the people to remedy and prevent wrongs by applying the law that any attempt to question his acts by such agencies would be usurpatious,—it has been and is now no more in danger than "a star in maw of the clouds." It is grounded on the sovereignty of the people vitalized by a constitutional appointment of the judicial department to vindicate it.

How can one be familiar with *Att'y Gen. ex rel. Bashford v. Barstow* and doubt for a moment that the governor as a violator of law stands no different than any individual? Arguments similar to those we have heard to the contrary in this case were made then with a logic, eloquence, and force unexampled before in this court and never equaled since. There the record stands—an inexhaustible fountain of wisdom on the subject discussed. All the actors at the bar realized that they were engaged in a contest which was to settle for all time in this state the underlying principles of our governmental system—settle them untrammeled by any false no-

tion which had obtained elsewhere under the misconception that foreign systems furnished a model for it. They were too near the time and circumstances of origin to need to look for precedents. In fact there were no precedents. They were familiar with the systems of the ancients. They knew the purpose of the builders here was to displace it. In the light of the monumental purpose and with the experience which the official expounders themselves gained in making our constitution, there was wrought out and pronounced a result which no one need misunderstand.

How the sentiments leading up to and characterizing the final result in *Att'y Gen. ex rel. Bashford v. Barstow* grow as we contemplate them, and fill the soul with admiration for our form of government, and gratitude to those who placed its dominant principles on such an enduring foundation. Some of those sentiments, in the language of that day, may well be repeated here as best voicing our own conception.

"This government is nothing but a division of the powers of the government, nothing more." "Sovereignty is not in one of the departments, nor in all of them." This is not only a popular government, but it is a representative government— one where the officers are but agents and not rulers of the people—"one where no man is so high as to be above the constitution and no one so low as to be beneath its protection." That was the first significant official evidence here of full appreciation of how widely our system varies from those of old by which many courts have set the judicial compass to determine the real nature of constitutional rights. It has been followed with few lapses since. It was followed in *Nunnemacher v. State,* 129 Wis. 190, 108 N. W. 627, in rejecting the heresy that found early lodgment in the jurisprudence of this country, that there is no natural right to transmit property by will or inheritance; and again in *Will of Dardis,* 135 Wis. 457, 115 N. W. 332; and again in *Will of*

*Rice,* 150 Wis. 401, 136 N. W. 956, 137 N. W. 778, reject-
ing the notion that competency to make a will rests in privi-
lege instead of in a right, and again in *State ex rel. McGrael*
*v. Phelps,* 144 Wis. 1, 128 N. W. 1041, repudiating the claim
that there is no natural right to participate in the usual way
in making a choice of agents to vitalize the sovereignty of the
people in governmental affairs.

It is somewhat strange that, notwithstanding the real logic
of the change effected by the declaration and successful con-
flict for independence on our shores, courts sometimes seem
to have failed in appreciation that it was independence of the
system of government characterized by individual possession
of mere privileges emanating from a personal sovereign which
was declared for, fought for, and won in the smoke and din
of battle and by the sacrifice of blood and treasure,—a sub-
stitution for the old system of one based on inherent in-
dividual rights, recognizing nothing in the nature of sover-
eign authority but that inherent in the people and delegable
by the people to co-ordinate departments in such manner as
the people might see fit, coupled with constitutional restric-
tions and guaranties.

Notwithstanding the light of the old notion of personal
sovereignty and the system upon which it rested was extin-
guished in the struggle characterizing the birth of the new
system on our shores, which arose in all its unspeakable benefi-
cence from the ashes of the old like the beautiful flower from
the ashes of Hyacinthus, and has ever since pervaded the land
and is fast extending its blessings to include all mankind, the
old, like Banquo's ghost, appears in apparition from time to
time, called forth, as it were, from the human tendency—
product of heredity—reaching back through the ages—to bow
at a personification of personal sovereignty. It would be
most lamentable if such false conceptions should find any
place in our jurisprudence after the early most emphatic re-
jection of it and the frequent affirmances of such rejection.

We do not fail to note at this point the personal expression of doubt in *State ex rel. Peck v. Rusk,* 55 Wis. 465, 479, 13 N. W. 452, as to the competency of the court to send its writ to the governor of a state or in any way review his acts. But it was not an authoritative saying. It was a mere passing and wholly personal and, we are constrained to think, rather inconsiderate remark. It is well to eliminate it, expressly, from having any cast of judicial decision.

It must not be understood that there is any want of appreciation here of the fact that much deference is due to the co-ordinate department of the government, vitalized by the governor. It is the pleasure and the duty of the courts to pay that deference and, perhaps, to resolve reasonable doubts as to where mere deference ends in favor of the executive department. But the court must not go so far as to cast any doubt upon its own authority to deal with all judicial questions, regardless of whether it may necessarily call in question some act of the governor. It may very properly hesitate, and even decline, to use its authority in any coercive way as to him, where there is any measure of discretion to do so, but not even venture to doubt that it possesses the power to act when action is necessary. No one can tell how soon action may be necessary to stay the hand which might accomplish most serious mischief, as was the case giving rise to *Att'y Gen. ex rel. Bashford v. Barstow,* 4 Wis. 567.

Some courts have given the weak excuse for doubting their right to send a writ to a governor, directly or indirectly questioning his executive act, that the court might be powerless to enforce obedience—even suggesting the possibility of executive control of the militia having to be contended with; as if a court with knowledge of its constitutional authority would be justified, under any circumstances, in not using it merely because the one who would be otherwise acted upon, even though he be the chief conservator of the law, might commit treason, as it were, rather than submit to duly con-

stituted authority. This court has never yet acknowledged
the existence of either the want of power to enforce its writs
or want of courage to vindicate it.

Judges of great eminence and text-writers the most learned
have discoursed along the same line as the foregoing. Jus-
tice FIELD, speaking for the court in *McCauley v. Brooks,*
16 Cal. 39, said this: "There is nothing in this distribution
of powers which places one department above the law or
makes either independent of the other. There is no such
thing as absolute independence." And further, in effect,
where power is given a department it is to be implied that
there is independence within the scope therof. If it over-
steps its line the judiciary will vindicate the violated right.

For a further example of the many illustrations in the
books of what has been said, Justice VALENTINE, speaking
for the court in *Martin v. Ingham,* 38 Kan. 641, 17 Pac. 162,
thus expounded the constitutional system:

"There is no express provision in the constitution, nor in
any statute, exempting any member of the executive depart-
ment, chief or otherwise, from being sued in any of the
courts, . . . and if any one of such officers is exempt . . .
it must be because of some hidden or occult implications of
the constitution or the statutes, or from some inherent and in-
superable barriers found in the structure of the government
itself. . . . In all other cases it is not the rank or character
of the individual officer, but the nature of the thing to be
done, which governs. No other officer is above the law. . . .
The different departments of the government are not inde-
pendent of each other. . . . It is said that if the governor
opposes the order or judgment of the court, it cannot be en-
forced. . . . But are the courts to anticipate that the gov-
ernor may not perform his duty? . . . No one should sup-
pose that he would fail in his duties. No department should
ever cease to perform its functions for fear that some other
department may render its acts nugatory. . . . Each of the
different departments is superior to the others in some re-
spects. . . . Each department in its own sphere is supreme.
But each outside of its own sphere is weak and must obey."

Courts which hold contrary to the foregoing, as said by some text-writers, do so without any sound basis for their conclusion. They do so, as before indicated, largely from a false conception of the system of which they form a part.

We indorse without qualification the sentiments of the courts to which we have alluded. We refuse, utterly, to follow those jurisdictions which would place the gubernatorial office above the law—speak of it as entirely independent of either of the other co-ordinate departments of the government as regards their respective jurisdictions—or hold that it is not subordinate to and subject to obey when the court within its jurisdiction commands. We must refuse to follow the lead which would either deny possession of the authority delegated to courts by the people or hesitate to exercise it for fear of being efficiently opposed by a breaking of the law by the officer who stands as the ideal personification of government by law. We hold firmly to all the court said and decided on the subject in *Att'y Gen. ex rel. Bashford v. Barstow,* 4 Wis. 567. To deny possession of the power plainly lodged in the court by the constitution and which is inherent in the system itself—either from want of appreciation of the principle distinguishing such system from the one it displaced, or supposed want of power—on the ground that the governor, from his position, has greater physical power of resistance to the enforcement of the law than the court could lawfully overcome,—would be a failure of judicial duty characterized by want of judicial courage. Those who would lean on the latter reason fail to appreciate that no government can be stronger than the people, and that the people may be depended upon to efficiently strengthen the arm of either one of its co-ordinate departments as necessary to enforce submission to duly constituted authority. The people may always be depended upon, in the last analysis, to support firm vindication of official trust.

We contemplate with much satisfaction that in the early

history of our court its personnel possessed the learning, the comprehension of the judicial trust, and the courage to take the firm position on the subject under discussion recorded in *Att'y Gen. ex rel. Bashford v. Barstow.* Then it was suggested by counsel that the court might render a judgment which it would be unable to enforce, and other counsel replied in sentiments indorsed by the court: "I have not seen fit to point the court to the possible consequences of its judgment, still I say it may or may not be executed. The only judgment to be pronounced is the one which law and justice dictate, not that which the executive arm can most easily execute." Three members of this court, two having been fathers of the constitution, placed upon the records each his exposition of our form of government. With perfect harmony they proclaimed the subordination under the constitution of the executive office to the sovereignty of the people, represented by the judiciary on all judicial questions. The masterly treatment of the matter and unanswerable logic with which the conclusion was supported have rendered it unnecessary to rediscuss the subject and almost inappropriate to attempt it. Such attempt would not have been made even briefly had not the proposition under discussion been presented and urged with such confidence as to indicate advisability at least of reaffirming the early decision. If the writer could make plainer what was before so clearly pictured he would gladly embrace this opportunity to do so, but confesses inability in that regard. There stands the picture of our system, painted by master hands more than fifty years ago. With the unqualified repudiation then of the claim that executive action under all circumstances is beyond reach of the court, we have marveled somewhat that the idea should at this late day be seriously advanced, supported by the same infirm logic as before, with added sanction of some courts which have fallen into error.

Before it was contended upon the one side, in harmony with the ancient system, that the governor occupies a sort of sovereign status removed beyond the reach, directly or indirectly, of the court and answerable only to the people; that "In city or in the country; in the battle or at the banquet; in anger or in love; he is the governor still."

> "The attribute to awe and majesty
> Wherein doth sit the dread and fear of kings."

On the other hand, it was contended that sovereignty was in the people and only there, the governor being a mere agent to do the people's will, answerable to them within his jurisdiction, but amenable to the court as the superior agency of the people on all judicial questions, the same as any other individual; that any infraction of the law by him is neither justifiable nor defendable by his mere status as governor, and that what is the law, what a violation of it, and the consequences thereof, are judicial questions.

With inimitable power of logic the proper place of the judiciary in our system and importance of maintaining it was pressed upon the attention of the court to nerve it to the uttermost in solving the controversy—these inspiring words being indulged in from the bar: "When discontent, violence and anarchy shall succeed to law and order—when the people and public officers shall depart from the constitution and desert the ship of state, I have a hope that the last glimpse that will be caught of organized government will be the judiciary,—that courts may be seen as long as any vestige of a state shall remain, still ready to direct—still speaking the law with an even mind, dispensing justice with an even hand, sitting serene and unmoved, above the influence of fear and of faction, still abiding by that motto so peculiarly their own—*fiat justitia, ruat cœlum.*"

The result was, as before indicated, unqualified support of the contention for the supremacy of the courts on all questions

appertaining to the violation of law and the protection of right, the court saying in terms or effect, "To talk of sovereign departments created by our constitution is to simply talk, and not to think, and much less to think rationally. We have no sovereign department. We have no triple sovereignty." "Our government is founded on principles not known to the law of any other country. The sovereignty of the commonwealth remains in the people." Each co-ordinate state agent stands for the whole people within its proper sphere. When the court speaks within its sphere it is not the justices who speak, but the people through their chosen agent, the court. To it is delegated all judicial authority, whether it concerns the executive or any other individual. To that authority all must bow. In that there is subordination—not to the court—not to the justices of the court—but to the sovereignty of the people. Such is the constitution—the collective voice of the people from whence the sovereign command emanates through each of its agencies, giving to each its measure of representative authority,—to the court all that appertains to the redress of violated rights.

Can there be any doubt, in view of the foregoing, of the power and the duty of the court to deal with every question in this case of violated right? Is not the idea that such duty stops at the threshold of the executive office, or anywhere short of its full performance, the veriest heresy?

Many of the authorities cited to our attention in support of the proposition under discussion, rightly understood, are in harmony with what has been said, and as to those which are contrary thereto they are not worthy of being followed. As has been clearly indicated in this opinion, *Att'y Gen. ex rel. Taylor v. Brown,* 1 Wis. 513, upon which some reliance has been placed in support of the proposition urged by counsel for respondents, is in the same class with *People ex rel. Broderick v. Morton,* 156 N. Y. 136, 50 N. E. 791; *Jones-*

*boro, F. B. & B. G. T. Co. v. Brown,* 67 Tenn. 490; *Hawkins v. Governor,* 1 Ark. 570, and many other cases cited, and still others which might have been. Therein, with varying phrasings, is found the expression upon which counsel have builded their hopes: "The governor is not answerable to the court for how he has performed or failed to perform his legal or constitutional duties. He cannot be judicially coerced into performing or controlled as to the manner he shall perform or prohibited from performing his executive duties." True, but is it his duty, acting as a *quasi*-judicial tribunal, to go outside of his jurisdiction and violate the constitutional right of due process of law? The distinguished courts which have so much reveled, so to speak, in language similar to that quoted, have not intended, in general, to be taken as meaning that the executive of a state may not be reached by the department -charged with remedying violated rights, in case of his doing something which he has no right to do or doing what he has a right to do in an illegal manner.

We do not need to go into the subject at length as to the extent to which the executive may directly or indirectly be reached within the scope of his duties. That he can be as to mere ministerial matters in case of clearly violating a duty, but not in the field of discretion, is strongly supported. Here there was neither ministerial nor discretionary duty to do the act sought to be enjoined; that is, the forcible instalment of *Mr. Anderson* in the office of commissioner of insurance. Besides, the question is raised as to whether there was not actual usurpation in the proceeding itself for the removal of appellant, which will be discussed further on. So the case as to the primary right involved really only deals with matters of jurisdiction. In general, where it is suggested that neither the governor nor his agents can be dealt with whether within or without the scope of executive authority—that, the alleged offender being governor or the agent of the governor,

the gubernatorial office is an efficient shield,—the real point. involved did not warrant the argument made in support of it. It was made without thought that jurisdictional defects render an act void, regardless of the tribunal to which they are referable. *Marbury v. Madison,* 1 Cranch, 137, is often cited, often misunderstood, and often not followed. The real logic of it is that the courts may reach the executive indirectly as to ministerial or jurisdictional matters, and in case of the head the impediment is referable to matter of policy rather than competency. In High on Injunctions, at sec. 1326, after reviewing at length the authorities, the author remarks: "If the acts which it is sought to restrain are purely ministerial as distinguished from an executive or political nature, the fact that they have been committed to executive officers such as the governor of a state, etc., will not prevent relief by injunction in a proper case." Matters jurisdictional, manifestly, are no further beyond reach than matters ministerial, but, as we have seen, the law for this state is firmly entrenched in *Att'y Gen. ex rel. Bashford v. Barstow,* 4 Wis. 567, supporting competency of the court to deal with the governor directly or indirectly for any violation of law.

### III.

Counsel for respondents do not seem to insist very confidently or particularly that appellant was not a *de facto* officer. But since under some circumstances that question might be very vital to this litigation, it seems best to treat it briefly.

Much might be said as to what is the precise nature of that special status denominated *"de facto."* A person may be a *de facto* officer and have no real title at all to the place he assumes to have the right to. If one is in possession of an office, performing its duties, and entered by right or such claim of right as not to be classible as a usurper, or have been in

undisturbed possession so long as to be equivalent to an entry under claim of right, and still claims in good faith to be entitled to the office, and all surroundings afford an appearance of *de jure* official status,—he is, as a general rule, *de facto* what he claims to be. What gives him that status is color of authority,—color of title is not essential, strictly speaking. The latter term is often used, but its infirmity was exposed in the leading case of *State v. Carroll,* 38 Conn. 449.

This broad definition of what constitutes an officer *de facto,* formulated by Lord HOLT in *Parker v. Kett,* 1 Ld. Raym. 652, 12 Mod. 467, and given special significance by Lord ELLENBOROUGH and the full King's Bench in 1865, *Rex v. Bedford Level,* 6 East, 356, was demonstrated in *State v. Carroll* to cover the subject under discussion as it has ever since stood in England and generally in this country: "One who has the reputation of being the officer he assumes to be although he is not such in point of law." The supreme court of Massachusetts added the weight of its sanction thereof in *Petersilea v. Stone,* 119 Mass. 465. The text-writers give like sanction, expressing the American view to be, that it is color of authority, not color of title, which distinguishes an officer *de facto* from a usurper. Throop, Public Officers, § 623; Mechem, Public Officers, § 317.

The question of whether a person in office has a *de facto* right thereto, it would seem from the foregoing, can in all ordinary cases only safely be solved by principle. It is not best to rely on case law and tie to some particular adjudication involving facts somewhat similar to those to be presently dealt with. The principle governing the matter is definitely settled in the unwritten law, is plain, simple, and easily understood. If one finds another in the apparent enjoyment of an office, having entered by right or a good-faith claim of right, or been in possession so long that there is a presumption in his favor in that regard, that one need not,

in general, investigate the title of such other to the office before venturing to transact business with him. He may act on the appearances of official status. For all practical purposes such other is an officer *de jure*. There is no other safe rule to go by. Variations here and there, seemingly without appreciation of the prevailing principle, or moved by the necessity of a particular situation to engraft an exception thereon, have made some confusion in the authorities.

Prior to *State ex rel. Jones v. Oates,* 86 Wis. 634, 57 N. W. 296, no attempt had been made here to state any general or even particular limitation of the customary rule; the court being content to deal with each particular situation as it arose. It is significant that, though in many instances prior thereto, commencing with *Tolle v. Stone,* 1 Pin. 230, whether the particular status involved a *de facto* officer was important, the answer was most always in the affirmative. They were not referred to in *State ex rel. Jones v. Oates,* but a rule was made for the peculiar situation in hand in the nature of an exception to the common rule.

One would assume from examination of the many cases preceding *State ex rel. Jones v. Oates* and the many others subsequent thereto, that there could hardly be conceived a situation of an office *de jure* and an entry and retention in good faith with all the environments of an officer of that character, without the person in possession being at least an officer *de facto* until such time as an adjudication of his title should occur, so the precise situation giving rise to the particular case is important.

These are the facts of the *Oates Case:* The incumbent of the office and his adversary were rival candidates for the place for a new term. The latter in due course obtained the regular certificate of election, his majority being one out of a poll of 4,645 votes. The former refused, upon due demand, to surrender possession, claiming, notwithstanding the

official canvass, to have received a majority of the legal votes cast. *Mandamus* proceedings were instituted to settle the controversy. Thus the question arose whether an officer holding over after the expiration of the term for which he was elected, and in defiance of the result of an official canvass certifying another to have been duly elected as his successor to the particular place, is an officer *de facto* and as such entitled to retain possession until the title shall have been judicially settled in proceedings to that end. In short, the question was, Is a person whose term has expired, who really has no right, except pending the appearance of a successor having a *prima facie* right to take his place,—one who holds on claiming to be the one elected notwithstanding the legal canvass and declaration of the demandant to have been duly elected to the particular office and for the particular term,—a *de facto* officer?

For the particular situation it was apparent to the court that an affirmative answer might lead to very serious consequences—that it might make a very harmful rule. The court felt warranted in determining the matter in the negative and without precedent, proceeding to that end to meet the particular emergency by this process of reasoning:

"A *de facto* officer is one who is in possession of an office and discharging its duties under color of authority. . . . By color of authority is meant authority derived from an election or appointment, however irregular or informal, so that the incumbent be not a mere volunteer. . . . Tested by this rule, it is apparent that the defendant is in no proper sense a *de facto* officer as against the relator. There has been no canvass or determination by any one in his favor, nor has he any certificate, commission, or authority from any person, officer, or board purporting to authorize him to discharge the duties of the office."

Thus it will be seen the opinion in *State ex rel. Jones v. Oates* was confined to a very narrow compass, namely: Is a

person in possession of an office, having no certificate of election or of appointment covering the period of his possession, in opposition to one who has been duly certified to have been elected to take his place in the particular office for the particular term, and the one in possession having no right whatever to the place referable to any evidence he possesses except to hold the accessories of the place in trust to deliver the same to his successor upon demand,—a *de facto* officer?

The case was quite different, it will be observed, from one involving a claimed forfeiture of a term of office by removal for cause, the person in possession of the place and alleged to have been removed having his commission entitling him to remain and insisting in good faith that the proceedings to annul such commission are invalid.

The general rule that possession with color of authority and performance of the duty of the office creates the *de facto* status was not denied in the *Oates Case,* but rather affirmed, though there was a suggestion that color of authority means "authority derived from an election or appointment, however irregular or informal." It may be that the court, *arguendo,* went rather farther than was necessary in an effort to state a sound basis for the decision, instead of resting it upon the exigencies of the particular situation and upon a permissible exception to the general rule. As said before, courts in general distinguish color of title from color of authority, holding that the former may exist without the other and that no election or appointment is essential to a *de facto* status,—only those general appearances suggesting and giving confidence to people having occasion to perform official business with the office that the one in possession, performing the duties thereof and claiming the right, in good faith, to do so, is the officer in fact which he appears to be. To harmonize with the current of authority the decision would need to be restrained to the idea that, in the particular circumstances, there can be

no color of authority where there is no color of right.  That makes a good exception to an old rule to meet the particular species of mischief the court dealt with in the *Oates Case*. The effect of it, as there suggested, must be that one may in some circumstances have a *de facto* status as to the public— for example, when he is within the stated exception,—though not such status as regards his personal right.

The first instance of rival claimants dealt with here after *State ex rel. Jones v. Oates,* and where that was cited, was in *Deuster v. Zillmer,* 119 Wis. 402, 97 N. W. 31.  The officer there held over in defiance of the person who had been elected his successor.  The former was held to be an officer *de facto,* though his term had expired, because the latter had not been "declared," as in the *Oates Case,* "duly elected to that identical office as his successor."  It was distinguished from the former case on that ground.  The *Oates Case* was again referred to in *State ex rel. Rinder v. Goff,* 129 Wis. 668, 109 N. W. 628, but the person having the *prima facie* right was in possession of the office.  It was again mentioned in *State ex rel. Manitowoc v. Green,* 131 Wis. 324, 111 N. W. 519.  There was a successor in that instance, and a holding over without right as against the *prima facie* title, though not under the precise circumstances of the *Oates Case*.  The person so holding over was held to be the officer *de facto*. Thus, it will be seen, the tendency has been to restrain the *Oates Case* to its particular facts and the exception those facts gave rise to.

Applying the foregoing here, it is considered that appellant was the commissioner of insurance, at least *de facto,* when he sought protection against the efforts to forcibly disturb his possession of the office rooms and records.  The case is not within the exception created by *State ex rel. Jones v. Oates,* because the term for which appellant was appointed had not expired by operation of law and he had in his possession the

commission covering some three years time yet, which was still in force unless the attempted removal was valid. *Anderson* had not been certified to have been appointed to the particular office as successor to appellant for a new term, but to take up and continue the work of the term covered by appellant's appointment. The latter was still in office, with all the appearances of still being entitled to the place, and insisting in good faith upon having such right, and there was a serious question, from a private and a public standpoint, as to whether he was not so entitled,—so. serious that it has taken a long time and much labor of two courts, assisted by the industry of eminent counsel for the respective parties, to solve it.

## IV.

If the foregoing conclusion be not correct, in my opinion that did not warrant leaving the rival claimants—one in possession. claiming in good faith to have a right to remain and the other out of possession claiming the right to enter—to contend and settle the matter by physical force. The course in *State ex rel. Jones v. Oates* was by orderly judicial proceedings, not by violence. If the rule there be applicable here, then *Anderson* had a clear legal right to possession and a clear legal judicial remedy by *mandamus* to accomplish that which was sought by an assault upon the office quarters and threatened assault upon appellant himself, if necessary to cause his submission. Would it not be a most serious reproach to our system to hold that under such circumstances the courts must or will stand idly by and see a respectable, distinguished citizen, in high station,—in good-faith possession of one of the most important offices in the state and convinced of his duty to retain the place, subject to judicial remedies,—treated as an outlaw, while the one seeking possession and the one seeking to assist the claimant to gain possession have but to ask in order to have the right vindicated by a

judicial remedy, as in the *Oates Case*,—violently ejected, regardless of the good faith of the aggressors? In such a situation is it not in the interests of all parties concerned, especially under the particular circumstances of this case, in the interests of public order and public welfare and public dignity, that the court should intervene with its "even mind and hand" efficiently commanding peace? No such proceedings as were brought to a close by the temporary injunction in this case should be sanctioned by the courts for a moment, in my opinion, unless in some special circumstances of a person holding possession in a most unreasonable and contemptuous manner, akin to that of an outlaw who deserves no consideration whatever in a court of equity. If there is a reasonable question whether the retention be right, the rule that there is no wrong without a remedy should apply, and the rule, also, that in a case of legal and equitable remedy as well the latter should be permitted if the former is not as full and adequate. That is the universal doctrine. It has been vindicated in this court to prevent breaches of the peace and detriment to public interests, where small amounts of money were involved. *Milwaukee E. R. & L. Co. v. Bradley,* 108 Wis. 467; 84 N. W. 870. The logic of that case demanded injunctive protection in this one unless appellant is to be regarded as a person who is entirely outside the scope of the law's protection. That the doctrine of protection by law, under all circumstances involving any merit, is the rule of this court, is well evinced by the quotation in *Chain B. Co. v. Von Spreckelsen,* 117 Wis. 106, 94 N. W. 78, from *Ward v. Sweeney,* 106 Wis. 44, 60, 82 N. W. 174. The great power intrusted to the court to command and enforce peace should be used in such circumstances regardless of who is the actor.

Thus I cannot escape the conclusion that, from any fair viewpoint, appellant had a cause of action in equity when he initiated these proceedings. If he was a *de facto* officer, that

must be true. If there was a fair question as to whether he had that status, and he was acting in good faith, of which there can be no manner of doubt, then, in my opinion, it is likewise true. I permissibly step aside, momentarily, to express this as a personal opinion. I wish it to so be recorded. I am conscious of some support in such view, though others may not wish to join of record, because what has preceded and what will follow, or either, is sufficient for the case. As to my brethren who do not join with me on the record, or at all, in this, I have endeavored to speak so as not to cause them any embarrassment.

## V.

At this point it seems best, since a majority concur, to consider the broad question of how far a court of equity may or should go in a case of this sort. That involves the mixed question of how far the court may go as matter of jurisdiction in the technical sense, and how far in the more limited sense of judicial policy; and perhaps the still further element of how far as matter of broader judicial policy, not trenching upon jurisdictional grounds in any sense. True, in view of the decision reached on other questions, this subject might be passed without expression of opinion; but, as circumstances might have existed rendering it vital, those who concur on the particular points have concluded that the subject might well be dealt with and, with due deference to those who do not agree with the final result and those who do, yet might prefer not to join in an opinion either way as to the particular matter—it is thought that what is here said is appropriate to the case, will be helpful hereafter, and will not embarrass any member of the court in any event. If it were not thought such could be accomplished, out of deference to any one who does not agree as to the particular question or wish to express an opinion thereon in this case, though concurring in the general re-

sult reached, the writer and all of the majority would pass the subject without treatment.

The question is this: Should the court rest, in a case of this sort, having reached a point calling for judgment vindicating the primary right—the right to immunity from being forcibly dispossessed by illegal methods,—leaving the more important question, the right to the office, undetermined?

That is an important question. It has been taken largely for granted that either the court is without jurisdiction to, or in any event should not, try the title *de jure* in an equity action to quiet the right of possession against forcible attempts to disturb it. Must parties in such a case, though in the court having jurisdiction to settle the whole controversy, depart with but partial relief, and none as to the ultimate matter, and come back, not really in another form of action, because we really have but one, but asking another form of relief; a part of the same form as before and, from a practical standpoint, including it? Under our liberal Code of Procedure, rightly understood and administered, is it true that such devotion to mere form is necessary, commendable, or really right? If there be expressions in opinions which would sustain such course, or even precedents, and there be no jurisdictional impediment in the way, has not the time come, and is this not a good opportunity, to eliminate them from our jurisprudence and go back to the conception embodied in the Code?

The learned court below supposed its power was included in very narrow limits by the mere form of relief appropriate to satisfy the primary subject of the litigation, the mere right of immunity from forcible ejection, and even, as we have seen, supposed there was incompetency to determine the matters of fact essential to that right. So it was decided that there was no jurisdiction to look into the merits at all, respecting the right *de jure* between appellant and his adver-

sary.    It was supposed at the circuit, and contended here by
counsel for respondents, that such was the infirmity of judi-
cial authority in this equity action.    Counsel for appellant
passed up that phase of the case, as to the *de jure* right, on
the oral argument and, as was thought at first, in the printed
argument, in such a way as, seemingly, to concede that the
court below was right on that question, and that this court
would not go into the subject further than to see whether
appellant had such reasonable ground for his claim as to en-
title him to protection in his possession pending a trial of the
title in some other action.

The circuit court relied, evidently, on *Ward v. Sweeney,*
106 Wis. 44, 60, 82 N. W. 174, and similar cases, without tak-
ing note of the fact that in all such the primary right involved
in the litigation was the actual title to the office.    Counsel
for respondents have been unable to discover any authority
on that, as indicated by their few cited examples, other than
such as to show that an action in equity will not lie to try
title.    That must be admitted, but it does not meet the ques-
tion.    This action is not to try the title but to protect the
possession pending trial as to the *de jure* right.    As we have
before indicated, such right is legal in character, and when-
ever a judicial question is raised in respect thereto, pri-
marily, it is a legal question and a subject for the appropri-
ate legal remedy.    But while a legal right, in case of there
being an adequate legal remedy to vindicate it, can only be
the subject of a legal action and legal relief, where the right
is equitable, or the title is legal and of necessity no legal
remedy will reach the mischief of its violation or threatened
violation, or when a legal right is incidental to an equitable
cause of action, then the boundless resources of equity will
meet the case, and such is the perfection of our system that
there is no wrong within the competency of the individual to
commit, which is above the grade of those mere moral in-

fractions which are not recognized as judicially remediable, that equity cannot prevent, or redress, if there is no legal remedy to adequately fit the case. That is elementary and has been declared here over and over again.

Thus it is plain that the right of possession was the primary right here, not the title to the office. So the ground of the decision below, and of respondents' position here, fails. Another elementary principle comes in at this point. Where a court of equity has acquired jurisdiction of the parties and the subject matter for one purpose, it may properly adjudicate all cognate questions and settle the whole controversy, though the connecting matters would not, of themselves, form a primary subject for equitable interference. The mere statement of this would seem to be sufficient. There is no principle of equity jurisprudence with which the profession is more familiar. We therefore pass it without citation to support it.

In view of the foregoing principles, it seems very clear, without reference to authority, that there is no jurisdictional difficulty in the way of the trial court finally disposing of the whole controversy between the parties. The right to protection against violent disturbance pending settlement of the title was the primary right. The right to the office was incidental thereto and had to be judicially settled some time. The questions involved were practically all questions of law. No possible prejudice could arise because of absence of legal methods of reaching the final result. Why then turn the parties out of court to come back upon the same facts and in practically the same action under a different name and seek, primarily, a different form of relief? It seems that such a course would be contrary to the letter and spirit of the Code and contrary to the light in which it has been viewed here in recent years, though it may have been overlooked somewhat at times. When the framers of the Code abolished all old

forms of action and with it the system of distinct courts, and substituted in place thereof unity in form,—one form of action for the enforcement or protection of private rights and the redress or prevention of private wrongs, denominated a civil action,—no matter of jurisdiction in the technical sense was left to vex the courts and embarrass one in quest of justice as regards whether to ask for relief in any particular form of action, and no matter of right in the technical sense subject to violation, except as regards whether the kind of relief necessary to fit the case required, by common-law rules, jury interference. That right, at common law, did not exist where the controversy, though a proper subject matter for legal action, was connected with and germane to the primary subject of the appeal for equitable relief. The court, having jurisdiction of the parties and of the primary subject matter, was competent to settle the whole controversy—the main issue and all the incidental controversies connected therewith—in a single decree. 1 Story, Eq. Jur. § 64; *Prescott v. Everts,* 4 Wis. 314; *Akerly v. Vilas,* 15 Wis. 401.

That stated principle has been considered so grounded in our jurisprudence that it has been customary, from an early date, to merely state and apply it as occasion arose, without hesitating to justify the application by reference to authorities. The constitutional guaranty of the right of trial by jury was "that such right shall remain inviolate." So it has been held that it extends no further, and restricts the freedom of equity authority no more, than was the case at common law. Thereby, and by removal, through the Code, of jurisdictional difficulties as regards the particular form of action and particular court to vindicate a particular right, all substantial interferences with settling the rights of parties, regardless of the nature of the relief required, once they were in court in good faith and it had acquired grasp upon the general controversy required to be settled, to do full jus-

tice between the parties, vanished. *Gates v. Paul,* 117 Wis. 170, 94 N. W. 55; *Luetzke v. Roberts,* 130 Wis. 97, 109 N. W. 949; *Knauf & Tesch Co. v. Elkhart Lake S. & G. Co.* 153 Wis. 306, 141 N. W. 701.

We see no reason why the principle stated may not be applied to a case of this sort. The fact that there has been no such application heretofore here makes no difference. Principles should rule in the judicial field, not mere precedents. In no other way can the law preserve anything like the cast of a science. In High on Injunctions, after discussing the rule that an equity action is not maintainable for the purpose of trying the title to an office, it is said as a result of reviewing the authorities, the rule applies "only to cases where the title to the office is the sole issue involved, and where the bill is filed for the primary purpose of determining that issue. And where the question as to the title to public office arises merely incidentally to the determination of a suit of which a court of equity otherwise has jurisdiction, the rule has no application." § 1315a (4th ed.). The author ventures to state that, as a logical deduction from the ruling principles of equity jurisprudence. While it is rather against the generally accepted theory, we see no escape from the conclusion.

In the circumstances of this case it seems that establishment of the real status of the office is peculiarly within the field of equity jurisprudence. Appellant is in possession. To prove his right, the facts *aliunde* the record had to be examined. No possible prejudice can occur to respondents or to the public by the title being finally quieted in this action. On the contrary, every legitimate private, as well as every public, interest would be best promoted by the entire controversy being brought to a termination at the earliest practicable moment and without the useless expense and expenditure of money and time which would be involved in another action. Why then should the idea that equity cannot take

jurisdiction to try the title interfere with undoubted com-
petency to do so, where it is germane to a proper ground of
equity action?  The extreme of technicality which would
adhere to an idea beyond its necessary limitations, to the
manifest useless delay in the administration of justice, is
foreign to the modern conception of the requirements of the
Code and inconsistent with the trend towards a restoration
of those beneficent features intended by its framers to be in-
corporated therein.

It seems the court should decide in this case, and as an
established principle of our practice, that where the contro-
versy as to the title to an office is incidental and germane to
a proper subject of primary right in a suit for equity relief,
and the court having the case in charge has all the parties
interested before it, it has competency to and will settle the
incidental as well as the primary controversy, where it clearly
appears that justice will be best subserved thereby.

## VI.

In view of the probability of the last question discussed
taking the course indicated, the reargument was had on the
question of whether the executive, in administering the power
of removal under sec. 970 of the Statutes, is required to
proceed by due process of law; whether that, in the circum-
stances of this case, entitled appellant to reasonable notice
of hearing of the particulars of the charge made against him,
reasonable opportunity to be heard in respect thereto in per-
son and by counsel and by his witnesses, to know the adverse
evidence to be considered, exercise the right of cross-exami-
nation, and present all material evidence in his behalf; and,
if so, whether such right was denied to appellant; and, if so,
whether the result reached was valid; and, further, whether
it is a jurisdictional requirement to competency to render a
judgment of removal in such a case that the evidence, in

some reasonable aspect, warrants finding existence of the cause for removal charged. We will now proceed to discuss the case in respect to those matters.

· If results already reached were not sufficient for the case, there is a still broader one than any heretofore discussed, except possibly that of the constitutional power of this court in its relations to the executive department of the state. As the case developed in our consultations, it assumed such magnitude and character that the particular right involved sank somewhat into insignificance. The constitutional question before referred to and the general features of the case challenged our attention to the right of the individual as guaranteed by the fundamental law. So, on the one hand, there was questioned the power of the judicial department to deal with violations of private rights when it came to questioning the validity of executive action; and on the other there was raised, by the very nature of the transactions in evidence, the question of whether the constitutional guaranties of private rights had not been violated. If we passed the danger respecting the proper place of the judicial department in our system being invaded, there was left the danger of private rights being held successfully violable and a precedent being established greatly weakening the dignity of such rights, at the very foundation thereof. Neither of the parties in this litigation would wish to prevail as to the particular right at so great peril to the public welfare as that of having that question decided wrong or even passed unnoticed. The distinction and high character and patriotic devotion to their own high ideals of government by the people through the people's chosen agents, which they must be assumed to conceive to be founded in our fundamentals, is proof enough for that. So the parties and the particular alleged violated right seemed to form but a mere background to the questions the

situation gave rise to, and to almost be obscured by the paramount importance of the inquiries to be solved in reaching a final result being solved right. In appreciation of that, the court rested from the labor of considering the case as at first submitted by counsel for the respective parties, and ordered a resubmission upon four propositions which appear at length in the statement of facts and may be epitomized to this:

Is validity of an order of removal under sec. 970 of the Statutes dependable upon the constitutional guaranty of due process of law being observed, and, if so, are the common-law requirements a part of the statute as to hearing, upon reasonable notice to the party interested of time, place, and questions involved, and proceeding with substantially the essentials of a fair judicial investigation and determination, to and inclusive of a result supported, in some reasonable view, by evidence,—especially in case of an office for a fixed term?

If the stated proposition be resolved in the negative, then we manifestly have a condition in this state not dreamed of when our system of statutes was originated. Then there were but few officers within the particular removal provision. Now there are hundreds. A system of government, largely by commissions with membership both as to the major and subordinate factors composed of men of high character and special attainments, has been developed. A maximum of special knowledge on the part of the incumbents is required, with a minimum of political interference, if the complicated system is to have any fair opportunity to attain somewhere near to the ideal of efficiency its originators designed to accomplish, and all hoped for. In view of that, as well as of the overshadowing importance of preserving the integrity of constitutional guaranties of private rights, the question of whether the executive possesses the power of summary removal as to the vast number of important public offices, unrestrained by those principles of natural justice which char-

acterize the common law—a power which might be used to build up a personal following from the utter dependence of the individuals upon the discretion of the head,—is of immeasurable importance.

The proposition, as stated, might be further narrowed without sacrificing any of its essentials, and might be greatly expanded so as to develop many important details. To take the latter course and discuss each of such details at length would extend this opinion to a very great length without, perhaps, any corresponding added dignity or element of demonstrated truth as to the result. However, the discussion vill unavoidably extend to considerable detail, though attempting to tie as closely as practicable to the real gist of the matter as indicated in the proposition stated.

Notwithstanding expressions here and there which would give rise to doubt if one were not grounded in the real philosophy of the law,—courts in general hold and this court has held, as we shall see in the course of this opinion, that neither any personal nor property right, in the broad sense of those terms, not even a status, or anything which can be the subject of rightful private possession to enjoy, valuable in a pecuniary sense or in promoting any fundamental right,— except in case of a mere granted privilege, subject to be recalled by the terms of its acquirement,—can be taken from its possessor, against his will, without the due process of law of the constitution,—a proceeding judicial in character, characterized by the common-law safeguards against injustice, unless some other procedure is provided by the written law. Why does that not apply to the right to hold and enjoy an office, with its honor and emoluments, to which one has been elected or appointed?

Counsel for respondents answer the foregoing in the negative, in part upon the theory that an office is not property and, therefore, that the due process of law of the constitu-

tion does not apply, and that such contention has support in *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 64 N. W. 304, where, it is said, *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112, much relied on here by counsel for appellant, was not followed.

Much confusion, it seems, has arisen from a confusion of terms in the cases dealing with the subject under discussion. True, in the *Starkweather Case,* to show that one of a statutory removal tribunal is not disqualified because he is not so circumstanced as to be competent to exercise that judicial power conferrable only on courts after the manner of the common law, it was said that the power to remove public officers is not judicial but administrative, to be exercised in a judicial manner, and that the right to an office is not property or a vested right,—evidently meaning, not property in the sense that it is not of such a nature that it cannot be taken away arbitrarily and except upon rendering just compensation, but may be taken upon any condition of its bestowal. The opinion of the court, when carefully read, seems to express that idea very clearly. That is in perfect harmony with *Dullam v. Willson,* as will be seen by a careful study of that case. There the power of removal for a cause specified in the written law and established by investigation and found by application of judgment to proof was said to be judicial, and that such essentials—by necessary implication and as plainly as if written into the law in unmistakable words—require the power to be exercised with all the common-law and ordinary safeguards, founded in natural justice, for the protection of private rights—so required by the constitutional guaranty of due process of law—hearing upon reasonable notice of time, place, and charges and after the manner of fair judicial investigation. What was called judicial power in the one case was called administrative power, exercised judicially, in the other,—the power generally de-

nominated *quasi*-judicial; and what was called property in one because a valuable right of which one could not be deprived except in some manner·constitutionally provided by law, was said not to be property in the other. It was thus said, evidently, to distinguish the right to an office from a thing which is subject to absolute ownership and not for the purpose of expressing the idea that such right is not of any pecuniary value. On the real essentials, as regards this case, the *Starkweather Case* and *Dullam v. Willson* are in harmony. More will be said later in respect to the character of the power of removal and the nature of the right to an office as regards whether classible as property or not, though, as we shall see, that is not very important in this case.

The broad principles of natural justice, which, as indicated, require hearing before condemnation, are older than this court or the courts of this country. They obtained here before the Revolution through grace of the sovereign, embodied in Magna Carta. "No freeman shall be taken or imprisoned, or disseised, or outlawed, or banished, or in any ways destroyed, nor will we pass upon him, nor will we send upon him, unless by the lawful judgment of his peers, or by the law of the land." It was incorporated into our fundamentals by the general declaration upon which the constitution was grounded, and pervades in its spirit the whole instrument. It is inherent in the very system, as said by an eminent text-writer. Story, Const. (5th ed.) § 1938. No special guaranty was necessary, as in the Fifth and ·Fourteenth amendments to the national constitution, as regards the inviolability of liberty or property except by due process of law and under the protection of the principle of equality before the law.

No court has dignified the ideas above expressed more constantly or conspicuously than our own, as we shall see in the course of this opinion. When we carefully analyze our

adjudications, avoiding mere reference to any expression here or there, or a particular case, to fit a particular matter in hand, harmony will be found throughout, as what follows will indicate.

' What is due process of law? There is nothing very technical about it when we view the subject broadly. Due process of law means, in brief, the law of the land—including the unwritten law. It is, simply, that which must be followed in depriving any one of anything which is his to enjoy until he shall have been divested thereof by and according to the law of his country. Whether the proceedings relate to liberty or property, in the technical sense, and be of a strictly judicial nature, or to mere privilege, immunity, status, or anything else of value, which commonly are of a *quasi*-judicial nature, incidental to or as a part of administrative authority, and reviewable by courts as to jurisdictional matters, or, of a purely ministerial nature where the thing is a mere creature of the law granted upon condition of being so dealt with, due process of law pervades and rules them all.

The mistake has influenced some courts, that due process of law calls for the interference of a court—judicial proceedings, in the technical sense, and therefore that it only appertains to property in the sense of things of absolute ownership—things which may be bought and sold and passed by will or inheritance. By or according to the law of the land covers the whole field—everything appertaining to right is to be dealt with according to law—administrative power, such with the concomitant of *quasi*-judicial authority, legislative methods, judicial power in the technical sense—each in its proper sphere is due process of law. In *Kennard v. Louisiana,* 92 U. S. 480, 481, in dealing with a fixed term of office and power of removal for cause, on appeal from the state court presenting questions similar to those discussed here, the

test applied was whether a hearing had been afforded to the officer according to the essentials of the common law, except as the same might have been changed by statute, it being taken for granted that such was necessary in the absence of some clear, constitutional provision in the written law enacted to take its place. Due process of law is, as the court said approvingly, "due course of legal proceedings according to the rules and forms which have been established for the protection of private rights." It was not doubted there that the right to an office, not terminable at the pleasure of some legislative agency, is within the protection of the fundamental law and the methods established in the common law or expressly by statute; including the right of a fair hearing according to the principles of natural justice. The general effect of the decision, in harmony with the authorities in general, is that due process of law contemplates legal proceedings of the sort provided by the unwritten law, in case of there being no abrogation thereof by written law, but not necessarily confined to proceedings in courts.

Further illustrating the subject, the supreme court of Michigan in *Att'y Gen. ex rel. Rich v. Jochim,* 99 Mich. 358, 58 N. W. 611, said, in effect: If one accept office from which by the law of the land he is subject to be removed in any particular way, then deprival that way is due process of law. If he takes an office which is in the power of the legislature to abolish and he is thereby deprived of it, his removal is by due process of law.

The suggestion that the special guaranty as to liberty and property does not extend to the right to an office because it is not, strictly speaking, the one or the other, is far too narrow a view of the constitutional idea, as what has been said sufficiently shows. The special guaranty as phrased was adopted doubtless, as distinguished commentators have said, to cover in a particular way all that is included in the gen-

eral declaration forming the substructure of all American
constitutions. Under the general and the special guaranties
as well, no right of an individual, valuable to him pecuniar-
ily or otherwise, can be justly taken away without its being
done conformably to those principles of natural justice which
afford due process of law and the equal protection of the
laws—a fair hearing and judgment upon evidence, unless the
written law constitutionally otherwise provides. For em-
phasis, we reiterate this idea. The interference, as before
indicated, may be by that *quasi*-judicial authority which the
legislature may delegate to an individual or a board, but
whether the power be exercised by a court or a *quasi*-judicial
tribunal, unless otherwise clearly provided, the essential fea-
tures are substantially the same.

That the protection of due process of law extends to rights,
in the broadest sense of the term, has always been fully rec-
ognized here and most significantly in *State ex rel. Milwau-
kee Med. College v. Chittenden*, 127 Wis. 468, 107 N. W. 500.
The court there said:

"One of the fundamental principles of our system of gov-
ernment is that no one shall be condemned, as to his person
or his property, without due process of law. That is well
within the letter, and, manifestly, within the spirit of the
Fourteenth amendment to the national constitution, within
our constitutional guaranty as to a firm adherence to the
fundamental principles of justice (sec. 22, art. I, Const.),
and that comprehensive, basic guaranty making the constitu-
tion as a whole a recognition of and pledge for the preserva-
tion of all inherent rights, and especially rights to life, lib-
erty, and the pursuit of happiness."

"Due process of law does not mean merely according to the
will of the legislature, or the will of some judicial or *quasi*-
judicial body upon whom it may confer authority. It means
according to the law of the land, including the constitution
with its guaranties and the legislative enactments and rules
duly made by its authority, so far as they are consistent with

constitutional limitations. It excludes all mere arbitrary dealings with persons or property. It excludes all interference not according to the established principles of justice, one of the most familiar of them being the right and opportunity for a hearing, to meet opposing evidence and oppose with evidence, according to the established principles of fair investigation to determine the justice of the case, before judgment affecting personal or property rights shall be pronounced."

The foregoing only puts in another form the idea as phrased by the most eminent of our elementary expounders of the constitution as to the scope of the constitutional guaranties. At secs. 1928 and 1950, Story on the Constitution (5th ed.), it is said:

Due process of law "covers every right to which a member of the body politic is entitled under the law. The limbs are equally protected with the life; the right to the pursuit of happiness in any legitimate calling or occupation is as much guaranteed as the right to go at large and move about from place to place." "The word 'liberty' . . . implies the opposite of all those things which, besides the deprivation of life and property, were prohibited by the Great Charter." "None of our liberties are to be taken away except in accordance with established principles; none can be forfeited except upon the finding of legal cause after due hearing."

It would seem that what was said by the court in the *Chittenden Case* should be considered a sufficient answer to any contention which is or could be now made, that the right to a public office, whether considered as property in the technical sense or merely in the broader sense of a thing of value to the possessor, or just a right which the possessor is at liberty to possess and which is promotive of his legitimate desires and his happiness—a right not within the field of property at all,—is under the protecting guaranty of the constitution.

From the foregoing it will be seen that we must distinguish between an office held subject to summary right of removal

for cause satisfactory to the removal officer or tribunal, and an office having the incidents of a fixed term, but subject to be terminated for due cause, or some particular cause, required to be established by proof. Due process of law in the one case may not require a common-law hearing, while it does in the other; that being supposed to have been in contemplation of the lawmaking power as an absolute requirement of the common law and to be regarded as read into the statutes in the absence of any express indication to the contrary or something equivalent thereto.

The distinction mentioned is noted by all the text-writers. For example:

"The general rule is that where a definite term of office is not fixed by law, the officer, or officers by whom a person was appointed to a particular office may remove him at pleasure, and without notice, charges, or reasons assigned. . . . It is conceded, in all the cases, that where a fixed term is assigned to the office, the appointing power has no absolute power of removal." Throop, Public Officers, § 354.

At common law in all cases except where an office is held absolutely at pleasure, "an officer could be removed only for cause and after a hearing." Throop, Public Officers, § 362.

"In this country, the rule is, that where an officer holds his office for a certain number of years, 'if he shall so long behave himself well,' he cannot be removed, even for misbehavior, without notice and a hearing. So where he is appointed for a fixed term, and removable only for cause, he can be removed only upon charges, notice, and an opportunity to be heard." Throop, Public Officers, § 364.

To the same effect are Dillon, Mun. Corp. (4th ed.) § 473; Mechem, Public Officers, § 454.

One might call the roll of all the highest courts of the country which have dealt with the subject in support of the foregoing. It is no exaggeration to say, as was said at the bar, that there is practical unanimity in the adjudications in this country in respect to the matter, that courts which started

wrong have retraced their steps and taken a position in harmony with courts in general, and that the instances now and then where a court still stands in opposition are inconsequential—so much that way as not to be entitled to any consideration whatever. Counsel for appellant have cited to our attention a large number of well selected judicial authorities, a few of which, and some others, we will incorporate herein. *People ex rel. Schumann v. McCartney,* 34 App. Div. 19; *Murdock v. Phillips Academy,* 12 Pick. 244; *U. S. v. Fisher,* 222 U. S. 204, 32 Sup. Ct. 37; *People ex rel. Jordan v. Martin,* 152 N. Y. 311, 46 N. E. 484; *People ex rel. Kasschau v. Police Comm'rs,* 155 N. Y. 40, 49 N. E. 257; *Hallgren v. Campbell,* 82 Mich. 255, 46 N. W. 381; *People ex rel. Metevier v. Therrien,* 80 Mich. 187, 45 N. W. 78; *Speed v. Detroit,* 98 Mich. 360, 57 N. W. 406; *Field v. Comm.* 32 Pa. St. 478; *Comm. ex rel. Bowman v. Slifer,* 25 Pa. St. 23; *Page v. Hardin,* 8 B. Mon. (47 Ky.) 648; *State ex rel. Denison v. St. Louis,* 90 Mo. 19, 1 S. W. 757; *State ex rel. Withers v. Stonestreet,* 99 Mo. 361, 12 S. W. 895; *People ex rel. Mayor v. Nichols,* 79 N. Y. 582; *Bergen v. Powell,* 94 N. Y. 591; *Willard's Appeal,* 4 R. I. 595; *State ex rel. Att'y Gen. v. Hawkins,* 44 Ohio St. 98, 5 N. E. 228; *State ex rel. Att'y Gen. v. Hoglan,* 64 Ohio St. 532, 60 N. E. 627; *Collins v. Tracy,* 36 Tex. 546; *State ex rel. Reid v. Walbridge,* 119 Mo. 383, 24 S. W. 457; *Biggs v. McBride,* 17 Oreg. 640, 21 Pac. 878; *Kennard v. Louisiana,* 92 U. S. 480; *Foster v. Kansas,* 112 U. S. 201, 5 Sup. Ct. 8; *Ex parte Hennen,* 13 Pet. 230; *Chase v. Hathaway,* 14 Mass. 222; *Mead v. Deputy Marshal,* 1 Brock. 324; *State v. Donovan,* 89 Me. 448, 36 Atl. 982; *Ham v. Board of Police,* 142 Mass. 90, 7 N. E. 540; *Cull v. Wheltle,* 114 Md. 58, 78 Atl. 820; *Townsend v. Sauk Centre,* 71 Minn. 379, 74 N. W. 150; *State ex rel. Caldwell v. Wilson,* 121 N. C. 425, 28 S. E. 554; *McCully v. State,* 102 Tenn. 509, 53 S. W. 134; *McDowell v. Burnett*

(S. C.) 75 S. E. 873; *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112.

For the better appreciation of the cited cases we will quote from a few of them.

In *Page v. Hardin,* 8 B. Mon. (47 Ky.) 648, while the power of removal was held exercisable by the governor, it was nevertheless said that the proceedings, in conformity with fundamental principles of justice, were required to be judicial in their general characteristics. "We shall not," said the court, "argue to prove that in a government of laws a conviction whereby an individual may be deprived of valuable rights and interests, and may, moreover, be seriously affected in his good fame and standing, implies a charge and trial and judgment, with the opportunity of defense and proof. . . . Such a proceeding for the ascertainment of fact and law, involving legal right, and resulting in a decision which may terminate the right, is essentially judicial, and has been so considered elsewhere."

This language, spoken for the court in *State ex rel. Reid v. Walbridge,* 119 Mo. 383, 24 S. W. 457, is particularly applicable here:

"In the case presented, the power to amove the officer is 'for cause,' and no notice is mentioned as requisite to be given to the officer to be proceeded against. But the law, in accordance with the principles of justice,—principles which are fundamental and eternal,—will require that notice be given before any person be passed upon, either in person or estate or any other matter or thing to which he is entitled. And though the statutes do not in terms require notice, the law will imply that notice was intended. . . . And what the law will imply is as much part and parcel of a legislative enactment as though set forth in terms. . . . Notice in this case . . . had been given and charges preferred, and this court, following the authorities elsewhere, has decided that even where the removal is 'for cause' that still notice must be

given. . . . But . . . if an officer be removed, it belongs to the courts to determine the sufficiency of the cause alleged."

. Further on the same subject from *People ex rel. Schumann v. McCartney,* 34 App. Div. 19, quoting from *People ex rel. Kasschau v. Police Comm'rs,* 155 N. Y. 40, 49 N. E. 257:

"The relator was not subject to removal except for some legal cause, to be ascertained and adjudged as matter of fact upon a hearing. . . . The proceeding was judicial in character, and hence the tribunal before which the investigation was had could not dispense with the usual form of procedure. . . . When a party is protected in the enjoyment of a public office . . . from removal except for cause, to be ascertained and adjudged upon a hearing of a judicial nature, and it appears that he has been removed without any proof of the facts upon oath, the determination . . . is clearly erroneous as matter of law."

And the court further said, for the particular case:

. "The relator cannot be deprived of his position upon evidence satisfactory to the commissioner, unless that evidence is procured in the course of a judicial investigation, where the relator has been informed of the charge against him and has had an opportunity of examining the witnesses against him and of presenting evidence in his own behalf. On the hearing at which the evidence satisfactory to the commissioner was elicited, . . . the entire proceeding was a mere mockery of justice."

The following from *Field v. Comm.* 32 Pa. St. 478, is peculiarly applicable: The court differentiated between *Ex parte Hennen,* 13 Pet. 230, where the circumstances did not exist, as in this case, and those where such circumstances do characterize the subject, and observed as to the latter by quoting the language of Lord CAMPBELL in *In re Poole* [*Reg. v. Archbishop of Canterbury,* 28 L. J. Q. B. 154], then said to be a late English case:

"There could be no doubt his grace had acted most conscientiously but . . . he had taken an erroneous view of the

subject. . . . He was bound to hear the appeal and he had not heard it. It was one of the first principles of natural justice that no man should be convicted without first being heard. . . . That had been the uniform principle on which this court, from the most ancient times, had acted; and he recollected hearing a very aged judge once say, and not irreverently, that the Almighty and Omniscient Being would not condemn our first parents without their being first heard." 32 Law Times, 230.

The following is from the opinion of Justice CAMPBELL in *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112:

"The action of all persons, official or private, which is in violation of constitutional rights is simply null and void and needs no reversal. . . . The fact, then, that the statute and the constitution, in giving the governor power to remove, prescribe no methods of examination, can in no way relieve him from the necessity—even if he is to pass personally on the facts—of having specific charges of misconduct communicated to the officer, and established by proof, with full opportunity to the respondent to examine and cross-examine witnesses, and be heard on the facts and the law."

In *People ex rel. Metevier v. Therrien,* 80 Mich. 187, 45 N. W. 78, the point was urged upon the attention of the court, as in this case, that the act of the governor could not be inquired into, and the court replied:

"The governor cannot foreclose the right of the court to preserve to such officers their constitutional rights. The right to hold this office is just as sacred in the eye of the law to Metevier as the right to hold property he has earned. It is a property right, and one of which he can only be divested by strict conformance with the statutes."

In other words, as the court said, by due process of law.

We have thus quoted at much length from authorities elsewhere because our own court has not dealt with the subject under discussion very frequently and not, perhaps, significantly, except as to the requisite in general of due process of

law in order to deprive any one of any valuable right, and that due process of law requires a common-law hearing in the absence of a statute expressly or by necessary inference pro-viding to the contrary, and that, it seems, was as emphatically declared in *State ex rel. Milwaukee Med. College v. Chitten-den,* 127 Wis. 468, 107 N. W. 500, as anywhere in the books. The early declaration on the subject by DIXON, C. J., in *Seifert v. Brooks,* 34 Wis. 443, may well be added:

"That every man is entitled to his day in court, and must have it, and cannot be affected in his person or his property, unheard or without the privilege secured to him of appear-ing or being represented in his own defense, if he so desires, is a maxim the force and importance of which every good lawyer appreciates, and one which no court ever surrenders."

## VI a.

Since some confusion has arisen, as before indicated, re-specting whether a proceeding of the nature of that under con-sideration is judicial or administrative in character, all ref-erable, it seems, to the remark in *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 64 N. W. 304, and repeated in *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 122 N. W. 748, and supposed by counsel for respondents to be applicable to this case, that the power is not judicial but on the contrary is administrative though required to be exercised in a judi-cial manner, we will give some further attention thereto, though, as said before and must clearly appear upon principle and authority heretofore cited, it is essentially judicial, want-ing only the circumstance of being exercisable by a court, and the different terms are merely different methods of describing the same thing. The better term to use is *quasi*-judicial. That accurately describes the power. A brief review of the adjudications in this court will leave no room for doubt as to its judicial character or but that the idea pressed upon us that it is administrative, so far as affecting the right of a com-

mon-law hearing under the removal statutes, is quite illogical. It is unfortunate that the various terms, judicial, *quasi*-judicial, administrative, and administrative judicially exercised, have been used in some decisions while speaking about one and the same thing. Our own decisions are to the effect that any person or board required to determine any matter in public affairs requiring investigation, findings of fact upon proof, and the application of legal principles thereto, if not acting as a court, is acting as a tribunal in the exercise of *quasi*-judicial power, the result being reviewable by the court as to all jurisdictional questions.

In *State ex rel. Gill v. Watertown,* 9 Wis. 254, the power of removal "for due cause" was held to require due cause in some reasonable view in the judgment of the court; that what constitutes "due cause," in the ultimate analysis, is purely a judicial question. There, as here, counsel to support the contrary relied on *Att'y Gen. ex rel. Taylor v. Brown,* 1 Wis. 513, in respect to the power exercised under the law respecting removals for cause being so far removed from judicial character that the result was not reviewable by the courts. It was replied thereto that, within its jurisdiction, a removal body, competent to act for due cause, cannot be interfered with by the courts; but that what constitutes due cause is a judicial question; that to assign a cause and pronounce upon its existence is one thing, and whether the assigned cause answers to the call for "due cause" is wholly a legal question, to be determined, in the last analysis, by the courts; that the initial tribunal cannot make an innocent matter "due cause" by assigning it as such. There was the clearest of indication that a removal tribunal, required to exercise discretion, possesses judicial power in a proper sense and that its determination as to all jurisdictional questions is a subject for review under the superintending control power of the courts.

In *Randall v. State,* 16 Wis. 340, the court was more em-

phatic.  Exercise of the governor's removal power was said
to require him to act "in a judicial capacity"—to "inquire
into the truth of the charges, and examine into and weigh the
effect of testimony.  If the charges are sustained by satis-
factory testimony, he can remove the delinquent officer and
appoint another in his stead."

In *Larkin v. Noonan,* 19 Wis. 82, the court was still more
emphatic, holding that the removal power of the governor is
analogous to that exercised by a court in the trial of a case.
"He is required," said the court, "to furnish the accused
with a copy of the charges made against him and give him
an opportunity of being heard in his defense."  True, in the
particular case, a hearing was required by statute, but, as we
have seen and shall further see, that, by necessary implica-
tion, is written into every power of removal for cause which is
required to be established by proof, especially in case of the
office being for a fixed term.  "This," continued the court, "in-
volves, as a consequence, a trial—a legal investigation into
the truth of the charges.  Witnesses may be subpœnaed,
sworn, and examined.  Testimony must be taken, weighed,
and considered, and, although the proceeding is summary and
no trial by jury allowed, yet it conforms in important particu-
lars to proceedings in judicial tribunals.  If the charges are
sustained by satisfactory evidence, the governor may remove
the delinquent officer.  If the charges are not proven, the of-
ficer must be acquitted.  Hence, in the hearing of causes of
this nature, the governor acts in a *quasi*-judicial capacity, and
the proceeding is analogous in its most essential features to
a judicial hearing and investigation."

In *State ex rel. Getchel v. Bradish,* 95 Wis. 205, 70 N. W.
172, the court further advanced—stepping perhaps beyond
safe boundaries in holding a *quasi*-judicial body to have such
characteristics of a court that what would disqualify a judge
to preside in the latter and render a judgment void rendered

therein, if it did, would have the same effect in case of a participant in a *quasi*-judicial hearing,—applying that to a judgment forfeiting a privilege and distinguishing the case from *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 64 N. W. 304. Thereafter it became necessary to limit that decision in order to produce harmony with the *Starkweather Case. Wood v. Chamber of Commerce,* 119 Wis. 367, 96 N. W. 835; *State ex rel. Cook v. Houser,* 122 Wis. 534, 100 N. W. 964. In doing so there was no attempt to limit it as regards the principle of *Larkin v. Noonan,* 19 Wis. 82, and, of course, no thought in any of the cases to change it.

So it is plain that the power of removal under sec. 970, Stats., is judicial in character,—it is of the same nature as the power called by the Michigan court in *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112, "judicial," and it is misleading to differentiate between the term "judicial power" and "administrative power judicially exercised,"—they mean the same thing as applied to proceedings of the nature of those under consideration. To the same general effect are *Gaertner v. Fond du Lac,* 34 Wis. 497; *Oshkosh v. State ex rel. Perkins,* 59 Wis. 425, 18 N. W. 324, and many other cases decided by this court to which reference might be made.

## VI b.

Before proceeding to the last vital question involved in the resubmission, we will recur to the subject of whether the right to an office once obtained, with its honors and emoluments, is property in the constitutional sense. That is not essential to the solution of the final result, as we have seen, but it has been much argued both to support the idea that the due-process-of-law feature of the constitution does not include it and the idea that removal proceedings are not judicial. The case might turn on those contentions if they were sustained. So it is manifestly appropriate, even though not necessary, to

discuss the matter.    Whenever, conceding for the case the
result upon one proposition is not efficient, there is another,
thought to be decisive, and it is suggested for consideration,
then its solution is legitimate and often advisable, though not
necessary.    *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50
N. W. 1103, may be mentioned as a good illustration.    There
the last of four alternatives has become, I venture the opin-
ion, in the course of time, the most important of all, although
it was long treated as mere *obiter*.

I marvel that after the extraordinary pains taken by the
fathers of our system to make its principles so broad as to
encompass in its protecting folds every right of every char-
acter, essential to or promotive of human liberty and happi-
ness, there should be any attempt to narrow it by construc-
tion, instead of viewing them in the broad spirit which led to
the constitution.    As said by commentators, it was not sup-
posed in the beginning that anything in the nature of pro-
tection of private right from tyrannical aggression, other than
the principles of the common law, was needed, so the general
declared purpose of the effort to form a new government was
included, and in the detail statement of principles the special
guaranty as to private rights was omitted.    The danger in-
volved in that led in the very beginning of the administration
under the constitution to the addition of ten amendments sup-
posed to be broad enough to cover all such matters.    That the
intention was not to leave any of them out is most manifest.
Among those added specific guaranties is that as to due pro-
cess of law and that other as to taking of property for public
use without just compensation.    Later, because of changed
conditions giving rise to the thought that possibly the prin-
ciple so definitely declared might, by some narrow construc-
tion, not be wholly efficient, the guaranty as to due process of
law was repeated, amplified, so to speak, by guaranteeing
against the making or enforcing any law abridging the privi-

leges or immunities of citizens of the United States, and against denying to any person equal protection of the laws. When it came to forming our state constitution, it was supposed that the safety of human rights was sufficiently provided for by the general declaration and the detail provisions associated therewith, emphasized by the significant admonishment as to the importance of a "frequent recurrence to fundamental principles." So no special guaranties were added, as has been the case in most state constitutions.

Now in contemplation of the industry thus exercised to afford protection to the individual from injustice of any sort, can it be possible it was thought the terms "liberty" and "property" would not include more than freedom from unjust physical restriction and things subject to be bought and sold, or stop short of freedom for one to possess anything and to enjoy it as property, if valuable in any sense, which may lawfully administer to his reputable desires and happiness? Why stop with tangible things—things subject to transfer and measurement accurately in money? If a thing has a pecuniary value or a real value to its possessor, it seems it has a property element in the constitutional sense and freedom to enjoy it is liberty in a broad sense. I think it is dealing with technicalities to restrict "property" so as to exclude the right to an office, once acquired, until deprived of it by law,—acquired, perhaps, by years of effort in preparation for its duties, and by the legitimate expenditure of money. We may adhere to all that was said in *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 64 N. W. 304, and *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 122 N. W. 748, that it is not a vested property right. Certainly it is not,—in that, by the very terms of its bestowal, it is subject to be taken away and has neither assignable nor inheritable features; but it has a pecuniary value, and that is sufficient. The framers of the constitution did not intend any narrow conception of the

terms "liberty" and "property." They intended, as all history shows, directly and circumstantially, to include everything valuable to the individual as regards the dominant right to the pursuit of happiness.

I think the disposition on the one hand to take the broad view above indicated, and on the other to take a narrow view which would minimize the scope of the constitutional guaranties, and the tendency of some judicial writers to combat principle with mere argument in reaching for logic to support a decision which needs no support but some elementary principle, as would be seen by searching for it, instead of relying on argument rather than on thinking,—has caused unfortunate confusion. That, I think, will be quite well illustrated before I close this discussion.

If I do not accomplish anything more in this treatment, I hope to remove anything like confusion as regards the terms under consideration in our own decisions, and demonstrate the position of our court on the side of the broad progressive view of the constitution which renders its principles, as was intended, adaptable to the protection and conservation of every right which concerns legitimate human welfare. Many distinguished courts have referred to an office as property, while others, and a minority I think, hold that an office, or the right to an office, often confusing the two terms, is not property. Many text-writers have added to the general confusion. It cannot well be said that both sides have used the term "property" in the same sense. There must be some line of harmony. Where is it? That is the question. To find it and bring it into sufficient significance to pervade even here, so it will not be thought there is any want of harmony between the various expressions used, or between them and the court's general conception of constitutional principles as found in its definitions, is sufficient to warrant this effort.

An examination of the decisions leads to the conviction that

in the early instances of controversy over the right to deprive
one of an office, either by legislative abolishment of the place
or by removal under the written law, it was said in support of
a decision sustaining the deprivation that the thing involved
was not property or a vested right of property and so it could
be taken away. In support of a determination that the due-
process-of-law feature of the constitution applies to the dep-
rivation of office, it came to be frequently said that the thing
is property because it is of pecuniary value. In support of
the contrary theory and that the power to remove an officer
for cause is not judicial, it was said that an office, or the right
to an office, is not property,—though not venturing to say that
it is not a thing of value to its possessor. Where an effort
was made in the initial stages of the confusion to support the
latter view by something in the nature of logic, it was said
that the thing is not property because not subject to absolute
vestment and to be bought and sold and pass by inheritance.
And again, that it is a mere agency, terminable by choice of
the agent or by legislative will, and has no element of gain
except contingent upon service previously rendered. The
teachings of the old masters of the law, Coke and Blackstone,
that the right to an office and to take the emoluments thereof
is property, have been carelessly, it seems, brushed aside by the
mere statement that conditions under which they wrote were
different than those existing under our system; that the dis-
tinction renders that which was formerly properly denomi-
nated property not so now—the feature generally referred to
being that an office then was a hereditament, while it has no
such element now. That demonstrated the very extreme of
argument based on false logic, sometimes indulged in as an
easy method of constructing a basis for an ultimate conclusion
to be pronounced. It often happens, where the superstruc-
ture is suspended upon mere assertion at first and then there
is effort to create a support in reason, that the reason is more

the product of desire than of principle. That is well illustrated when we refer to the text of Blackstone and see that the right to an office and to take its emoluments—not the office contemplated as a place—was denominated property and not, necessarily, with reference to any of its features which some judicial writers have said rendered it then of a property nature, but not now. Blackstone divided property into tangible and such intangible things, or incorporeal things, "as can neither be seen or handled," creatures of the mind and existing only in contemplation. All were classed under the broad term "property" and not necessarily because they were subjects of traffic. 2 Cooley, Bl. Comm. 37. In the details as to the intangible class of property we find an almost boundless field. It extends to substantially everything of any value, pecuniary or otherwise, to the individual,—including the "right to exercise an office and to take the fees and emoluments thereunto belonging." It was said that was classible as within the intangible sphere because one might have an estate, that is, a right therein, among other things "for a term of years or during pleasure only," "though no public office, in general, is a subject of sale." 2 Bl. Comm. 37. Thus the word "estate" was used in the broad sense of a rightful possession at pleasure, for life, or for years upon conditions subsequent or without condition, and property was regarded as including everything with it in the broad sense of the term, whether tangible or intangible and only existing in contemplation of the senses—if valuable to the person in any sense. Who can doubt but that this conception was in the minds of the framers of the constitution while they were not in the peril of seeking information from an unreconcilable undigested mass of judicial sayings,—just had the teachings of the old philosophers of the law for their guidance.

Thus the efforts to give support to the idea that the right to an office is not property seem futile. They originated in

such an early case as *Conner v. Mayor*, 1 Seld. (5 N. Y.) 285, to sustain the right of the legislature to deal with an office regardless of the will of the officer. It was followed in *Donahue v. County of Will*, 100 Ill. 94, to sustain the position that the right to an office is not under the protection of due process of law. That case is cited by most text-writers, while conceding by the reasoning that a distinction must be made between an officer and the right to an office, and that many courts hold that the latter is essentially property. Throop, Public Officers, § 18. In *Wammack v. Holloway*, 2 Ala. 31, the court said that the right to an office is "as much a species of property as any other thing capable of being held or owned." Citing Blackstone and Bacon. It is no less property now than in the olden times because it is not a 'hereditament.'

In *Nichols v. MacLean*, 101 N. Y. 526, that view was adopted, upon the elementary principle that an office is of pecuniary value to its possessor, and that having such value, in the broad sense, it is property. ANDREWS, J., speaking for the court, said:

"The right to an office, till terminated by lawful methods, is as perfect as the title to real and personal property. It is not property in the sense that chattels or lands are property of the owner. But an office has a pecuniary value although primarily it is an agency for public purposes."

To the same effect are *People v. Wells*, 2 Cal. 198, 203; *State ex rel. Childs v. Wadhams*, 64 Minn. 318, 324, 67 N. W. 64; *People ex rel. Metevier v. Therrien*, 80 Mich. 187, 196, 45 N. W. 78; *State ex rel. Jennett v. Owens*, 63 Tex. 261; *Hoke v. Henderson*, 15 N. C. 1, 17; *Plimpton v. Somerset*, 33 Vt. 283; *Board of Police Comm'rs v. Pritchard*, 36 N. J. Law, 101; *Page v. Hardin*, 8 B. Mon. 672; *Comm. ex rel. Bowman v. Slifer*, 25 Pa. St. 23; *King v. Hunter*, 65 N. C. 603; *Balling v. Board*, 79 N. J. Law, 197, 74 Atl. 277; and many other cases that might be referred to.

By an examination of a large number of cases where the contrary of the foregoing is suggested, we find little attempt to review the line of authorities cited and no instance where the real nature of the right was vital to the case. That it is not property in the sense of the right thereto being protected by the guaranty against deprivation of property without just compensation, may be freely admitted. That it is a right held upon condition subsequent, may be freely admitted. Why was not the right to deprive one of an office referred to that condition,—which was a perfectly logical reason,—instead of to the illogical one that it is not a property right in any sense? In many jurisdictions it is found that the right has been at times spoken of as property, and at others as not property. Many of the citations made to support the position of the non-property idea do not deal with the matter at all, as for example we find *State ex rel. Kennedy v. McGarry,* 21 Wis. 496, and *State ex rel. Willis v. Prince,* 45 Wis. 610, cited over and over again. They do not mention the matter, and when rightly understood they have not the remotest bearing thereon. They are merely to the effect that a legislative office is subject to be taken away according to the conditions inhering in the right when it was bestowed and accepted.

That is the logical basis for all to rest upon. Subject to termination of the right by due process of law, it is property. In view of the foregoing it seems best that the broad view of the terms "liberty" and "property," as it must have been entertained in the beginning, should prevail, instead of restricting it for the purpose of supporting the idea of control over legislative office; which needs no support but the simple one that the person who takes such a thing at the hands of the people does so with the condition subsequent inhering in the right. Nothing but that need have been referred to in sustaining the decision in any of the cases where the non-property idea was adopted.

So we may safely bring together the apparently conflicting

ideas. An office, as a place, is not property. The right to hold an office and to take its emoluments until deprived thereof upon condition subsequent—due process of law—is property in the broad sense which includes everything of every nature, tangible, intangible, corporeal or incorporeal,— valuable, pecuniarily or otherwise, to its possessor. In the sense incorporated into the fundamental guaranties, it is property; but as a thing which may be bought and sold and one may have an absolute estate in which cannot be taken away by the state without his consent or the rendering of just compensation, it is not property. We may adhere firmly to the doctrine that it is not a property right in the technical sense, or the right to hold an office a vested property right, in the sense of ownership without being subject to conditions of divestment according to law without compensation to the divestee; but the latter sense will be found, in my opinion, immaterial to the disposition of any question which may arise. It has no necessary connection with the public right to terminate an office, or to deal with a mere privilege, even, as in *State ex rel. Getchel v. Bradish,* 95 Wis. 205, 70 N. W. 172, granted subject to conditions subsequent, express or implied; while the broader view may be vital in many cases, since the effort to narrow it in all cases is directed, in effect, to the weakening of constitutional guaranties.

The result is, it seems, that for all the purposes of this case, even if the result were to depend upon it, the right to an office and to take its emoluments is property, as much as anything of value which any one could be possessed of subject to contingencies by which it might be taken from him, and that the right cannot be constitutionally violated except according to the law of the land.

## VII.

From what has preceded it remains to be seen whether the common-law right as to the manner of exercising the power of

amotion of an officer having a fixed term, for cause established by proof, from his position, was abrogated by sec. 970, Stats., as to officers therein mentioned. If not, it must be considered, as authorities already referred to abundantly show, as part of the statute.

The repeal of the common law may be express or implied. That there was no express repeal in this case is indisputable. Whether there was an implied repeal depends upon construction. Therefore some rules for construction are important.

One of the cardinal rules for construction of a statute, especially where it affects private rights, when so obscure as to require the meaning to be read out of it by construction, is that it should be viewed favorable to continuation of the common law rather than as a repeal of it, where there is a permissible choice between the two. Another such rule is that we may look to the whole of the act of which that to be construed forms a part, to the conditions to be dealt with from the standard of the lawmakers at the origin of the enactment,—the history of the legislation,—especially in case of its adoption from another state,—and the more in case of its having been judicially construed there before adoption here, and, further, the effects and consequences.

In view of those rules, courts in general, as we have already seen, hold that the common-law manner of proceedings, said to be grounded in the principles of natural—of eternal—justice, must be held to be still in force, in the absence of either an express repeal of it or a repeal by very clear or, as sometimes said, necessary inferences. That the repeal must be very plain, the discussion which has preceded amply demonstrates.

So it seems, if the argument of counsel for respondents, on the theory that a repeal of the common law be fairly inferable from the statute, be conceded, it is far from sufficient. But it hardly seems just or reasonable to say of the statute that

something not in its letter is there in spirit, which would be such an invasion of the most cherished of all common-law rights—the right of a fair hearing upon fair notice and with ordinary safeguards to prevent injustice before one is passed upon in his personal or property rights—the one above all others essential to safeguard against aggression and oppression. No court heretofore has ventured to say that, or attempted to do so. Courts have often been pressed to do so, in support of authority claimed to exist under circumstances the same and similar to those we now have to deal with, but never, so far as we can discover, in any significant instance, with success.

If there is nothing else to produce the conclusion that the legislature did not intend to abrogate the constitutional safeguard, the very consequences of the contrary would justify, yea require, searching in the obscurity, if obscurity exists, for some meaning which would avoid the peril. The fact that a very good despot may make the very best of governments, and that the peril suggested is so very remote that the thought of it should not have efficiency, does not meet the case. Experience has shown how very fair men lose their balance and become unsafe in times of great public excitement; that then their acts often do not so much "wait upon their judgment" as upon the passions, the prejudices, the selfishness, the ambitions and intoxication of place. Hence the importance of that wise admonition, "the blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality, and virtue, and a frequent recurrence to fundamental principles." There is no more important of such principles than the one that private rights should be guarded, so far as feasible, beyond even the possibility of arbitrary unjust interference, and, to that end, that all the checks upon abuse of power and balance between powers found in the constitution, read in the light of the unwritten rules of natural justice, should be maintained

in all their integrity and with all the "vigilance" which the experience of the past has taught "is the price of liberty."

The reasons suggested above were deemed by the Michigan court in *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112, sufficient to compel rejection of the theory of implied statutory repeal in such circumstances as we have here. We can no better point what has been said than by quoting this language of that court:

"The exercise of such a power in such a manner, would be too despotic for any attempt at vindication in a country which boasts of the utmost liberty compatible with the safety of the state, and is entirely opposed to the genius of our free institutions. . . . If it exists it places in the power of the governor, at his mere will or caprice, to remove all state officers, except legislative and judicial; and to fill their places with his own partisans, thus revolutionizing the whole administration of the state. . . . It is no answer to say that it may never be done. It is sufficient to know that it could be done. . . . The impossibility of sustaining the governor's action here . . . appears by comparing its necessary results with the rest of our constitutional scheme of government. If he could remove respondent as he did . . . every officer of the government may be removed as soon as the legislature adjourned and every office can be filled with the governor's nominees and the whole system will be annulled."

There are many authorities to the same effect. A good selection of them appears in appellant's brief.

"If the intention of the legislature is clear, the courts, as in duty bound, will give it effect, but if it is doubtful, the doubt will be resolved against arbitrary power and in favor of a trial before judgment." *People ex rel. Maloney v. Douglass,* 195 N. Y. 145, 87 N. E. 1070.

"It is a dangerous principle to apply power where it is not conferred by legislative authority in clear and distinct terms." *People ex rel. Brown v. Woodruff,* 32 N. Y. 355.

Other courts have spoken in the same way in support of the view that a repeal of the common-law safeguards in such

a situation as the one under discussion requires clear, express legislative action or its equivalent. The books are replete with such illustrations as are given. This is so manifest that we will not refer further to authorities for support. It may safely rest upon principle and logic, which speak more efficiently than the language of judges or the circumstances of cases.

Turning now to the history of the statute, it is this: The system embodied therein, if it did not originate, existed, in New York when the work was done for adoption here prior to 1849. It was incorporated into the revision of that year at ch. 11. Doubt was expressed on the argument whether it came directly from the New York model (art. IV, title VI, ch. 5, R. S. N. Y. 1836), or indirectly, being copied from ch. 15, R. S. Mich. 1846, but we see little if any reason for doubting the former. The phraseology and general arrangement follow much more closely, and the ideas as well, the New York than the Michigan statutes. Moreover, it is almost certain there was little acquaintance with the latter when the work was done here. The time between the two was brief. There was a later revision in New York (1846), but the time was too brief between its promulgation and the work here to afford opportunity for familiarity.

The general scheme of Michigan was doubtless taken from New York. All features—particularly provision for exercising the power of removal without specifying the manner of executing the power being associated with sections as to minor offices containing such specification—are in the Michigan statute, much the same as in ours. That feature was referred to by counsel for respondents in support of the view that a repeal of the common law was intended. That was the condition when the Michigan court dealt with the subject of removals in *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112. True, the statute was then declared unconstitutional upon the theory that it contemplated exercise of judicial power and

the governor had no such power under the constitution when the statute was enacted and it was not validated subsequent to the grant of such power.   In that the court failed to do what this court, and courts in general, before and since, have done, distinguish between *quasi*-judicial power which may be delegated to tribunals other than courts, and appreciate that judicial power of the express words of the constitution, the power to redress and prevent wrong which at common law was lodged wholly in courts.   *State ex rel. Milwaukee Med. College v. Chittenden,* 127 Wis. 468, 107 N. W. 500.   The real essentials of exercise of the power as decided by the Michigan court were not governed by whether exercisable by a court or a *quasi*-judicial tribunal, but by the nature of the power itself. After the adoption of the amendment to the Michigan constitution clothing the governor with power to exercise the function of removing officers for cause, he was still not a court but a *quasi*-judicial tribunal.   There was no specific delegation of judicial power, but merely delegation of power to do the thing which in its very nature was said by the court to be of judicial character.   That was called the conference of judicial power.

From what has been said it is evident that all the Michigan court said in *Dullam v. Willson* as to the necessity for a common-law hearing in executing a power like the one in question, would have occurred just the same had the statute on the subject of removals been held valid.   It was just as applicable to the statute as to the constitutional provision.   It related to the nature of the power and not to the manner of expressing it.   That shows, by necessary inference, that the idea did not receive any favor at all that a part of a system of statutes phrased like ours, even when associated with other parts providing for manner of exercising the power, could be properly read as inferentially repealing the common-law method of dealing with rights.   On the contrary, such idea was most emphatically repelled.

Recurring to the New York statutes, which like ours contained the association of provisions above referred to, it does not seem to have been supposed there before adoption of the plan here, or thereafter, that the common-law method of exercising the power had been repealed by the statute. Had it been so supposed it is quite certain some evidence thereof could be discovered. The indications are all to the contrary. Counsel for respondents seem to have failed to find any favorable to their contention and we have been likewise unsuccessful. They cite many cases under different statutes and applicable to different conditions which make for a plausible argument, but come far short of making such a clear case as would warrant the belief that the legislature, in such a very important field, intended to repeal the common law.

It is useless to review, in detail, the citations by respondents' counsel in support of their contention. We will refer especially only to the three relied upon from our own jurisdiction. They are the best of all, particularly because of inclination to follow, closely, our own decisions in case of the court having spoken upon the particular subject.

First in order is *State ex rel. Kennedy v. McGarry,* 21 Wis. 496. The statute there concerned the removal of a minor county officer. It was a special statute dealing only with the administration of affairs in Milwaukee as to the inspector of the house of correction. It provided that "Said board shall also appoint one inspector for said house of correction, who shall be the principal keeper of said house of correction, and who shall hold his office for the term of two years, commencing on the first Monday of January succeeding his appointment, unless sooner removed by said board for incompetency, improper conduct, or other cause satisfactory to said board. The cause of such removal shall be particularly assigned in writing, and entered upon the minutes of said board, with the ayes and noes upon the adoption of the vote for such removal."

Note that the officer was made expressly subject to removal for specified cause, conditioned only upon "the cause of such dismissal being particularly assigned in writing and entered upon the minutes of such board, with the ayes and noes upon the adoption of the vote for such removal,"—indicating pretty clearly that the legislature contemplated only such protection of the officer and the public. against abuse of the removal power as would be afforded by record affording a judicial review if desired as to whether the assigned cause was one within the statute. Emphasis was put by the court on the phrase "satisfactory to said board" and the necessity for the jurisdictional feature to be complied with. The decision turned on those features—thought to show a clear legislative intent that the officer should hold his place wholly subject to the judgment of the county board respecting any matter rendering him unsuitable for the place. The nature of the office, the broad power to deal therewith, in good faith, wholly in the discretion of the board, conditioned merely upon making the required record, settled the matter as to what the legislature intended, in the judgment of the court. Rightly understood, it seems the case throws little or no light in respondents' favor on the question under discussion. It has been cited over and over again elsewhere without appreciating that it does not announce any general principle broader than this: When a power of summary removal without notice or hearing is clearly given by the written law, notice and hearing after the manner of the common law are not required. Much improper use has been made of this case both by text-writers and courts.

Next we have *State ex rel. Willis v. Prince,* 45 Wis. 610. That involved power of a county board to remove its clerk "when, in their opinion, he is incompetent to execute properly the duties of his office, or when, on charges and evidence, it shall appear to said board that he has been guilty of official misconduct, or habitual or wilful neglect of duty, if, in the opinion

of said board, such misconduct or habitual or wilful neglect shall be a sufficient cause for removal."

All the statutory steps requisite to execution of the power seem to have been followed. Nevertheless the trial court reviewed the judgment of the board upon its merits, taking evidence, and reversed the board's order.

This court found no jurisdictional defects. The proof of the charge was of such nature that the board, as matter of course, could take judicial notice of it, so to speak, as a court, in general, can of matters in its own official record. The cases showed that the board acted upon the refusal to satisfy all the conditions of its records. There was no question but that a statutory cause was assigned and that the evidence to support that cause was before the board and all rights to which the officer was entitled had been accorded him. This court, necessarily, reversed the circuit court upon the ground that, since the county board did not commit any jurisdictional error, and acted upon its "opinion" with the facts before it, as it was expressly empowered to do by the statute, its decision was final. We are unable to see why counsel for respondents see anything in the case, as it appears in the published report or aided by the briefs used on presentation of the case here, which in any way affects the question in hand in favor of respondents.

The last case is *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 122 N. W. 748. That involved a removal under the civil service law as to state employees having more or less of an official status. The power was given to the appointing officer to remove "for just cause," the act of removal to be characterized by his furnishing the person removed "his reasons for the same and allow him a reasonable time in which to make an explanation. The reasons for removal and the answer thereto shall be filed in writing with the commission." The statute, as will be seen by its very language, repelled the

.idea that any notice or opportunity for a hearing before removal was contemplated by the legislature. The case was clearly of the same class as *State ex rel. Kennedy v. McGarry,* 21 Wis. 496, which was cited in support of the decision. The various citations in the opinion are merely to the point that, when an officer or body is given power to act by the exercise of judgment in a *quasi*-judicial way, whatever he does, acting within that jurisdiction, is final though he may err in judgment—a very familiar rule. Thus the statute in the *Dahl Case* is very unlike the one before us.

The New York model, as before indicated, empowered the governor to remove any of a specified class of officers, saying nothing whatever as to the manner of administering the power, while as to a class of officers having to do with handling of public moneys the most summary power of removal was given to the governor "in case it shall appear to him on the report of the comptroller that such treasurer or other officer has, in any particular, wilfully violated his duty." Note the words "appear to him." In this the peril of having a person, after having shown unfitness for handling public moneys, in place at all, was appreciated. The statute dealt with a class of situations requiring prompt action—not waiting for anything except the report of the officer who from his position would most likely be correctly advised of the incompetence.

The feature aforesaid of the New York statute was adopted here in sec. 7 of the 1849 statute. There was no change except such as was necessary to adapt it to difference in conditions. There was no such office here to conserve the interests of the state in respect to its finances, as comptroller. The feature made prominent in the New York statute by the words *"appear to him on the report of the comptroller"* was preserved with like prominence by the words "may be re-

moved by the governor in case it *shall appear to him on suffi-
cient proofs,"* etc.

Substantially all the officers mentioned in the next section
of our act of 1849 were by the New York act made removable
by the senate on the recommendation of the governor—no
specification as to cause being made. That was there asso-
ciated with another section giving the governor power to re-
move any officer appointed by him, no requirement being
made as to cause or manner of executing the power. That
scheme was changed for our system as to a class of officers,
including the one in question, making them, for specified
causes, subject to be *"removed by the governor upon satisfac-
tory proof."* While counsel for respondents argue that there
is no difference between the terms *"in case it shall appear to
him on sufficient proof"* in the section which deals with offi-
cers with respect to which the public interests would natu-
rally require quick action, and the term *"upon satisfactory
proof"* in respect to officers where no such harsh action would
be likely to be necessary, still our judgment is not convinced.
The latter class of officers includes important positions, pub-
lic as well as private interests. Time would naturally be re-
quired for investigation, deliberation, and the careful applica-
tion, in a judicial way, of judgment to proof in case of execut-
ing the power of removal as is customarily required in the ex-
ercise of such powers and was required, quite universally, at
the time of the adoption of the statute as to important officers.
For those the term was used: *"be removed by the governor
upon satisfactory proof."* We cannot escape the conclusion
that a different method of executing the power may have been
intended as to the first class than the second. True, it is the
governor in the one case as a tribunal who is to be satisfied
in any event, but why did the legislature use the term, confin-
ing the opinion specifically to the governor in one case and
inferentially in the other? Does it not seem that its pur-

pose was to distinguish between mere personal opinion in the former and the distinctly judicial or tribunal opinion in the latter? Must we not assume that such a change of significant words had some definite purpose, especially in case of a statute carefully prepared, as this was, by a specialist and adopted without change to provide a comprehensive system dealing with various situations? There were ten sections in all, relating to the subject of removals, the same number as in the New York statute. It seems that the legislature attached some considerable significance to the difference in phraseology between the two sections. At least, the legal presumption that one section was enacted in special contemplation of its being supplemented by common-law requirements so that, in the removal proceedings, a record would be made and the decision would be distinctively that of a *quasi*-judicial tribunal instead of a personal opinion, is much strengthened by the peculiar difference in phraseology between the two sections. In this we do not intend to decide that the common-law feature of a removal procedure was repealed—even as to the first class of officers dealt with.

The result of our study of the statute which has been told in the foregoing quite briefly, considering the labor put upon the question, is that we cannot see in it any implied repeal of the common-law requirement for administering the power granted. If we could indulge in the premise with which the learned counsel for respondents started, that the repeal should or may be found if it be fairly inferable, and proceed to the end uninfluenced by "effects and consequences," the rather striking difference between the two sections, and the dignity which the foundation principles of the common law and of the constitution as regards protection of property and personal rights against aggression and spoliation should have—must have, in dealing with such a subject, we might discover the legislative intent in the statute which the learned

counsel so ably contended for in the printed argument and at the bar. But we cannot start or proceed along a process of reasoning with our eyes blinded to the obstacles mentioned which, in the whole, very clearly preserve the common-law requirement, respecting the execution of the power granted, "as part and parcel of the statutes as plainly as if incorporated therein." While, because of the importance of the case and the earnestness with which this particular phase of it was pressed upon our attention, it has received as much care as if it were really an original matter, it is not. The result reached follows elementary principles laid down by the most learned writers after long judicial experience. For example . Judge Dillon (2 Dillon, Mun. Corp. 5th ed. § 480): "The proceeding in all cases where the amotion is for cause is adversary or judicial in its character; and if the organic law of the corporation is silent as to the mode of procedure, the substantial principles of the common law as to proceedings affecting private rights must be observed."

## VIII.

Thus we have seen the governor, under sec. 970, Stats., is a *quasi*-judicial tribunal exercising administrative with added judicial functions, and his acts are, to a certain extent, reviewable by the courts under "supervisory control power,"— the power as to circuit courts being conferred by sec. 8, art. VII, of the constitution. *State ex rel. Milwaukee Med. College v. Chittenden,* 127 Wis. 468, 107 N. W. 500; *People ex rel. Mayor v. Nichols,* 79 N. Y. 582. An officer exercising such power, necessarily, as we have seen, acts in a *quasi*-judicial capacity and the matter of procedure must be of a *quasi*-judicial character, and as the officer is an inferior tribunal, as such he must be amenable to the court when acting in excess of the jurisdiction conferred. As other courts have said, it is of little consequence what name is given to the

power. The name cannot relieve it of its essential character. Neither this nor any of the numerous authorities go further than to hold that excess of jurisdiction is jurisdictional; that want of full opportunity to be heard according to settled requirements for the protection of private rights is jurisdictional; that cause for removal within those prescribed by statute, where it covers the subject, is jurisdictional; and that proof to establish the claim is also jurisdictional—all in harmony with the decisions of this court.

To preserve logical order of decision the scope of superintending control power as regards *quasi*-judicial tribunals may well be restated here. It is no different when the governor acts as the tribunal than in any other case. His competency to exercise the power is one thing, and exercise of it in a particular case without the conditions precedent thereto is another. The former is legal while the latter is not. Such a tribunal may have jurisdiction of certain subjects, but that alone does not give competency to act in any particular instance. There must be jurisdiction of the kind of subjects. That, in general, is referable to the written law. There must also be jurisdiction of the parties and the particular matter, obtained as provided by the written law in case of provision being made therefor therein, otherwise by the unwritten law. Having acquired jurisdiction in the particular instance, in proceeding to and inclusive of the finality the tribunal must keep within its jurisdiction. Full exercise of the power involves application of honest judgment—reasonably fair human judgment—to the situation in hand to and inclusive of the close. No one with competency to act can properly do so in an arbitrary, unreasonable manner or beyond the scope of the authority. Action within the power is exercise of legal discretion. Action outside of it is not exercise of such discretion as the law permits, but is abuse of it. In the former

field errors, regardless of how numerous, are merely judicial and not the subject of review before any court. In the latter field errors are jurisdictional, the acts those of usurpation, and result void,—subject to be challenged directly as such by writ of *certiorari* or any other proper judicial instrumentality, or treated as void collaterally. It forms no bar to the object of a proceeding either by way of attack or defense.

Thus the proceedings of our *quasi*-judicial tribunals are subject to the superintending control judicial power which extends to preventing usurpation, coercing activity without acting upon the judgment as to how to act, keeping the tribunal within its jurisdiction, and correcting excesses of it. This broad field of activity, as is apparent, does not invade at all the doctrine that the discretionary acts of such a tribunal are not the subject of judicial review. There can be no discretionary acts except within the discretionary field. The extent of it is overstepped when the boundary of jurisdiction is passed. Entrance there is into a forbidden field and all acts therein are, as indicated, violations of law and void.

The doctrine stated is elementary; though its emphatic restatement at this time and even reiterations of it for purpose of emphasis, seem appropriate to the case under its peculiar circumstances. Such doctrine has been applied here in a great variety of situations, as the following significant instances will show: *Milwaukee I. Co. v. Schubel,* 29 Wis. 444; *State ex rel. Moreland v. Whitford,* 54 Wis. 150, 11 N. W. 424; *State ex rel. Wood Co. v. Dodge Co.* 56 Wis. 79, 13 N. W. 680; *State ex rel. Heller v. Lawler,* 103 Wis. 460, 79 N. W. 777; *State ex rel. Durner v. Huegin,* 110 Wis. 189, 85 N. W. 1046; *State ex rel. Augusta v. Losby,* 115 Wis. 57, 90 N. W. 188; *State ex rel. N. C. Foster L. Co. v. Williams,* 123 Wis. 61, 100 N. W. 1048; *State ex rel. Milwaukee Med. College v. Chittenden,* 127 Wis. 468, 517, 107 N. W. 500.

These cases amply illustrate that the dividing line between

the field of judicial review of decisions of a *quasi*-judicial
tribunal and that of immunity therefrom is the one between
error in the exercise of discretion and error in assuming the
right to exercise it when it does not exist at all, or exists to
be exercised in the particular way, or under the particular
circumstances. As said in *State ex rel. Milwaukee Med. Col-
lege v. Chittenden, supra,* to appreciate the foregoing there
must be a proper conception of the significant distinction be-
tween judicial error by a court proceeding according to the
course of the common law, and such error by a mere tribunal
exercising *quasi*-judicial authority. "In the former, juris-
diction of the parties and the subject matter being estab-
lished, the determination cannot be successfully challenged
for such error, though the basic findings of fact rest upon in-
sufficient evidence or have no foundation whatever therein."
To that broad scope such tribunal, under such circumstances,
has jurisdiction to commit error, while in the latter, where
findings of fact must be based on evidence, a determination
without evidence, or not warranted by the evidence in any
reasonable view of it, is a "clear violation of law in reaching
a result within the power of the tribunal to reach, proceeding
properly, and is jurisdictional error. In the former the evi-
dence is not reviewable at all. In the latter it may be re-
viewed, but only to the extent of determining whether there
is evidence upon which the tribunal could reasonably have
reached the conclusion which it did." "In the first a conclu-
sion without any credible evidence to support it or any evi-
dence at all is mere judicial error. In the second, want of
credible evidence, which in case of the verdict of a jury would
be sufficient upon appealing to require a reversal, is jurisdic-
tional error; error committed outside of jurisdiction instead
of in the exercise of jurisdiction."

The power of supervisory control in the situation suggested
may be used in many ways to secure an adjudication as to the
void act. It may be dealt with directly by either of the juris-

dictional writs or indirectly, in peculiar circumstances, by injunction, or treated as void where, in passing, it would otherwise bar the way to any legitimate act. The following cases illustrate all those phases: *Lutheran E. Church v. Grist-gau*, 34 Wis. 328; *State ex rel. Rinder v. Goff*, 129 Wis. 668, 109 N. W. 628; *Speed v. Detroit*, 98 Mich. 360, 57 N. W. 406; *People ex rel. Metevier v. Therrien*, 80 Mich. 187, 45 N. W. 78; *People ex rel. Mayor v. Nichols*, 79 N. Y. 582; *State ex rel. Denison v. St. Louis*, 90 Mo. 19, 1 S. W. 757; *Poyntz v. Shackelford*, 107 Ky. 546, 54 S. W. 855; *State ex rel. Reid v. Walbridge*, 119 Mo. 383, 24 S. W. 457.

Thus, upon principle and authority, in this form of action, or any other where the matter becomes material, all questions which go to the validity of the decision may be considered, and such decision affirmed or reversed according to whether jurisdictional error was committed or not. All other questions are foreclosed by the exclusive jurisdiction of the tribunal. In *Speed v. Detroit, supra*, it was said, no matter how the question comes up, the thing forming the subject of the controversy being vital, it would be a reproach to the law if courts were so infirm as to be obliged to treat it as valid, or even voidable. The void act being the result of excess of jurisdiction of a *quasi*-judicial tribunal, it is of very little consequence how its validity may be challenged, whether directly or indirectly.

There is no principle more sanctified by time and universality than the foregoing. As applied to the circumstances here the language of Lord CAMPBELL in *Ex parte Ramshay*, 18 Q. B. 173, has been regarded as among the classics, and it is found quoted over and over again as expressing the rule in the absence of some unmistakable written law to the contrary:

"This instrument [the order of removal] is not absolutely conclusive. . . . The exercise of authority to dismiss from office . . . is subject to the control of the courts. . . . We

may assume that the chancellor has duly exercised his jurisdiction till the contrary is proved. But we think that it would have been open to Mr. Ramshay to show that he was removed without notice of any charges against him, or without opportunity of his being heard in his defense, or that no evidence was adduced to support the charge, or that the complaints made against him were not of inability or misbehaviour in his office, and were of a nature, that, if proved or admitted, they could not disqualify him for office," . . . within the meaning of the act of Parliament. "The chancellor has authority to remove a judge of a county court only on the implied condition prescribed by the principles of eternal justice. . . . He cannot legally act upon such an occasion without some evidence being adduced to support the charges. Where the party complained against has a fair opportunity of being heard, where the charges if true amount to inability or misbehaviour [within the meaning of the law], and where evidence has been given in support of them, we cannot inquire into the amount of evidence or the balance of evidence, the chancellor, acting within his jurisdiction, being the constituted judge upon the subject."

The jurisdictional requisites were phrased by Chief Justice SHAW in *Murdock v. Phillips Academy,* 12 Pick. (29 Mass.) 244, about this way: (1) Citation to the officer to appear and reasonable time therefor; (2) Notice to him of the charges to be answered; (3) Reasonable time assigned for proofs; (4) Liberty of counsel to defend his cause and except to proofs and witnesses; (5) Conclusion upon the proofs and answer. They may otherwise well be stated in language commonly used here thus: (1) Reasonable notice of time, place of hearing, and of charges constituting a proper subject for investigation; (2) Reasonable opportunity to defend characterized by full disclosure of adverse evidence according to the established principles of fair judicial investigation to determine the justice of the case; (3) A decision upon proofs of record supporting it in some reasonable view.

Testing the situation by the jurisdictional features suggested, it would be doing the greatest injustice to the gov-

ernor to suppose he entertained the idea that the power of removal was required to be exercised in compliance therewith. He appreciated that at the hearing he sat as a court, because he so declared, but assumed he had competency to act substantially *ex parte* and in the quadruple capacity of informer, trier, prosecutor, and witness. He was simply mistaken, acting, we do not doubt, in good faith, in the belief that under sec. 970 of the Statutes he possessed all the power exercised, and which it was suggested there was competency to exercise, under the statute considered in *State ex rel. Kennedy v. McGarry,* 21 Wis. 496, and *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 122 N. W. 748, and that anything less harsh was matter of grace and not of right.

That several serious jurisdictional errors characterized the proceedings is too plain for argument. No one would seriously claim that such proceeding had hardly a semblance of the common-law requirements—a proceeding after the manner of such before a *quasi*-judicial tribunal. A conclusion that such a hearing was requisite to validity of an adverse determination practically ends the matter. There were these radical departures from the field of authority:

(a) There was practically no notice of a hearing with reasonable opportunity to prepare for and make a defense. The time of notice was less than an hour. Nothing short of a full day would do under ordinary circumstances. There were no extraordinary circumstances warranting a shorter time, but rather there were circumstances demanding a longer time. The office was one of the most important, as we have said, in the state, and the proceedings were instituted at a time of great official activity and requirement. The power of the governor in such a case is a substitute for the power of impeachment. What would be thought of the legislature if, upon one hour's notice, it should proceed against the governor, in face of his solemn protest of unpreparedness for the

occasion for want of reasonable opportunity therefor, to try him on articles of impeachment?

The precedents are few as to what is a reasonable notice and time to prepare for a hearing in a case of this sort, but there are some. A notice somewhat exceeding twenty-four hours was held sufficient in *People ex rel. Donovan v. Board of Fire Comm'rs,* 77 N. Y. 153. The same time was passed without comment in *Kennard v. Louisiana,* 92 U. S. 480. In *People ex rel. Schumann v. McCartney,* 34 App. Div. 19, four hours' notice was said to be equivalent to no notice at all. In *People ex rel. Jordan v. Martin,* 152 N. Y. 311, 46 N. E. 484, a rule requiring two days' notice was treated as reasonable. A few hours' notice is not consistent with due process of law. *U. S. v. Fisher,* 222 U. S. 204, 32 Sup. Ct. 37. In a serious matter one should not be required to answer the same or even the next day. *Roller v. Holly,* 176 U. S. 398, 20 Sup. Ct. 410.

Nothing further need be said on this branch except that it must be considered that there was the merest mockery as to the element of notice.

(b) The right of appellant to a fair hearing, with reasonable opportunity to defend according to the essential of fair judicial investigation, was plainly violated. The governor had no right to act upon personal information not disclosed so as to afford fair opportunity to meet it. All should have been disclosed to appellant and made a matter of record. *People ex rel. McAleer v. French,* 119 N. Y. 502, 23 N. E. 1061; *Rex v. Fishermen of Faversham,* 8 Term Rep. 352; *Capel v. Child,* 2 Cromp. & J. 558. As said in *State ex rel. Milwaukee Med. College v. Chittenden,* 127 Wis. 468, 107 N. W. 500, the law contemplates that the members of such a tribunal will "proceed with dignity and fairness commonly expected of tribunals exercising judicial or *quasi*-judicial authority;" that they will "act upon proof of some sort reason-

ably appropriate to the case and made a matter of record; not necessarily . . . in all cases act regardless of personal investigation, but in case of reliance thereon the result of the investigation will be made a matter of record; that opportunity will be afforded to the party affected . . . to know of and rebut the evidence produced against him if he so desires. In short, they will exercise their judicial function judicially, and that their decisions will be open to review by the court for jurisdictional error, including that involving the question of whether the basis for the decision indicated by the record constitutes reasonable ground therefor."

A reasonable opportunity to be heard in such an important matter, especially since no time for preparation was afforded, was not satisfied by the period of part of an hour, in defiance of appellant's sworn statement that such time was entirely inadequate for him to suitably present the evidence and the law. Reasonable opportunity to present evidence was not satisfied by closing the hearing while appellant's most important witnesses were present and waiting to testify. That competency to condemn appellant was about to expire by the intervention of a co-ordinate branch of the government, affords no excuse for the refusal to accord appellant his constitutional rights. The governor could not properly thus run a race with the approaching intervention without imperiling his jurisdiction. To do so intentionally, to the manifest prejudice of appellant, could not appear otherwise than illegal. Purposely rushing such an important matter, one of the most important that could engage executive attention, to a finish before the legislature could have time to convene, frankly proclaiming his purpose in that regard as an excuse for cutting off appellant without opportunity to present his most important evidence, is too clearly jurisdictionally unfair to be consistent with the right to a fair hearing.

We will not pursue this matter. It seems certain the gov-

ernor, who is a lawyer and man of judgment, had no idea appellant was entitled to a hearing of a judicial character, and that he accorded the sort of hearing which occurred more as a matter of justifying the disturbance of such an important office than as a recognition of any right of the officer. Whatever regard for the latter possessed the executive mind evidently took the form of merely extending a courtesy. From the standpoint of what a hearing should be there was no hearing in a judicial sense. As said by Justice FIELD in *Windsor v. McVeigh,* 93 U. S. 274: "Whenever one is assailed in his person or his property then he may defend, for the liberty and the right are inseparable. This is a principle of natural justice recognized as such by the common intelligence and conscience of all nations." A violation of right in this respect "is not a judicial determination of right and is not entitled to respect in any tribunal."

(c) If we were able to reach this stage of the case without discovering a fatal jurisdictional defect, there would be left the question of whether there was any legitimate basis in the evidence for the finding of fact upon which the removal order was grounded. I will now turn briefly to that.

The charge against appellant was in these words, following substantially the language of the statute: "Said *Herman L. Ekern* did serve on and under the political committee and as 'manager' of the political campaign" for one L. L. Johnson, who was then and there a candidate for the office of speaker of the assembly of the state of Wisconsin, contrary to the provisions of sec. 1666*y* of the Statutes.

It will serve no valuable purpose to restate the evidence. It appears in substance in the statement of facts which heads this opinion. Suffice it to say that I fail to discover proof to sustain the charge in any reasonable view of the statute. Certainly, it seems, the legislature did not purpose preventing the commissioner from having his choice among aspirants

of his own party for the mere office of speaker, or even from making that known and in a purely personal way asking friends among members of the legislature to support such choice. That it did not purpose tieing his hands so as to disable him from extending the ordinary courtesies commonly indulged in between gentlemen and friends belonging to the same party, such as engaging rooms by request, even with the knowledge of their intended use for political purposes; and that is the very word of appellant's offending. His refusal to close the rooms upon the ground that he did not control them, as he was commanded to do on peril of being removed from office—instead of being evidence to sustain the charges was evidence to the contrary, in the light of undisputed evidence that he had no authority to comply with the command. He denied, in the most emphatic manner and in most satisfactory detail, that he was or had been a member of, or had served on or was serving on, a political committee, or as manager of a political campaign, for Mr. Johnson. There was nothing definitely produced to the contrary, while there stands the summary refusal to take the corroborating evidence of Mr. Johnson and others on the subject. The only reasonable explanation of the proceeding seems to be that it was supposed that personal undisclosed supposed knowledge of the governor was a proper basis for action.

On the face of the record, I feel bound to say, there is no real basis for the decision that appellant violated the statute.

If the proof justified a finding that appellant acted for Mr. Johnson, in the nature of a committee or as member of a committee, in the promotion of his candidacy, still I think there is no proof of there having been a political committee or manager, in the statutory sense. The law must be restricted to the common, ordinary meaning of words. Notwithstanding the ingenious argument of counsel to the contrary, it seems the legislature evidently used the term "political committee"

in the sense of managing committee for a political party, and the term "manager of a political campaign" to characterize a manager for a political party, in the technical sense, in such a campaign. The statutes, in many places, deal with political parties, political committees, and political campaigns. Sec. 1966y was passed about the same day as the Corrupt Practices Act wherein such terms are used many times. Provision is made therein for such committees, they are given a sort of *quasi*-official status, and regulated with much detail. Similar committees have been dealt with in this state for some twenty-five years as a proper subject for regulation under the police power, as significantly indicated in *State ex rel. Cook v. Houser,* 122 Wis. 534, 100 N. W. 964. It seems quite plain, I think, that "political parties" and the associate terms were used in sec. 1966y in the sense of similar terms in sec. 94—1 to sec. 94—39 of the Statutes. That accords with the construction of the term "political committee" elsewhere. Revised Laws Mass. (Supp. 1902–1908) ch. 11, sec. 1. It gives sensible effect to the statute. To apply the term as used in sec. 1966y to a person who may, of his own volition or by request, favor some one of several persons elected to the legislature as result of a political campaign—some one of the aspirants within his own party—for presiding officer, would be to render the statute absurd.

I am of the opinion not only that there was no evidence to reasonably support the charge against appellant from any fair viewpoint, but that the charge itself was not within the statute. The governor unwittingly traveled into the realms of doubtful construction, and that is not permissible in any case, especially not to maintain such an extraordinary power as that asserted. A meaning was adopted which it seems the legislature did not contemplate putting into law. Otherwise hardly any man of sufficient individuality to be competent to fill the high and responsible office of commissioner of insur-

ance would be found to take it. Practical construction has, so far as it has progressed, rejected any such meaning. Notwithstanding the bitter factional contests for the position of speaker of the legislature, candidates for speaker, or for head of any committee of the legislature, treated the Corrupt Practices Act as having no reference to a canvass for such positions

I am conscious that this opinion has been extended to a very great length,—I trust not too great. The questions, as I have before remarked, are of such overshadowing importance that the particular right involved, though of much dignity, is of little importance beside the proper decision of the important questions upon which its conservation depends. I have endeavored, to the best of my ability, to do justice to the court, to such questions, and to the vindication of that broad construction of private rights and the inviolability thereof believed to be laid down in the constitution, and the judicial power and willingness to use it to vitalize such conception.

We must remark in closing, that we have not been unmindful at any time of the regard which this court should have for the high office of governor. A solemn duty rests here in that regard. It is a matter of great delicacy to deal with the governor's action and condemn it as void, but when duty requires it the duty must be performed. Any one who would hesitate when the duty is plain, because of the exalted station of the co-ordinate department of government, is unworthy to be a trustee of the judicial power delegated by the people. With due deference to the co-ordinate department and full appreciation of its independence within the scope of its authority, we must, with the courage which should characterize the supreme judicial office, vindicate the paramount authority here to determine what the law is, what acts constitute a violation thereof, and what are the legal consequences. The moment it shall be established that either of the other departments is independent of the judiciary in that field, the guard which the people placed in the constitution to conserve

private rights will have been broken down and the pathway for usurpation will be open and plain. We entertain no thought that the governor had any purpose to violate the law. He is human, and so is liable to err. Error often occurs, as we think it did here, without consciousness of any ulterior influence, and yet some strong feeling, springing from provocation, may so have had the field as to subvert the judgment.

To recapitulate the points in this opinion:

The governor within the scope of his authority is independent of the judicial department of the state. He can neither be compelled to act or not to act, or his act called in question.

If the governor acts beyond the scope of his authority and violates private rights, the injured party may appeal to the courts for redress and be entitled thereto regardless of the official status of the wrongdoer, though such status may have much to do with the manner of redress.

The courts, except in some extreme cases of hardship not admitting of any other remedy, will not act coercively in respect to the governor; that not from want of power but on grounds of public policy.

The public policy which shields the governor from judicial coercion except in dire necessity, does not apply to his agents, though the court will not, from the same policy, act then coercively to restrain the vitalization of the executive will unless there is some clear, apparent necessity therefor.

If a person takes office by lawful means and remains therein in good faith believing that he has, *de jure,* right to do so, and his possession is characterized by all the usual appearances of right, he has color of authority and has *de facto* status until the end of his term or some other has been duly declared successor to him in the particular office.

A person in possession, under the circumstances before stated, does not lose his *de facto* status before the end of the term for which he was elected or appointed by reason of the

formal, premature, adverse termination thereof and the appointment or election of a successor, so long as he remains in possession, doing business as before, in good faith and upon reasonable ground challenging the validity of interference.

Subject to the exception suggested, a person in good-faith possession of a public office and to all appearances entitled thereto *de jure,* is at least a *de facto* officer.

If a person has possession of an office and is entitled thereto *de jure* or *de facto,* or there is a fair question as to whether he has not, at least, the latter status, he is entitled to protection by injunction against being dispossessed by violent and unlawful means.

The remedy by action for injunction may be used in the circumstances stated in the foregoing, though there be no action pending to try the title to the office and the only purpose is to preserve the existing condition of things until the adverse claimant shall have established his right by legal means.

A controversy between rival claimants for an office as to which has the title is not a proper primary subject matter for equitable interference, but the right to immunity from being dispossessed by violent and unlawful methods is such a subject matter.

Though an equitable action will not lie to try title to an office, where the question of title is incidental and germane to some proper subject matter of primary interference in equity the incidental matter may be litigated to effect, under the rule that a court of equity having jurisdiction of the parties and a proper primary subject matter for a legitimate purpose may retain jurisdiction to do full justice between the parties, including all the incidental germane matters, and, even, when the action is grounded in good faith at the start, if the primary subject matter entirely drops out for failure of proof.

Where the power of summary removal from public office

exists, the officer clothed with the power may execute it without judicial interference before or after.

Where a person holds a public office *ad libitum* purely, he may be removed at the pleasure of the officer having the power of removal.

Where the power of summary removal is expressly or by necessary inference conferred by statute, the removal may occur without hearing except such as the statute expressly requires.

Where a person holds office for a term fixed by law, but is subject to removal for cause, or a particular cause, unless the written law expressly or by necessary implication provides to the contrary the power of removal must be exercised upon charges satisfying the calls of the statute, reasonable notice of the charges and the time when the hearing will be had in respect thereto, reasonable opportunity to be heard in person, by counsel, and by witnesses, to meet the adverse witnesses, hear their testimony and cross-examine them, and know all of, and have opportunity to meet, the proofs to be considered,—in short, a hearing after the manner for fair judicial investigation and determination accordingly.

The right to hold and enjoy a public office is of pecuniary value and in a broad sense is a property right and matter of personal liberty within the protection of the declared purpose of the constitution, within art. V and sec. 1, art. XIV, of the amendments to the federal constitution.

Due process of law, within the constitutional guaranties, limits the exercise of the power of removal to those proceedings expressly provided by statute, or, where none are so provided, to the methods which by the common law are required according to established principles of natural justice.

Whether the governor, exercising the power of removal, acquired jurisdiction to act and proceeded to a finality without

excess of jurisdiction, may be inquired into whenever the result is called in question collaterally or directly.

In exercising the power of removal for cause and upon notice and hearing, the governor acts as a tribunal and, the same as any other inferior body exercising *quasi*-judicial authority, his act may be reviewed, under the supervisory control power of the court, for jurisdictional error whenever the same comes in question directly or collaterally.

Whatever a *quasi*-judicial tribunal does within its jurisdiction, regardless of the mere judicial error committed, is final, but any material excess is jurisdictional and renders the result void.

An inferior tribunal required to decide upon evidence commits a clear violation of law in deciding without any evidence or contrary to any reasonable view of the evidence, and such violation is jurisdictionally fatal to the result.

The prohibitory clause of sub. 2, sec. 1966*y*, as to the commissioner of insurance not serving on or under any political committee, or as manager for any political campaign, has reference to those committees and campaign activities recognized and regulated by statute, particularly by the several sections of the Corrupt Practices Act. Sec. 94—1 to sec. 94—39. It has no reference to mere personal preferences or favors, or activities, for one of a body elected as the result of a political campaign, as presiding officer of the body.

The facts upon which the decision is grounded, as to the governor's jurisdiction to make the order of removal, are undisputed and indisputable. All that is shown by the record as made in behalf of respondents. Therefore, it would be a useless delay in the administration of justice and prejudice to public interests to remand this case for any less purpose than a speedy termination of the litigation by judgment on the merits according to the prayer of the complaint, and, as germane thereto, judgment that at the time of the commence-

ment of the action appellant was, *de jure,* commissioner of insurance.

*By the Court.*—So ordered.

TIMLIN, J.   I concur in the opinion of Mr. Justice MARSHALL to this extent:

(1) Sec. 970, Stats., under which the removal of the appellant was attempted, authorizing removal for cause proven, must be construed to require due process of law, *i. e.* charges, notice thereof, and a hearing. *State v. Smith,* 35 Neb. 13, 52 N. W. 700, 16 L. R. A. 791.

(2) There was in this case less than an hour's notice, and the governor refused to hear the appellant's witnesses Johnson and Rosa.   This was insufficient as to notice and inadequate as a hearing, consequently the attempted removal was without jurisdiction and void. *U. S. v. Fisher,* 222 U. S. 204, 32 Sup. Ct. 37.

(3) There being no lawful removal there was no vacancy, hence no power to appoint a successor.   The appellant is the *de jure* commissioner of insurance and entitled to an injunction to restrain trespasses, actual and threatened, for the purpose of seizing upon his office, the property and emoluments thereof.

(4) The governor has no power, jurisdiction, or authority, as against even a *de facto* officer in possession of the office, to install the appointee of the former before a judgment in *quo warranto* in favor of such appointee.

To avoid unseemly clashes between co-ordinate branches of the government and to avoid the condition which must necessarily ensue should the governor personally violate the injunctional order, the court will not unnecessarily issue an injunctional order against the governor.   But the appellant is entitled to such order against the subordinates acting under the order of the governor in the unlawful attempt to wrest

from appellant by force his said office.    To this extent the order appealed from should be reversed.

There is doubtless much good law and much elevated and inspiring sentiment in the opinion of Brother MARSHALL, but I have not had time to go over it with that care which ought to be preliminary to a formal approval of all that is said therein.

BARNES, J. (*dissenting*).    The order appealed from should be affirmed for two reasons: (1) Because the certificate of appointment held by *Mr. Anderson* gave him the *prima facie* right to the office and the right to the possession thereof until the question of title was tried in an appropriate proceeding brought for that purpose, and (2) because the governor had the right under sec. 970, Stats., to remove *Mr. Ekern* without hearing or notice, and the courts have no jurisdiction to pass upon the sufficiency or insufficiency of the evidence on which action was taken, and *Mr. Anderson* was both the *de facto* and *de jure* commissioner of insurance.

Practically every substantial question of law involved in the case, with possibly a single exception, has already been passed upon by this court.    This being so, the decisions of foreign jurisdictions are of little consequence unless they suffice to convince the court that it should overrule its former decisions.    I think our decisions and our statute law meet the case we have before us fully and fairly, hence this dissent.

The title to a public office cannot be tried in an equity action.    *Ward v. Sweeney,* 106 Wis. 44, 82 N. W. 169; *State ex rel. Lochschmidt v. Raisler,* 133 Wis. 672, 114 N. W. 118; *State ex rel. McCoale v. Kersten,* 118 Wis. 287, 95 N. W. 120; *State ex rel. Jones v. Oates,* 86 Wis. 634, 57 N. W. 296; *State ex rel. Rinder v. Goff,* 129 Wis. 668, 109 N. W. 628.

An injunction will not lie to preserve the *status quo* in favor of a person in possession of an office and making a good-faith claim of title thereto, unless it clearly appears that

such party is in fact entitled to the office. *Ward v. Sweeney, supra.* While two members of the court did not agree to all that was said in the opinion in that case, the entire court did agree that the law was as above stated. See opinion of court, 106 Wis. 49, 50; concurring opinion of Mr. Justice MAR-SHALL, pp. 56, 63, and concurring opinion of Mr. Justice BARDEEN, p. 63. Such is the law generally in reference to the issuance of injunctions *pendente lite* in equity actions. *Shel-don v. Rockwell,* 9 Wis. 166; *Warden v. Fond du Lac Co.* 14 Wis. 618; *Pettibone v. La C. & M. R. Co.* 14 Wis. 443; *Cobb v. Smith,* 16 Wis. 661; *Marshall v. Pinkham,* 52 Wis. 572, 9 N. W. 615; *Converse v. Ketchum,* 18 Wis. 202, 206; *T. B. Scott L. Co. v. Oneida Co.* 72 Wis. 158, 39 N. W. 343; *Walker v. Backus H. Co.* 97 Wis. 160, 72 N. W. 230; *Tiede v. Schneidt,* 99 Wis. 201, 211, 74 N. W. 798. There is but one well recognized exception to this general rule, which is found in such cases as *Valley I. W. M. Co. v. Goodrick,* 103 Wis. 436, 78 N. W. 1096; *Glassbrenner v. Groulik,* 110 Wis. 402, 404, 85 N. W. 962; *Quayle v. Bay-field Co.* 114 Wis. 108, 89 N. W. 892; *Bartlett v. L. Bartlett & Son Co.* 116 Wis. 450, 460, 93 N. W. 473; *Milwaukee E. R. & L. Co. v. Bradley,* 108 Wis. 467, 486, 84 N. W. 870. Manifestly the instant case does not fall within the exception.

The holder of a certificate of election is entitled to the possession of an office pending the trial of title thereto as against an incumbent in possession who makes a good-faith claim of title. This was expressly decided in *La Pointe v. O'Malley,* 46 Wis. 35, 55, 50 N. W. 521, where it is said that when the canvass "shows the election of an individual to a particular office, and he qualifies within the time and in the manner prescribed by law, he is entitled to the office as against every other person laying claim thereto, *until the result of the election so declared is set aside by the judgment of some competent court in a direct proceeding for that purpose.* In such

case, the person declared to have been elected is· not required to institute a proceeding to have the judgment which has already been given in his favor confirmed by the judgment of a court, before he can enter upon the duties of his office."

The same question came before the court in *State ex rel. Jones v. Oates,* 86 Wis. 634, 57 N. W. 296, and it was again held that a certificate of election carried with it the· *prima facie* right to the office as against an incumbent in possession claiming title, and that such· *prima facie* right included the right to the possession of the office pending the trial of title thereto.    After stating the rule the court uses the following language: "To this, we think, there is but one exception, and that is when the office is already filled by a *de facto* officer." Page 638.    This exception is carried into some of the subsequent cases: *State ex rel. McCoale v. Kersten,* 118 Wis. 287, 293, 95 N. W. 120; *State ex rel. Rinder v. Goff,* 129 Wis. 668, 683, 109 N. W. 628.    It is fair to assume that the court in these cases used the language of the *Oates Case* in the light of the explanation there given as to what was meant by it. It is there said in effect that the words *"de facto* officer" did not refer to one who might be a *de facto* officer as to the general public.    Oates was in possession and was clearly such an officer, and he was ousted by *mandamus* in favor of the relator, who held the certificate of election.    He was ousted because it was said that as to the relator, Jones, he was not a *de facto* officer.    So the decision is that a claimant in possession is not a *de facto* officer as against the certificate holder and therefore has no right of possession as against him.    Not only ·are the cases of *La Pointe v. O'Malley* and *State ex rel. Jones v. Oates* direct authority to the point that the holder of a certificate of election is entitled to the possession of the office pending a trial of title thereto as against an incumbent in possession, but the subsequent cases of *State ex rel. McCoale v. Kersten, supra; State ex rel. Rinder v. Goff, supra;*

and *State ex rel. Hayden v. Arnold,* 151 Wis. 19, 138 N. W. 78, when correctly read are to the same effect.

These cases state the law as it should be. Where there is a controversy between an incumbent in possession and one holding a certificate of election, one or the other should hold the office until the controversy is settled. Possession at best is only slight evidence of title. As between two such claimants it is eminently just and reasonable to give some effect to the certificate of election and to say that it carries the right to the possession of the office until the title is determined. This is not only a just rule, but one that avoids unseemly struggles to obtain or retain possession. The party in possession forfeits no rights and suffers no injury by surrendering possession *ad interim.* Every one had the right to suppose that the rule of law was firmly grounded in our jurisprudence until the present controversy arose.

I do not think that any satisfactory reason can be given why the rule referred to should not apply here. A certificate of appointment from the executive, where the law empowers him to appoint, is entitled to the same weight and effect as is a certificate of election from a canvassing board in the case of an elective office. If one gives the right of possession, surely the other does. So far as I have been able to ascertain, there is no conflict in the cases on the point. In fact the decisions go further and hold that *mandamus* will lie to put the holder of a certificate of appointment in possession of the office pending the trial of title thereto and will oust the party in possession although he claims to be legally entitled to the office. *In re Sells,* 15 App. Div. 571, 44 N. Y. Supp. 570; *Conklin v. Cunningham,* 7 N. M. 445, 38 Pac. 170; *Beebe v. Robinson,* 52 Ala. 66; *Casey v. Bryce,* 173 Ala. 129, 55 South. 810; *Hubbell v. Armijo,* 13 N. M. 482, 85 Pac. 1046; *Cameron v. Parker,* 2 Okla. 277, 38 Pac. 14; *Elledge v.*

*Wharton,* 89 S. C. 113, 71 S. E. 657; *State v. Herried,* 10 S. Dak. 16, 71 N. W. 319.

It has been urged that in the *O'Malley* and *Oates Cases* the terms of office under which the incumbents gained possession of the offices had expired and that the controversies arose over new terms, while in the instant case *Mr. Ekern's* term had not expired, and that therefore there is a well grounded distinction between the former cases and the present one. A number of the cases just cited dealt with removals made during a term of office. The logic of the argument is not convincing. The governor had the right to terminate the term of office of the incumbent for certain causes. His order of removal is entitled to as much weight and consideration as is his certificate of appointment. There had been a *prima facie* valid removal of *Mr. Ekern* as well as a *prima facie* valid appointment of *Mr. Anderson.* Until the *de jure* right could be determined, no injunction should issue to preclude the appointee from taking office.

For the reasons stated, if for no other, the circuit court properly dissolved the injunction. I think it was *Mr. Ekern's* duty under the law to have surrendered the office under protest and to then bring his action in an orderly way to try title. If successful, he would lose no right by so doing, not even the right to collect the salary and emoluments of the office while he was out of possession.

The next and the only question which I desire to discuss at any length is one of statutory construction. At the request of the court a reargument was made on the question of whether "due process of law" was observed in removing *Mr. Ekern.* I have never conceived that the question of "due process of law" was involved in the slightest degree. If the governor followed the statute in making the removal, it was valid. If he did not, it was a nullity. The legislature which creates an office has plenary power to provide how removal shall be

made. Whoever accepts an office so created accepts the bur-
dens as well as the benefits. He is entitled as a matter of
right to so much consideration as the legislature sees fit to
give him,—no more, no less. *Gillan v. Board of Regents,* 88
Wis. 7, 14, 58 N. W. 1042. It may provide for removal
without notice or hearing or the assignment of any cause.
In such a case removal may be made without notice or hear-
ing or the assignment of cause. It may provide for removal
without notice or hearing for specific causes. In such a case
removal may be made without notice or hearing, but a cause
must be assigned and it must be one specified in the statute.
It may provide for removal on notice and hearing for specific
causes, in which case a reasonable notice and hearing must
be given and the removal must be made for a cause found in
the statute. It would seem to me to be almost absurd to deny
this power to the legislature, and yet it seems to be done in
many jurisdictions, some courts holding that the right to hold
office is a property right protected by the "due process" clause
of the federal constitution, and others that the power to re-
move is judicial and must therefore be exercised in a judicial
manner. Still others seem to entertain no very well defined
reason for denying the power of the legislature, and proceed
on general principles to apply the same rules to removals of
incumbents of offices of legislative creation that are sometimes
applied to the case of officers provided for by constitutions.
I do not care to discuss these foreign cases nor the statutes
under which they arise. The fundamental principles in-
volved have been settled and rightly settled by this court.
This much may be said, however, that wherever the legislature
evidences an intent that notice and hearing need not be given,
that intent will control. *Coleman v. Glenn,* 103 Ga. 458, 30
S. E. 297; *Cull v. Wheltle,* 114 Md. 58, 78 Atl. 820, 824;
*Hallgren v. Campbell,* 82 Mich. 255, 46 N. W. 381, 383;
*Field v. Comm.* 32 Pa. St. 478, 481; *State v. Smith,* 35 Neb.

13, 52 N. W. 700; *People ex rel. Maloney v. Douglass,* 195 N. Y. 145, 87 N. E. 1070; *State ex rel. Caldwell v. Wilson,* 121 N. C. 425, 28 S. E. 554, 561; *S. C.* on appeal (*Wilson v. State ex rel. Caldwell*) 169 U. S. 586, 18 Sup. Ct. 435; *Andrews v. King,* 77 Me. 224; *State ex rel. Att'y Gen. v. Hawkins,* 44 Ohio St. 98, 5 N. E. 228; *McDowell v. Burnett* (S. C.) 75 S. E. 873; *People v. McAllister,* 10 Utah, 357, 37 Pac. 578, 580; *State ex rel. McKeavy v. Burke,* 8 Wash. 412, 36 Pac. 281; *State v. Grant,* 14 Wyo. 41, 81 Pac. 795, 799, 82 Pac. 2; *Reagan v. U. S.* 182 U. S. 419, 21 Sup. Ct. 842; *Shurtleff v. U. S.* 189 U. S. 311, 23 Sup. Ct. 535.

An office is not property, nor is the right to hold office a vested right.    *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 619, 64 N. W. 304; *State ex rel. Cook v. Houser,* 122 Wis. 534, 603, 100 N. W. 964; *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 303, 122 N. W. 748; *Crenshaw v. U. S.* 134 U. S. 99, 10 Sup. Ct. 431, and cases cited.   The guaranty of "due process of law" by the Fifth and Fourteenth amendments to the federal constitution is extended only to life, liberty, and property.   The right to hold an office created by legislative act does not involve any of these three things.   If due process of law is involved at all in the present case, then a removal in whatever manner the statute provides is due process of law.

As is well said in *State ex rel. Buell v. Frear,* 146 Wis. 291, 298, 299, 131 N. W. 832:

"The privilege of holding a public office is not in its nature of the class of rights which are guaranteed by the constitution as the natural and inalienable rights of every citizen. It has never been treated as a natural right in our governmental system.   It is in its nature a privilege which is extended to the citizens of the state upon such conditions and terms as the people in their sovereign capacity may determine."

Again, it was held in *Gillan v. Board of Regents,* 88 Wis. 7, 58 N. W. 1042, that a statute empowering the board of regents to remove a teacher at pleasure was as much a part of the contract of employment as if it were written into such contract, and that a removal might be made under it without notice or hearing. The power of amotion from office is not a judicial one under the law of Wisconsin, but is administrative, at least as to all officers whose removal is not provided for by the constitution. Many courts hold that the power of removal is judicial, and starting with this premise they reach the conclusion, logically enough, that it must be exercised in a judicial manner, which comprehends the giving of notice to the accused officer of the charges against him and a full opportunity to be heard thereon. *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112, is a typical case of this class and contains an able and elaborate presentation of the reasons for so holding, as well as a review of the authorities upon which the court based its conclusion. This court, however, refused to follow the Michigan decision in the *Starkweather Case,* although urged to do so, and said: "The better authority, however, is clearly to the effect that the power to remove officers for cause, though to be exercised in a judicial manner, is administrative, not judicial." If it were held otherwise the court would have been compelled to reach an opposite conclusion in the case, because by no stretch of imagination could it be held that the relator in that cause had a judicial hearing. One of his judges was a person who would succeed him in the office of mayor in case of removal, and another was the person who presented the charges against him. The *Stark-weather Case* does not conflict with what is said in *Larkin v. Noonan,* 19 Wis. 82. There the court held that a sheriff was entitled to be served with a copy of the charges against him and to a right to be heard in his defense, because sec. 4 of

art. VI of the constitution expressly required these things. The court proceeds to hold that a hearing being so required it should be carried on after the manner of court procedure. *Randall v. State,* 16 Wis. 340, is to the same effect and goes no further. The same thing is said in the *Starkweather Case.*

The case of *State ex rel. Getchel v. Bradish,* 95 Wis. 205, 70 N. W. 172, was distinguished from the *Starkweather Case* in that it was there decided that a license to sell liquor was a vested property right of which the owner could not be deprived without due process of law, and that in a proceeding to revoke the license the town chairman, who had hired a minor to purchase liquor, was disqualified from sitting on the trial of the saloonkeeper.

The decision in the *Starkweather Case* was vigorously attacked by the able counsel who appeared for the relator in *State ex rel. Cook v. Houser,* 122 Wis. 534, 100 N. W. 964, and was just as vigorously defended by the court, speaking through Mr. Justice MARSHALL. The discussion will be found on pages 573 to 581 of the opinion. I may be pardoned for quoting a few excerpts from it:

"We recognize the doctrine of the *Starkweather Case* to be now, after the lapse of nearly ten years and the approvals thereof indicated, firmly established. The maxim *stare decisis et non quieta movere* must prevail against all efforts to disturb it." Pages 574, 575.

And again: "Can there be any possible doubt as to the truth of the proposition, that what belongs to the people to do with as they deem best, those things respecting which their will is unrestrained by any constitutional limitation, they can grant upon the condition, among others, that the enjoyment thereof shall be solely secured by such remedies and administered by such tribunal as they may see fit? If there is, then the scores of boards and councils and commissions which every day act judicially in respect to such matters, without a thought on the part of anybody conversant with the law that

their decisions are subject to judicial review, should have immediate legislative attention. Does not every board of review pass upon, or have power to do so, the valuation for purposes of taxation of the property owned by the relatives and business associates of its members? And how about the assessor, who sits as a member of such board, though its function is to pass upon, in a judicial way, his own work? Many other illustrations quite as striking could be given, all demonstrating the decision in the *Starkweather Case* is in perfect harmony with the existing order of things, generally, and showing that the disquisitions found in some judicial literature respecting purity of judicial methods, as to members of a tribunal such as the one in question, applying to them the test for a judge as to qualifications for the performance of his official duties, are all wrong. Such things sound well to the ear, as do all lofty sentiments regarding the preservation of spotless judicial integrity and shielding the courts even from danger of every opportunity for a well grounded suspicion as to their decisions being influenced by ulterior matters, but when illegitimately applied to a mere ministerial officer in the performance of administrative duties, merely because he is clothed with some discretion in the matter, denominated *quasi*-judicial authority, are liable to lead to judicial error and to promote harmful impressions among the people." Pages 575, 576.

Speaking further of the nature of the power of a political committee to determine who were the nominees for office, the discussion proceeds:

"But we choose to rest the competency of the members of such committee on the broad doctrine of *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 64 N. W. 304. It was a mere administrative body, not a court in any sense, nor were its members expected to exercise the functions of judges, strictly speaking. The matter to be dealt with was a mere legislative privilege, grantable upon any condition the legislature saw fit to impose. The tribunal was given unqualified authority in respect thereto, so long as it proceeded within its appropriate sphere. None of the rules disqualifying judges

or jurors have any application to such a situation." Page 581.

If it were possible to approve of the holding in the *Stark-weather Case* that the power to remove an officer was administrative, by emphatic iteration and reiteration, the doctrine was approved in *State ex rel. Cook v. Houser,* 122 Wis. 534, 100 N. W. 964. It had already been quoted with approval in *Nehrling v. State ex rel. Thal,* 112 Wis. 637, 639, 88 N. W. 610, and was subsequently approved in *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 303, 122 N. W. 748. The point expressly decided in the cases referred to was decided *sub silentio* or else overlooked in *State ex rel. Gill v. Watertown,* 9 Wis. 254; *State ex rel. Kennedy v. McGarry,* 21 Wis. 496; and *State ex rel. Willis v. Prince,* 45 Wis. 610. The question should be at rest in this state so far as the courts are concerned if the doctrine of *stare decisis* means anything. It is true it is said in the *Starkweather Case* that the administrative power of removal must be exercised in a judicial manner. This expression can mean nothing more than that, when notice and hearing is required by law as it was in that case, the proceeding should be carried on somewhat like court proceedings.

So I think that clearly the only question arising on the point under consideration is: Does the statute require the giving of a notice of hearing and an opportunity to be heard as a condition precedent to removal? If it does not, whatever was accorded to the plaintiff in the way of a notice and hearing was given as a matter of grace and not of right, and he has no cause to complain about the inadequacy of the opportunity afforded to be heard. In this connection it will be observed that the statute does not expressly provide for notice or hearing, and if either is required it must be read out of the statute by implication. It may be further observed that such requirements cannot be interpolated into the statute unless it

is apparent that the legislature intended they should be. When we consider the history of this legislation, it is about as certain as anything of the kind can be that there was no such legislative intent. To my mind that conclusion is as inevitable as the result of a mathematical demonstration.

Sec. 970, Stats., under which the plaintiff was removed, was first enacted by the legislature of 1849 as part of a comprehensive scheme governing and regulating removals from office. It has been continuously on our statute books since that time without material amendment. The legislative intent with which we must deal is that of the legislature which enacted the original law. The entire enactment referred to embraces secs. 4 to 10, inclusive, of ch. 11, R. S. 1849, and is as follows:

"Sec. 4. The governor may remove from office any sheriff, coroner, register of deeds, or district attorney, giving to such officer a copy of the charges against him, and an opportunity of being heard in his defense.

"Sec. 5. The judge of the circuit court shall have authority, in term time or in vacation, to remove any clerk of the circuit court in any county within his district, when in his opinion he is incompetent to execute properly the duties of his office; or when on charges and evidence such judge shall be satisfied that he has been guilty of official misconduct, or habitual or wilful neglect of duty, if, in the opinion of such judge, such misconduct or neglect shall be a sufficient cause for removal; but no such clerk shall be removed for such misconduct or neglect, unless charges thereof shall have been preferred to said judge, and notice of the hearing, with a copy of the charges, delivered to such clerk, and a full opportunity given him to be heard in his defense.

"Sec. 6. The board of supervisors of any county may remove the clerk of their board, when in their opinion, he is incompetent to execute properly the duties of his office; or when on charges and evidence it shall appear to said board that he has been guilty of official misconduct, or habitual or wilful neglect of duty, if in the opinion of said board such

misconduct or neglect shall be a sufficient cause for removal; but no such clerk shall be removed for such misconduct or neglect, unless charges thereof shall have been preferred to said board, and notice of the hearing, with a copy of the charges delivered to such clerk, and an opportunity given him to be heard in his defense, and in no case shall such removal be made unless two thirds of all the supervisors entitled to a seat in such board shall vote therefor.

"Sec. 7. Any collector or receiver of public moneys, appointed by the legislature, or by the governor, by and with the advice and consent of the senate, or of both branches of the legislature, except those officers for whose removal provision is otherwise made by law, may be removed by the governor, in case it shall appear to him on sufficient proofs, that such collector or receiver has in any particular wilfully violated his duty.

"Sec. 8. All officers, except senators in Congress and those specified in the preceding section, who are or shall be appointed by the governor, by and with the advice and consent of the senate, or of both branches of the legislature, or by the legislature without the concurrence of the governor, may, for official misconduct, or habitual or wilful neglect of duty, be removed by the governor upon satisfactory proofs, at any time during the recess of the legislature, and the vacancy filled by appointment made by him, until such vacancy shall be regularly supplied; but no such appointment shall extend beyond twenty days after the commencement of the next meeting of the legislature.

"Sec. 9. All officers who are or shall be appointed by the governor for a certain time, or to supply a vacancy, may be removed by him.

"Sec. 10. All officers, except senators in Congress, who are or shall be appointed by the legislature, or by either branch thereof, may be removed by such body or branch making the appointment."

Sec. 4 of the above statute is now sec. 968 of our Statutes; sec. 5 is amended and incorporated in our present sec. 973; sec. 6 corresponds to our present sec. 974; sec. 7 to our present sec. 969; and sec. 8 to our present sec. 970, being the sec-

.tion under which the plaintiff was removed.    The words "or
of both branches of the legislature" contained in the original
act are not now found in sec. 970; otherwise the two statutes
are identical.    Sec. 9 corresponds to sec. 971, and sec. 10 to
sec. 972.

It will be observed that sec. 4 covers the constitutional of-
fices of sheriff, coroner, register of deeds, and district attor-
ney, which were also elective offices.    It was there expressly
provided that the removal could only be made after such an
officer was furnished a copy of the charges against him and
was given an opportunity to be heard in his defense.    So that
the matter of requiring a notice and hearing when they were
considered desirable was sharply called to the attention of the
legislature in the first section of the act which dealt with re-
movals.    This provision was in fact drawn in the language of
sec. 4 of art. VI of the constitution, which had been adopted
the preceding year.

. Sec. 5 also provides for the removal of a constitutional and
an elective officer, to wit, the clerk of the court.    The consti-
tution was silent as to how he should be removed, so that the
legislature might make such provision for it as was deemed
wise.    See sec. 10, art. XIII, Const.    The section provided
for two classes of causes for removal: (1) incompetency;
(2) official misconduct or habitual or wilful neglect of duty.
It was clearly the purpose of the legislature to authorize the
summary removal of the clerk for incompetency without no-
tice or hearing, because the statute required neither when re-
moval was made for this cause.    As to the second class of
causes, however, the statute carefully specified that the clerk
could not be removed for "misconduct" or "neglect" unless
"charges thereof shall have been preferred" and "notice of the
hearing with a copy of the charges" be "delivered to such
clerk and a full opportunity be given him to be heard in his
defense."    Here again the question of notice and hearing was

immediately in the mind of the legislature, and the law expressly provided that notice and hearing were required on such causes of removal as the legislature desired they should be given on. Could it in reason or common sense be said that a notice and hearing was intended before a removal could be made for incompetency, when the law did not say so, but did say in the same section and in the same sentence that notice and hearing should precede a removal for other causes? The answer is obvious. It might be observed in passing that the causes for removal on account of which a notice and hearing was required by sec. 5 are the identical causes for which removal might be made under sec. 8, our present sec. 970, and which pertinently omits the requirement as to notice and hearing, no doubt because it was considered wise to throw greater safeguards around removals from elective than from appointive offices.

Sec. 6 dealt with the removal of county clerks and vested the power of removal in county boards. Here again if the removal was made for incompetency no notice or hearing was required. If made for "official misconduct or habitual or wilful neglect of duty," it could only be made on notice and hearing. We have in this section a plain statement that notice and hearing should be given in the cases where it was desired that they should be given, and an omission of any reference to either in the case where manifestly it was not intended that they should be required.

Sec. 7 brings us to appointive officers and provides for the removal by the governor of any collector or receiver of public moneys appointed by the legislature or by the governor with the advice and consent of the senate, except as otherwise provided for, "in case it shall appear to him on sufficient proofs" that such officer "has in any particular wilfully violated his duty."

In making a removal for incompetency under sec. 5 the

circuit judge could act on his own knowledge. The county board could do likewise in making a removal for the same cause under sec. 6. Under sec. 7 the governor could act on any proofs that were *satisfactory to him*. No notice or hearing was provided for as in the preceding sections. The power of removal was vested in the head of one of the departments of government where there was no likelihood that it would be abused. It dealt with officers who were handling public funds and as to whom peremptory removals might be absolutely necessary to save the state from loss where a dishonest official was squandering or stealing the money of the state. Is it supposable that the legislature intended that such an officer might continue to embezzle state funds until he could be served with a copy of the charges against him and be given what might be deemed a sufficient time to prepare his defense? If so, why did not the legislature say so as it did in the preceding sections when it desired that notice and hearing should be given? We have sec. 7 on our statute books today as sec. 969. If it is learned that such an officer has stolen money of the state and is liable to steal more, must notice and hearing be given and proceedings be carried on in their usual leisurely way before thefts can be stopped? I do not think the legislature ever had any such intention, and I think it is very clear that it had not. I also think that if the court had such a case presently before it instead of the one pending, it would not hesitate to so hold. And yet if the requirement of a notice and hearing cannot be read into sec. 7 it cannot be read into sec. 8, the one with which we are concerned.

Sec. 8 of the act of 1849, being our present sec. 970, under which the governor acted in the instant case, provided that all officers, with certain designated exceptions, who are or shall be appointed by the governor with the advice and consent of the senate, may "for official misconduct or habitual or wilful

neglect of duty be removed by the governor upon satisfactory proofs at any time during the recess of the legislature."

The difference between secs. 7 and 8 in reference to the method of removal is one of verbiage only. Under sec. 7 the governor may remove on "*sufficient*" proofs and under sec. 8 on "*satisfactory*" proofs. The two words in this connection are practically synonymous and interchangeable. What is sufficient in the way of proof is ordinarily satisfactory, and what is satisfactory is sufficient. If this be not so, and there is a difference in the degree of proof required in the two cases, there is nothing in their use which indicates that a notice and hearing must be given in the one case and may be refused in the other. The proofs required must be sufficient or satisfactory to the governor and to no one else. They may be both sufficient and satisfactory and even conclusive without either notice or hearing. If the legislature had intended that notice and hearing should be required under sec. 8, it would have said so as it did in reference to all removals made under sec. 4 and as it did as to two of the three specified causes for removal under secs. 5 and 6. The matter of notice and hearing was present in the legislative mind when the original law was passed. The fact that they were required in some cases and omitted in others is proof conclusive that the legislature did not desire to require them in cases where they were not expressly provided for. In such a case silence is as plainly exclusion as the use of express words would be.

I can only read out of the law of 1849 the conclusion that sheriffs, district attorneys, coroners, registers of deeds, clerks of the courts when removed for official misconduct or wilful neglect of duty, and county clerks when removed for like causes, could only be removed on notice and hearing, because the legislature has said so in plain words, and that all other officers whose removal was provided for might be removed without notice or hearing, because the legislature carefully

refrained from requiring either. This latter statement is also true as to clerks of the courts and county clerks when removed for incompetency.

The scheme for removals was comprehensive and carefully worked out. As to elective and constitutional officers, safeguards were thrown around removals, with two exceptions. Clerks of the courts did their work under the eyes of the circuit judges, and when a judge became satisfied that a clerk was incompetent he might summarily remove him. Clerks of county boards did their work under the eyes of county boards, and such boards were empowered to summarily remove for incompetency. As to appointive offices created by the legislature, the power of removal as to all officers provided for in secs. 7, 8, and 9 was vested in the chief executive officer of the state. As to those provided for in sec. 10 the power of removal was vested in the legislature itself. Removals under secs. 7 and 8 could only be made on sufficient or satisfactory proofs. Removals under secs. 9 and 10 might be made at will without proofs and without notice. I think there is just as much reason for saying that a removal made under either of the two latter sections must be made on notice and hearing as there is for saying that notice and hearing is required under sec. 7 or sec. 8 or for removals for incompetency under secs. 5 and 6.

It is fair to assume that the legislature thought that a person who could be trusted to fill the office of governor could be trusted to deal fairly with officeholders whom he was empowered to appoint, and that cases might arise where prompt action was necessary for the public good, and that it was not wise to tie the hands of the governor when such action might well work to the detriment of the state. Governmental power must be vested somewhere, and the fact that it may be abused does not prove that the power must not be conferred. It would seem quite as logical to give a notice and hearing to

candidates for appointments before a selection is made as to require them in case of removal.

It has, I think, been the uniform practice of the legislature to expressly provide for a notice and hearing as a condition precedent to removal from office, where it was intended that no removal should be made without such notice and hearing.

By sec. 381, Stats., the board of regents of the state university have the power to remove the president or any professor, instructor, or officer of the university when in their judgment the interests of the university require it.

Sub. 3 of sec. 404 confers a like power on the board of normal school regents. This latter statute was construed in *Gillan v. Board of Regents,* 88 Wis. 7, 58 N. W. 1042, and it was held that the power of removal was plenary and could be made at pleasure and without cause.

Sec. 397 provides that any normal school regent may be removed for cause, *upon reasonable notice,* by a vote of two thirds of all of the regents.

Sec. 507 provides for the removal of school district officers, and that they must be removed on written charges which must be served on such officers, and can only be removed after a notice and hearing upon the charges.

Sec. 772a provides that the supervisor of assessment may be removed by the county board for incompetency, fraud, or wilful neglect of duty, on charges preferred and ten days' notice in writing of the hearing thereon, and that a copy of the charges must be served with the notice.

Sec. 925—36 provides for the removal of certain city officers by the common council. It expressly states that no such officer shall be removed except for cause, nor unless charges are preferred against him and opportunity given him to be heard in his defense.

Sec. 925m—309 provides for the removal of certain officers in cities operating under the commission form of government,

where such officers are elected by the council, and they may be removed by a majority of the members of the council. This statute requires neither cause, notice, nor hearing.

Sec. 976 provides for the removal of town officers and requires that removal be made only after notice and hearing.

Sec. 990—22 provides for the removal of persons in the employ of the state under the civil service law. The appointing officer is required to furnish his subordinate the reasons for removal and to allow him a reasonable time in which to make an explanation, and such reasons with the answer thereto are required to be filed with the civil service commission. The cause of the removal must be neither religious nor political.

This statute was construed in *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 122 N. W. 748, and it was held that the power of the removing officer was plenary so long as legal cause for removal was specified.

Sec. 975 provides for the removal of a county superintendent of schools. The statute requires it to be made on notice and hearing.

Secs. 1059a and 1059b provide for the removal of assessing officers and members of boards of review, and the following section provides that such removal be made after notice and hearing.

Sec. 1231 empowers the supervisors of a town to remove the superintendent of highways for neglect or refusal to perform his duties. It contains no requirement for either notice or hearing.

Sec. 1747—3 provides for the removal of grain and warehouse commissioners "for cause by the governor in the same manner as county officers may be removed."

Sec. 1747—30 provides for the removal of grain inspectors by the grain and warehouse commission whenever they have been guilty of any improper official act or are found to

be inefficient or incompetent.    The statute provides that in such case the removal may be immediately made.

Sec. 1797—1 provides for the removal of railroad commissioners and that such removal must be made on notice and hearing.

There are a number of other statutes which provide for removals, but these serve to illustrate that the legislature has had in mind the matter of requiring removals to be made on notice and hearing when it was considered desirable that they should be so made, and that in cases where neither notice nor hearing is provided for none need be given. *State ex rel. Wagner v. Dahl, supra.*

In the very first case which arose in this state under a statute like our sec. 970, Chief Justice Dixon, speaking for the court, stated clearly and concisely just what the power was of the body in which the right to remove was vested. The board of supervisors of Milwaukee county removed the inspector of the house of correction during his term, which was fixed by law at two years. The board was authorized to remove for "incompetency, improper conduct, or other cause satisfactory to said board." The court held that the words "other cause satisfactory to said board" meant a kindred cause, so that in fact the statute permitted a removal for incompetency, improper conduct, *and other like causes.* The statute was silent in reference to giving a notice and hearing to the accused official. McGarry insisted that he was entitled to have the removal proceedings carried on in a judicial way, and that the order of removal was void because this had not been done. Unsworn statements prejudicial to the accused were received and the right of cross-examination was denied. If a hearing means anything, it means that the right to cross-examine exists. The court disposed of the contentions made

in the only logical way in which they could be disposed of in the following language:

"That part of the answer in which it is alleged that persons were examined and made statements before the board touching the charges made against the defendant, but without being sworn as witnesses, and that the defendant was not permitted to cross-examine them, is also irrelevant. It was certainly very proper for the board to notify the defendant of their intended proceedings, and to allow him to appear and take part in them, and to produce and examine witnesses, which it seems he did do; but the board was not bound to do so. *It might have proceeded to order his removal ex parte, and without notice to him, and without any examination of witnesses, formal or otherwise;* and if it could have done that, then it could dispense with the oath to those persons who were examined, or refuse to allow the defendant to cross-examine. The most that can be said of it is, that it was a refusal to extend to him the same degree of consideration and favor which was shown when he was notified to appear and permitted to examine witnesses in his own behalf. The justice or injustice of the proceeding are not matters which can be examined here." *State ex rel. Kennedy v. McGarry,* 21 Wis. 496.

I cannot think that there is any such difference between the statute involved in the *Kennedy Case* and the one involved in the present case as would justify the placing of a different construction on the latter from what was placed on the former. Sec. 970 provides for removal for official misconduct and for wilful or habitual neglect of duty. The statute in the *McGarry Case* provided for removal for incompetency, improper conduct, and other like causes. Sec. 970 provides that the removal must be on proof satisfactory to the governor. The other law contained no such provision. But, as already stated, proof satisfactory to the governor does not mean proof taken after a notice is given and a hearing is had. The notice and hearing that is required by many statutes is for the protection of the officer, not for the informa-

tion of the governor.  That officer is the sole judge of what proofs are satisfactory to him and as to the manner in which they shall be taken, unless the statute otherwise provides.

The other cases in this court dealing with the question are in entire harmony with the *McGarry Case*.  A review of them will be found in *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 122 N. W. 748.  I think the case of *Nehrling v. State ex rel. Thal,* 112 Wis. 637, 88 N. W. 610, is in harmony with the other decisions of this court.  Under the statute there involved a removal might be made for "misdemeanor, incompetency, or inattention to the duties" of the office.  The statute was silent as to how the proceeding should be carried on.  The plaintiff was permitted to be heard, but made pretty much the same complaint about the character of the hearing that McGarry did in his case.  The court said: "The act nowhere requires or suggests that any witness shall be produced, much less sworn and examined, in the investigation resulting in such removal.  The act seems to contemplate a summary investigation by the trustees,—of course giving such official an opportunity to be heard."  This last clause is clearly *obiter* and is no less clearly ill considered and inconsistent with what precedes it.  An investigation is not summary where a party is given an opportunity to be heard, and giving such an opportunity is wholly inconsistent with the idea that the party may not produce or swear witnesses in his behalf.

The discussion on this branch of the case has already been carried to too great a length.  Under what I believe to be a fair construction of sec. 970, I do not think the plaintiff is entitled as of right to a notice and hearing, no matter to what extent fairness would demand it in the instant case.  The question is one for the legislature to settle and not the courts.  The decisions of this court I think fully justify my interpretation of the statute.  This case should not be confounded

with cases involving property or vested rights, such as the *Chittenden Case (State ex rel. Milwaukee Med. College v. Chittenden)* 127 Wis. 468, 107 N. W. 500.

Where the law confers the administrative duty upon an officer to remove another from office for a specified cause or causes, and no provision is made for a review of his decision on the questions of fact involved, such conclusion is final, and the only judicial question is whether the cause assigned was a legal cause. *State ex rel. Kennedy v. McGarry,* 21 Wis. 496; *State ex rel. Gill v. Watertown,* 9 Wis. 254; *State ex rel. Willis v. Prince,* 45 Wis. 610; *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 122 N. W. 748; *State ex rel. Davern v. Rose,* 140 Wis. 360, 122 N. W. 751; *State ex rel. Cook v. Houser,* 122 Wis. 534, 100 N. W. 964; *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 64 N. W. 304; *State ex rel. Coffey v. Chittenden,* 112 Wis. 569, 88 N. W. 587; *State ex rel. Durner v. Huegin,* 110 Wis. 189, 85 N. W. 1046.

If notice and hearing were not required in the instant case, the only question which the court could inquire into was whether or not the cause for removal specified in the order was a lawful one.

Where the governor removes an officer and assigns a statutory cause for removal, the courts will not place him on trial in reference to the motives which actuated him and will not pass upon his bad faith or alleged arbitrary action in making the removal. Where a co-ordinate department of government performs an authorized duty, the courts have no more right to impugn the motives which actuated such department than would the department in question have the right to impugn the motives of this court in deciding a case which properly came before it. This was decided at an early day in reference to the legislative department of government in *Fletcher v. Peck,* 6 Cranch, 87, and has never been departed from by the courts. It was also decided at an early day in this court

in reference to the governor, in *Att'y Gen. ex rel. Taylor v. Brown*, 1 Wis. 513, 522, where it is said:

"But it would be alike unbecoming and unwarranted on our part to inquire into the motives of the governor in the exercise of a discretion given to him alone, in any case. He is responsible for his acts in such case, not to the courts, but to the people; and whenever experience shall have demonstrated the impolicy or impropriety of clothing the chief executive officer of the state with a power of removing inferior officers, at his discretion, or 'when he shall believe the best interests of the state demand such removal,' it may then be the time for the people, in whose hands alone is the remedy, to eradicate the supposed evil. But courts are created to construe the laws as they are, not to declare what they should be.

"It is no part of our duty to impugn the action of the governor in such a case, but on the contrary, we are bound to hold him justified in whatever conclusion he may have formed. In this case, therefore, whatever may have influenced the executive in the removal of Mr. Taylor, has no claim to our attention; it is wholly foreign to the question before us, and can have no bearing upon it."

The case is an important one, dealing as it does with the power of a co-ordinate department of the government. It would be more satisfactory if the decision could be made by a unanimous court. The case has been very fully considered and no doubt each member of the court has given it the best thought and study he is capable of. I cannot bring myself to see the law as does the majority of the court, and duty impels me to say so and to refuse to assume responsibility for the decision reached. I have not sought to follow or discuss the reasons or arguments contained in the elaborate opinion of the court. I simply desire to state my own reasons in my own way for reaching the conclusion that the order appealed from should be affirmed.

I may be wrong, but it seems to me that the opinion of the court ruthlessly slaughters a number of our decisions in or-

der to reach the conclusion arrived at.   To be sure the de-
cisions are not expressly overruled, but they are limited,
qualified, and misconstrued so that their authors would
hardly recognize them.   I refer particularly to the cases of
*Att'y Gen. ex rel. Taylor v. Brown,* 1 Wis. 513; *State ex rel.
Kennedy v. McGarry,* 21 Wis. 496; *State ex rel. Willis v.
Prince,* 45 Wis. 610; *La Pointe v. O'Malley,* 46 Wis. 35, 50
N. W. 521; *State ex rel. Jones v. Oates,* 86 Wis. 634, 57 N.
W. 296; *State ex rel. Starkweather v. Superior,* 90 Wis. 612,
64 N. W. 304; *Ward v. Sweeney,* 106 Wis. 44, 82 N. W.
169; and *State ex rel. Wagner v. Dahl,* 140 Wis. 301, 303,
122 N. W. 748.   Any one who has sufficient curiosity to draw
a parallel between what is said in reference to the *Stark-
weather Case* in the present decision and what was said by
the same learned judge in reference to it in *State ex rel. Cook
v. Houser,* 122 Wis. 534, at pages 574, 575, 576, and 581
(100 N. W. 964), will understand what I mean.   The case
of *Dullam v. Willson,* 53 Mich. 392, 19 N. W. 112, is glori-
fied in the opinion, and it is said that the opinion in the
*Starkweather Case* when carefully read is in harmony with
it.   The present chief justice in writing the opinion for the
court in the *Starkweather Case* did not seem to think so, be-
cause the court utterly repudiated its doctrines and declined
to follow it.   To do otherwise would have been fatal to the
respondent's case.   The entire court entertained this opinion
at the time.

As before stated, I do not care to go into an analysis of
the court's opinion.   There are many propositions stated in
it with which I am in accord.   There are many others which
I cannot assent to.   I summarize my own conclusions as fol-
lows:

1. The certificate of appointment held by *Mr. Anderson*
gave him the *prima facie* right to the office of insurance com-

missioner and the right to its possession until the *de jure* title was settled.

2. Upon its production it was *Mr. Ekern's* duty to vacate the office under protest and commence an action to try title to the office.

3. An injunction should not issue against the person having the *prima facie* right to the office, nor in any event in favor of the incumbent except on a clear showing that he had the better title to the office.

4. Where an injunction is sought in such a case the court will inquire into the merits of the case as disclosed by the motion papers to ascertain whether the party in possession is clearly entitled to the office.

5. An office created by the legislature is not property, and the right to hold it is not a vested one.

6. The legislature may prescribe any method of removal from such an office it sees fit, and a removal made by the prescribed method is due process of law.

7. Where no provision of the constitution or of statute law requires that notice and hearing be given before a removal can be made, neither notice nor hearing is a necessary condition precedent to a valid removal.

8. It was clearly the intention of the legislature when it enacted what is now sec. 970, Stats., that the governor might remove the officers whom he was thereby authorized to remove without notice or hearing.

9. When the determination of a question of this kind is vested in some tribunal other than the courts, and no appeal from or review of the decision reached is provided for by statute, such decision is final and conclusive, if such tribunal acts within its jurisdiction.

10. The only inquiry left open to the courts in this proceeding is whether the cause assigned for removal is one for which the statute authorizes a removal to be made. If it

was, the governor acted within his jurisdiction in making it, no matter how grievously he might err in judgment.

11. The order of removal in this case assigns a statutory cause for removal, and it is therefore conclusive on the courts.

12. Injunction will not lie against a co-ordinate and equal branch of the government, and neither will the courts inquire into the motives of the legislature or the governor in performing an official act.

I do not wish to be understood as assenting to everything in the opinion of the court not covered by the foregoing propositions. I simply set forth the salient points on which I base my conclusion.

WINSLOW, C. J. (*dissenting*). I fully agree with Mr. Justice BARNES. I think he states accurately the law as it is, or rather the law as it was before the decision of this case.

If I could agree with my brethren of the majority that sec. 970, Stats., requires notice and hearing, I should have no doubt that the attempted removal was wrongful because of the absence of sufficient notice and hearing. I cannot, however, so construe sec. 970, for the reasons stated by Judge BARNES.

I wish to add a few words of a general nature. I am no worshiper of precedents. I have joined in the slaughter of precedents on numerous occasions and felt that I was rendering good service to the commonwealth. Nor do I attribute any special sanctity to decisions in which the opinions have come from my own hand. If they be wrong in principle or have outworn their usefulness owing to changed conditions or increasing knowledge, let them have short shrift.

*State ex rel. Jones v. Oates,* 86 Wis. 634, 57 N. W. 296, and *State ex rel. Starkweather v. Superior,* 90 Wis. 612, 64 N. W. 304, are no more my progeny than they are the progeny of the entire court, except that I was chosen to cut and fit

their verbal clothing. I shall have some difficulty in recog-
nizing them in the future in the new garb in which they are
henceforth to appear, but doubtless I shall become accustomed
to the change. I confess that it had never occurred to me as
possible that the *Starkweather Case* and the case of *Dullam
v. Willson,* 53 Mich. 392, 19 N. W. 112, could be harmon-
ized. I should have said that it was impossible. However,
one can hardly refuse to believe when confronted by the ac-
tual fact. The accomplishment of this remarkable result
seems to demonstrate that the word "fail" is no more entitled
to recognition in the lexicon of age than in the lexicon of
youth.

The most serious infirmity in the decision in this case, as
I regard it, is, not that it refuses to follow precedent, but
that it is really a step backward—a signal to retreat rather
than to advance. The present case is a case where a very im-
portant state office is at stake, but the principles decided ap-
ply as well to every ministerial officer however insignificant
whose removal is provided for by a statute similar to sec.
970, and there are many of them. Every such officer is by
this decision fortified and entrenched in his office. Proceed-
ings to remove him on the part of his superior will be of
little avail so far as immediate results are concerned. If he
can persuade a court that he is acting in good faith, he can
practically deny the power of his superior to remove him and
remain in his office for months while the necessary slow pro-
cesses of the law in circuit and supreme court are reaching
a result. The arm of the superior officer will be rendered
nerveless, and the man who is charged with responsibility for
results will have practically no certain means of achieving re-
sults because unable to command efficient service from his sub-
ordinates. Such is not the genius of the democracy of to-
day, much less of the democracy of the future. That democ-
racy will unquestionably elect a few men as the heads of its
various departments, and demand of them results. While

making this demand it will perforce give those heads full power to remove subordinates. That democracy will cease to attempt the impossible task of electing every minor official by vote of the people, but will adopt the short ballot, elect a few men to the important positions, invest them with plenary authority over their subordinates, and demand in return efficiency of service in each department. The subordinate official entrenched in an office from which he cannot be removed save by judicial trial will in my judgment disappear. The head of the department will be responsible to the people, the subordinate in the department will be responsible to the head. Thus the people will retain their power by retaining control of the head, not by attempting the impossible task of selecting fit occupants of all the subordinate governmental positions.

And so I say that this decision is a step backward; it tends to hamper the responsible heads of departments of the government; it seeks to return to the exploded idea that there is some private property right in an office, whereas the true idea is that it is simply an opportunity to serve the state.

The idea that some designing man will build up a despotism on the ruins of our liberties, if he be given the right of removal from office without notice or hearing, cannot be seriously entertained. There is no such danger in these days. It is the merest myth. The danger is rather that the responsible head of a governmental department will not have authority enough over his working force to perform the duties which the people have placed upon him and for the performance of which he is directly responsible. For this reason I regard the present decision as an unfortunate step in the wrong direction. I have no fear that it will have any very serious results; the legislature can always provide in express terms for removal without hearing, and doubtless will do so more and more as time goes on and the true theory of efficient government becomes more fully understood.